IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| KATHY BARNETTE and CLAY D. BREECE, | : |
| | : |
| Plaintiffs, | :    NO. 2:20-cv-05477 |
| | : |
| v. | : |
| | : |
| KENNETH E. LAWRENCE, VALERIE ARKOOSH, | : |
| MD, MPH, and FRANK DEAN, | : |
| | : |
| Defendants. | : |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

Plaintiffs ask this Court to disenfranchise Montgomery County voters who allegedly made technical errors when they submitted their mail-in or absentee ballots, and then were permitted to correct those mistakes at county board of elections offices. Because Plaintiffs lack standing to pursue their challenge and because their constitutional claim is deficient, the Court should dismiss the Complaint with prejudice.

## PROCEDURAL BACKGROUND

On the morning of Election Day, Plaintiffs filed a Complaint challenging the Montgomery County Board of Elections' decision to permit voters to correct errors with their mail-in or absentee ballot envelopes. According to Plaintiffs, the Board violated the Equal Protection Clause of the U.S. Constitution because voters in Montgomery County were permitted to make corrections, while voters in some other counties were not. Among other things, Plaintiffs request that the Court order that the affected ballots in Montgomery County be spoiled.

Shortly thereafter, Plaintiffs filed a Motion for Temporary Restraining Order, asking that the ballots at issue be segregated and not counted. The Court then held a hearing and oral

1

argument on Plaintiffs' TRO request, before granting Plaintiffs leave to file a supplemental memorandum in support of the TRO motion. Plaintiffs' supplemental memorandum discusses, at length, the purported merits of Plaintiffs' Complaint, including Plaintiffs' theory of Article III standing and their argument that Defendants have violated the Fourteenth Amendment. (ECF 32.) Within hours of filing their supplemental brief, however, Plaintiffs sought leave from the Court to withdraw the TRO motion, which the Court granted. All that remains is Plaintiffs' Complaint.

## FACTUAL BACKGROUND

The Election Code gives each county board of elections, among other "powers and duties," the power to "make and issue such *rules, regulations and instructions*, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 Pa. C.S. § 2642 (emphasis added). Separately, the Pennsylvania Constitution imposes a uniformity requirement on Pennsylvania "*laws* regulating the holding of elections by the citizens, or for the registration of electors." Pa. Const. art. VII, § 6 (emphasis added). "[R]ules, regulations and instructions" are not "laws" and therefore are not subject to Article VII, Section 6.

Under the Election Code, there are three general stages in which county boards of elections' process absentee and mail-in ballots.

First, ballots arrive at the county board of elections.

Second, before Election Day and before absentee and mail-in ballots are canvassed (*i.e.*, reviewed and counted), the Code requires county board of elections staff to conduct some type of manual review of each and every absentee and mail-in ballot and make a record that the ballot has been submitted: "The district register at each polling place shall clearly identify electors who have received and voted absentee ballots as ineligible to vote at the polling place, and district

2

election officers shall not permit electors who voted an absentee ballot to vote at the polling place." 25 Pa. C.S. § 3146.6(b)(1); 25 P.S. § 3150.16(b)(1) (stating same for mail-in ballots). The only way for the district register to include information about absentee and mail-in voters who have already voted is for staff to review absentee and mail-in ballots before pre-canvassing and canvassing, which may start on Election Day.

In Montgomery County, as alleged in the Complaint, the Board of Elections has instructed its staff to utilize its manual review not only to determine that a voter has cast her absentee or mail-in ballot, but also to identify "any defects such as defects in declarations or a missing inner envelope also known as a 'secrecy envelope.'" Compl. ¶ 17. If a staff member conducting the manual review identifies a defect with a ballot's declaration or secrecy envelope and the Board of Elections has contact information for the voter who submitted the ballot, the voter is "given the opportunity to correct their declaration or [the Board of Elections] will provide [the voter] with a secrecy envelope[.]" *Id. ¶* 18.

Third and finally, on or after Election Day, ballots are pre-canvassed and canvassed, in a process that is totally separate and distinct from the above-described manual review. *See* 25 Pa. C.S. § 3146.8(g)(1.1), (2). Pre-canvassing is "the inspection and opening of all envelopes containing official absentee ballots or mail-in ballots, the removal of such ballots from the envelopes and the counting, computing and tallying of the votes reflected on the ballots." 25 Pa. C.S. § 2602 (q.1). Canvassing is "the gathering of ballots after the final pre-canvass meeting and the counting, computing and tallying of the votes reflected on the ballots." § 2602(a.1).

The Election Code also imposes salutary requirements affecting absentee ballots and mail-in ballots, including for ballot security:

> The county boards of election, upon receipt of official absentee ballots in sealed official absentee ballot envelopes as provided under this article and mail-in ballots

> as in sealed official mail-in ballot envelopes as provided under Article XIII-D,
> shall safely keep the ballots in sealed or locked containers until they are to be
> canvassed by the county board of elections

§ 3146.8(a).[1] The storage requirement must be read in conjunction with the processing requirements discussed above, and in particular the county boards of elections' obligation to manually review ballots to update district registers. *See* §§ 3146.6(b)(1); 3150.16(b)(1). Manual review must, necessarily, precede storage of the ballots in "sealed or locked containers," to the extent that sealed or locked containers are something other than locked, monitored board of elections offices.

## ARGUMENT

Plaintiffs' claim has two independent, equally fatal, flaws. First, Plaintiffs lack Article III standing because they have not suffered an injury-in-fact. Second, Plaintiffs' constitutional claim fails for multiple reasons, including that the claim is premised entirely on a violation of state law, Plaintiffs' construction of state law is incorrect, and enfranchising voters does not implicate equal protection.

## I.      Plaintiffs Lack Article III Standing

Plaintiffs fail to establish the "irreducible constitutional minimum of standing," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992), which requires a plaintiff to demonstrate the now-familiar elements of injury in fact, causation, and redressability. *See id.* at 560-61.

### A.      Plaintiffs Did Not Suffer an Injury-In-Fact

Individual voters do not have standing to pursue injuries that are felt equally by all voters. "[W]hen the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of

---

[1]      The phrase "sealed or locked containers" is not defined in the Election Code.

jurisdiction." *Berg v. Obama*, 586 F.3d 234, 239 (3d Cir. 2009) (quoting *Warth v. Seldin*, 422

U.S. 490, 499 (1975)). In *Berg*, the plaintiff's "status as a voter did not provide him standing"

because the plaintiff "shared both his 'interest in proper application of the Constitution and

laws,' and the objective uncertainty of Obama's possible removal, *pari passu* with all voters; and

the relief he sought would have 'no more directly and tangibly benefited him than the public at

large.'" *Id.* at 240 (quoting *Lujan*, 504 U.S. at 573-74). Plaintiffs' claim of voter standing is in

direct contravention of *Berg*; neither Plaintiff asserts that they personally were not able to vote

because of the Montgomery County Board of Elections' actions. This dooms Plaintiffs' claim.

Indeed, multiple federal courts have rejected similar theories of voter standing in recent weeks

and months. *See, e.g.,*, *Donald J. Trump for President, Inc. v. Cegavske*, No. 20-1445, --- F.

Supp. 3d ----, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) (assuming *arguendo* that

challenged statute would result in counting of invalid votes, "plaintiffs' claims of a substantial

risk of vote dilution 'amount to general grievances that cannot support a finding of particularized

injury as to [p]laintiffs'"); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020)

("Plaintiffs' purported injury of having their votes diluted due to ostensible election fraud may be

conceivably raised by any Nevada voter" and "therefore does not satisfy the requirement that

Plaintiffs must state a concrete and particularized injury" (citing cases)); *accord, e.g.*, *Nolles v.

State Comm. for the Reorg. of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) ("generalized

grievance shared in common by all [Nebraska] voters" does not confer standing); *see also*

*League of Women Voters of Va. v. Va. State Bd. of Elections*, 458 F. Supp. 3d 460 (W.D. Va.

2020) (denying intervention as of right because plaintiffs' alleged "interest in protecting [their]

right [to vote] from dilution or debasement[] is no different as between any other eligible

Virginian").

Plaintiff Barnette's theory of candidate standing fares no better. The prohibition on generalized grievances applies with the same force to her as any other plaintiff. Just last week, in *Hotze v. Hollins*, No. 20-03709, 2020 WL 6437668 (S.D. Tex. Nov. 2, 2020), a district court rejected a similar theory of candidate standing where the alleged injury applied equally to ***all candidates*** because the candidates' "lack of a particularized grievance is fatal to their claim under the Equal Protection Clause." *Id.* at *1. The candidates' "general claim that Harris County's election is being administered differently than Texas's other counties d[id] not rise to the level of the sort of particularized injury that the Supreme Court has required for constitutional standing in elections cases." *Id.* The Fifth Circuit Court of Appeals summarily affirmed. *See* Order, *Hotze et al. v. Hollins*, No. 20-20574 (5th Cir. Nov. 3. 2020) (Document 00515623683).

Nor does a candidate's speculation that she ***might*** have been adversely affected by an election law or procedure—*e.g.*, that she might have gotten more votes absent the procedure—confer standing. It is well settled that such a speculative injury, which depends on the hypothetical actions of independent third parties (*i.e.*, voters), cannot confer standing. In the previous few weeks, two of this Court's sister courts, in the Western and Middle Districts of Pennsylvania respectively, applied exactly this rule. In *Bognet v. Boockvar*, No. 20-215, 2020 WL 6323121 (W.D. Pa. Oct. 28, 2020), the court held the plaintiff candidate lacked standing because "for the alleged harm to actually occur, more votes which otherwise would not have been counted must be cast in favor of Bognet's opponent than in his favor, otherwise he would benefit, not be harmed by those ballots. Further, the number of ballots cast in favor of his opponent would have to be sufficient to change the results of the election in order for Bognet to have been harmed. The Court finds that the alleged harm is conjectural and hypothetical,

insufficient to establish standing." *Id.* at *3. Likewise, in *Pennsylvania Voters All. v. Ctr. County*, No. 20-01761, 2020 WL 6158309 (M.D. Pa. Oct. 21, 2020), the court rejected candidate standing premised on speculation, because "[t]he implication that increased voter turnout is inherently beneficial to progressive candidates is dubious at best. And the Court finds this assumption far too dependent on the actions of tens, if not hundreds, of thousands of voters to premise standing. As a result, the Court finds that Plaintiffs' injuries are too speculative and not sufficiently imminent to support standing." *Id.* at *6. The same principle applies with equal force after an election where, as here, the candidate has not alleged that she lost votes that she would have otherwise gotten (let alone that the election would have had a different outcome had she gotten those votes).

### B.      Plaintiffs Cannot Establish Third-Party Standing on Behalf of Other Voters

Plaintiffs also cannot assert third-party standing on behalf of other voters who actually may have been affected by the County Board of Elections' instructions regarding absentee and mail-in ballots. The general prohibition against third-party standing "'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy,' and it assures the court that the issues before it will be concrete and sharply presented." *Sec. of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 955 (1984) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)); *accord Gen. Instrument Corp. of Delaware v. Nu-Tek Elecs. & Mfg., Inc.*, 197 F.3d 83, 87 (3d Cir. 1999) ("These requirements are designed to 'limit access to the federal courts to those litigants best suited to assert a particular claim.'" (quoting *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985)).

Plaintiffs attempt to fit their claim into a narrow exception to this rule. The Supreme Court has permitted third-party standing in only limited instances, by "requiring that a party

seeking third-party standing make two additional showings. First, [the Court has] asked whether the party asserting the right has a 'close' relationship with the person who possesses the right. Second, [the Court has] considered whether there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (citation omitted). Plaintiffs argue that a candidate can assert third-party standing using the exception by asserting the rights of "those who wish to vote for him." (ECF 32 at 9 (citing *Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973); *Torres-Torres v. Puerto Rico*, 353 F.3d 79 (1st Cir. 2003).) But neither *Mancuso* nor *Torres-Torres* applies here. Both cases dealt with candidates' ballot access and the harm to voters who wished to be able to cast a vote for the plaintiff candidate. *See Torres-Torres*, 353 F.3d at 82 ("Ballot-access cases typically involve both a First Amendment claim (involving the associational and voting rights of candidates and their supporters) and an equal protection claim (challenging a classification between groups of candidates)."); *Mancuso*, 476 F.2d at 190 ("[W]e believe that both candidates and voters may challenge on its face on equal protection grounds a candidacy restriction[.]"). The same is true of *Bullock v. Carter*, 405 U.S. 134 (1972), which involved a challenge to Texas's filing fee for candidates. *Id.* at 136.

This case does not involve ballot access or a restriction on candidacy. Nor do Plaintiffs identify any close interests that they share with voters or any reason that voters could not raise their claims themselves, as required by *Kowalski*. In analogous cases, where candidates seek to assert third party standing on behalf of voters who suffered an alleged injury during an election, courts have rejected candidates' attempts to invoke third-party standing on behalf of voters outside of the ballot-access context. *See Somers v. S.C. State Election Comm'n.*, 871 F. Supp. 2d 490, 497–98 (D.S.C. 2012) ("Even assuming Somers has sufficiently alleged that some UOCAVA Voters may be injured by the State's mailing of separate federal and state ballots to

UOCAVA Voters, Somers has not established that she is entitled to assert the interests of

UOCAVA Voters in this action. She has not alleged a close relationship to any UOCAVA Voter.

She has not shown that any UOCAVA Voter wishes to assert his or her rights and is unable to

bring this action.") This Court should follow suit.

II.     **Plaintiffs Have Not Stated a Claim Under the Equal Protection Clause of the Fourteenth Amendment**

Even if Plaintiffs have Article III standing—they do not—their constitutional claim fails

as a matter of law. Plaintiffs' Equal Protection Clause claim is an ill-fitting nesting doll. The

outer shell of their claim is that Defendants violated the Election Code by (1) manually

reviewing absentee and mail-in ballots and then (2) permitting voters whose ballots were

accompanied by potential deficiencies to cure those deficiencies. *See, e.g.*, Compl. ¶¶ 17, 40.

Underneath that layer, Plaintiffs assert that because the Montgomery County Board of Elections

is violating the Election Code but other counties are not, Montgomery County is valuing some

voters' votes differently from other persons' votes, in violation of *Bush v. Gore*, 531 U.S. 98

(2000). *See* Compl. ¶¶ 30-31, 39. Plaintiffs' theories, however, do not stack together to form a

permissible constitutional claim.

In *Lafayette Linear v. Village of University Park, Illinois*, 887 F.3d 842 (7th Cir. 2018),

the Seventh Circuit Court of Appeals asked of a similar claim, "if the core dispute concerns state

law, why is this case in federal court?" *Id.* at 843 (rejecting purported constitutional claims

premised on state law violations). As in *Lafayette Linear*, the answer is that Plaintiffs' claim

does not belong here. "[A] violation of a state statute alone is not cognizable under [42 U.S.C.] §

1983" (which provides the purported cause of action for Plaintiffs' federal constitutional claims)

"because § 1983 is only a remedy for violations of federal statutory and constitutional rights."

*Woodard v. Andrus*, 419 F.3d 348, 353 (5th Cir. 2005); *accord D.R. v. Middle Bucks Area*

*Vocational Tech. Sch.*, 972 F.2d 1364, 1375 (3d Cir. 1992). As Judge Ranjan in the Western

District of Pennsylvania recently stated in dismissing an equal protection claims premised

entirely on purported violations of state law:

> The problem with [Plaintiffs'] theory is that there does not appear to be any law to
> support it. Indeed, if this were a true equal-protection problem, then it would
> transform every violation of state election law (and, actually, every violation of
> every law) into a potential federal equal-protection claim requiring scrutiny of the
> government's "interest" in failing to do more to stop illegal activity. This is not
> the law. To the contrary, it is well-established that even violations of state election
> laws by state officials, let alone violations by unidentified third parties, do not
> give rise to federal constitutional claims except in unusual circumstances.

*Donald J. Trump for Pres., Inc. v. Boockvar*, No. 20-966, 2020 WL 5997680, at *46 (W.D. Pa.

Oct. 10, 2020). Plaintiffs' claim—that one county's violation of state law as compared to another

county's compliance with state law violates the constitution—is precisely the type of theory that

courts have repeatedly rejected. This Court should reject Plaintiffs' theory as well.

Beyond Plaintiffs' impermissible theory of a constitutional claim, Plaintiffs are also

wrong, as a matter of law, that the Montgomery County Board of Elections violated the Election

Code and wrong that *Bush v. Gore* applies.

### A.    The Montgomery County Board of Elections' Instructions for Conducting Manual Review and Curing Are Fully Consistent with the Election Code

The Election Code gives county boards of election authority to "make and issue such

rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the

guidance of voting machine custodians, elections officers and electors." § 2642(f). Here,

Plaintiffs argue that the Montgomery County Board of Elections' instructions to staff regarding

manual review of ballots for potential deficiencies and its instructions to voters regarding curing

those deficiencies violate the Election Code. *See* Compl. ¶17. The question, therefore, is

whether, under the authority delegated by the General Assembly to the county boards of election,

the Montgomery County Board of Elections' instructions are "not inconsistent with" the other provisions of the Election Code. *See* 25 Pa. C.S. § 2642(f).

      1.    <u>The Montgomery County Board of Elections' Manual Review of Ballots Is Consistent With the Election Code</u>

The Election Code presupposes that county boards of elections will manually review absentee and mail-in ballots ***before*** pre-canvassing and canvassing. *See* §§ 3146.6(b)(1); 3150.16(b)(1). The Election Code provision on which Plaintiffs rely to suggest that review before pre-canvassing is prohibited, § 3146.8, is in fact silent regarding a county board of elections' ability to manually review absentee and mail-in ballots before pre-canvassing. *See* § 3146.8(g)(1.1), (2). Additionally, because manual review before pre-canvassing is a necessary component of the Election Code, which requires reviewing ballots to prepare district registers before Election Day, *see* §§ 3146.6(b)(1); 3150.16(b)(1), a board of elections' manual review of ballots must occur before it can begin "keep[ing] the ballots in sealed or locked containers[.]" § 3146.8(a)(1). Thus, the storage requirement does not yet apply when the Montgomery County Board of Elections conducts its manual review of ballots, including the ballots at-issue in Plaintiffs' Complaint. *See*, *e.g.*, Compl. ¶ 17.

      2.    <u>The Montgomery County Board of Elections' Cure Procedures Are Consistent with the Election Code</u>

Just as Plaintiffs cannot point to anything in the Election Code that forbids manual review of ballots before pre-canvassing, nothing in the Election Code prohibits notifying voters whose absentee and mail-in ballots are potentially deficient to give those voters an opportunity to cure those deficiencies. *See* § 3146.8. Indeed, Plaintiffs do not point to anything in the Code at all. Plaintiffs instead truncate a portion of the Supreme Court's decision in *In re November 3, 2020 General Election*, 149 MM 2020, --- A.3d ----, 2020 WL 6252803 (Pa. Oct. 23, 2020), to try to create the illusion that curing is prohibited under the Code. They assert that, "[u]nlike in-person

voters, mail-in or absentee voters are not provided an opportunity to cure perceived defects in a

timely manner." Compl. Introduction & ¶ 20 (citing 2020 WL 6252803, at *6). But the full quote

shows that the Court was merely describing a federal court judge's observation that the Election

Code lacks an affirmative cure requirement:

> Judge Ranjan also considered the effect of interpreting Section 3146.8(g)(3) to
> *require* signature comparison. In his view, doing so would create a risk that voters
> would be disenfranchised, given that mail-in and absentee ballots are kept
> securely stored until election day when the pre-canvassing process begins, and ***the
> Election Code contains no requirement that voters whose ballots are deemed
> inadequately verified be apprised of this fact***. Thus, unlike in-person voters,
> mail-in or absentee voters are not provided any opportunity to cure perceived
> defects in a timely manner.

*In re November 3, 2020 Gen. Election*, 2020 WL 6252803, at *6 (emphasis added). The

Pennsylvania Supreme Court has not gone further to hold that the Election Code forbids curing,

however. *See Pennsylvania Democratic Party v. Boockvar*, 133 MM 2020, --- A.3d ----, 2020

WL 5554644, at *19-20 (Pa. Sept. 17, 2020) ("Boards are not ***required*** to implement a 'notice

and opportunity to cure' procedure for mail-in and absentee ballots that voters have filled out

incompletely or incorrectly." (emphasis added)). Instead, the Supreme Court impliedly left to the

counties the decision whether to cure absentee and mail-in ballots.

        3.    <u>The Montgomery County Board of Elections' Instructions for Conducting
Manual Review and Curing Are Consistent with the Purpose of the
Election Code and Act 77</u>

The Court should not countenance Plaintiffs' proposed statutory construction based on

implication-by-omission. Because the Election Code is, at worst, silent about whether the at-

issue practices are or are not permitted, the Court should follow Pennsylvania's instruction to

"turn to interpretive principles that govern ambiguous statutes generally and election matters

specifically[,]" i.e., "be mindful of the 'longstanding and overriding policy in this

Commonwealth to protect the elective franchise.'" *Id.* at *9 (quoting *Shambach v. Bickhart*, 845

A.2d 793, 798 (Pa. 2004)). "[A]lthough election laws must be strictly construed to prevent fraud, they ordinarily will be construed liberally in favor of the right to vote. Indeed, [courts'] goal must be to enfranchise and not to disenfranchise [the electorate]. Lastly, in resolving statutory ambiguity, [courts] may consider, *inter alia*, the occasion and necessity for, the mischief to be remedied by, and the object to be obtained by the statute." *Id.* (citations and quotations omitted).

In *Pennsylvania Democratic Party*, the Pennsylvania Supreme Court held that, even though the Election Code was ambiguous and did not explicitly permit the return of mail-in and absentee ballots via drop-box, that procedure was consistent with the Election Code's call to enfranchise voters and the "clear legislative intent underlying Act 77," which enacted vote-by-mail for all Pennsylvanians. *Id.* at *5-10 (holding drop-boxes were legal under Election Code although "neither th[e] statutory language nor any other provision of the Election Code explicitly empowers a county board of election to establish satellite mail-in ballot collection facilities or to utilize secure drop-boxes for purposes of accepting hand-delivered mail-in ballots").

Here, the Court should also construe the Election Code in favor enfranchisement, holding that permitting manual review and curing absentee and mail-in ballots before pre-canvassing is permissible under the Election Code. As described by the Pennsylvania Supreme Court, "in expanding voting by mail, the legislature sought to streamline the process for canvassing such ballots …." *In re November 3, 2020 Gen. Election*, 149 MM 2020, 2020 WL 6252803, at *14 (Pa. Oct. 23, 2020). Simply put, "[t]he law … militates in favor of this Court construing the Election Code in a manner consistent with the view of [the Montgomery County Board of Elections], as this construction of the Code favors the fundamental right to vote and enfranchises, rather than disenfranchises, the electorate." *Pennsylvania Democratic Party*, 2020 WL 5554644, at *9.

**B.**     **Neither Dillon's Rule Nor the Elections Clause of the United States Constitution Prohibit the Montgomery County Board of Elections' Election Instructions**

Plaintiffs are wrong to rely on Dillon's Rule and the Elections Clause here. Dillon's Rule states that "[m]unicipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature." *Pennsylvania Rest. and Lodging Assn. v. City of Pittsburgh*, 211 A.3d 810, 816 n.3 (Pa. 2019). Here, Plaintiffs do not (because they cannot) allege that the Montgomery County Board of Elections is a municipal corporation. That, in and of itself, renders Dillon's Rule inapplicable. Municipal corporations are created by the General Assembly and the laws creating and regulating municipal corporations are codified in Title 53 of the Pennsylvania Code. The county boards of election, however, are created and regulated by an entirely different provision, codified in Title 25 of the Pennsylvania Code. The Montgomery County Board of Elections is not the same thing as Montgomery County.

In any event, Dillon's Rule makes clear that the legislature can vest municipal corporations with as much or as little authority as the legislature chooses. *See Pennsylvania Rest. and Lodging Assn.*, 211 A.3d at 816, n.3. Even assuming the Montgomery County Board of Elections is a municipal corporation—although Plaintiffs have not pointed to anything establishing that is the case—as shown above, the legislature has given the county boards of election the power to "make and issue such rules, regulations and instructions, not inconsistent with law, as they may deem necessary for the guidance of voting machine custodians, elections officers and electors." 25 Pa. C.S. § 2642(f). The Montgomery County Board of Elections' instructions regarding manual review and curing are not inconsistent with the Election Code, *see supra* pp. 11-13, and so the Board of Elections did not exceed its statutory authority.

Plaintiffs' argument that the Montgomery County Board of Elections' actions here violate the Elections Clause of the United States Constitution fail for much the same reason. The

Elections Clause delegates power over the "Times, Places and Manner of holding Elections" to state legislatures. *See* U.S. Const., art. I, § 4, cl. 1. And here, the legislature, *i.e.*, the General Assembly, gave the county boards of elections the authority to make instructions not inconsistent with the Election Code. 25 Pa. C.S. § 2642.

    C.    <u>The At-Issue Inspection and Cure Procedures Do Not Violate the Equal Protection Clause</u>

The at-issue procedures are also fully consistent with the Constitution. One county inspecting absentee and mail-in ballots and providing an opportunity to cure, even if different from other counties' procedures, "does not burden anyone's right to vote. Instead, it makes it easier for some voters to cast their [mail-in or absentee] ballots …." *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (rejecting Equal Protection challenge); *accord Paher v. Cegavske*, No. 20-243,  2020 WL 2748301, at *9 (D. Nev. May 27, 2020) (Equal Protection claim fails where one county's "[p]lan may make it easier or more convenient to vote in [that] County, but does not have any adverse effects on the ability of voters in other counties to vote," and "there is no contention that … other counties could not have similarly adopted further accommodations for their residents.").

The District Court for the Western District of Pennsylvania, in rejecting a challenge to some but not all counties' use of drop boxes to collect mail-in and absentee ballots, made clear that the theory espoused by Plaintiffs here does not violate equal protection. *See Donald J. Trump for Pres., Inc.*, 2020 WL 5997680, at *44. There, the court rejected the plaintiffs' argument that was based on the premise that "the state [wa]s ***not*** imposing a restriction on ***someone else's*** right to vote[.]" *Id.* (emphasis in original). The court stated that its "ruling in this regard is consistent with the many courts that have recognized that counties may, consistent with equal protection, employ entirely different election procedures and voting systems within a

single state." *Id.* (collecting cases, including *Short*, described above). "And in this context, 'few (if any) electoral systems could survive constitutional scrutiny if the use of different voting mechanisms by counties offended the Equal Protection Clause.'" *Id.* (quoting *Trump v. Bullock*, --- F. Supp. 3d ----, 2020 WL 5810556, at \*14 (D. Mont. Sept. 30, 2020)). Here, the Montgomery County Board of Elections' procedures do not restrict the right to vote and are a quintessential local voting mechanism. They do not violate the Equal Protection Clause.

The only case on which Plaintiffs rely for their equal protection claim is *Bush v. Gore*. *See* Compl. ¶¶ 31, 39. Plaintiffs cite *Bush* for the proposition that "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* (quoting *Bush*, 531 U.S. at 104-05). But *Bush* is *sui generis*, with its holding recognizing that the decision was limited to the unique circumstances presented by the 2000 election recount and the attendant issues with administering the Florida Supreme Court's statewide relief:

> The recount process, in its features here described, is inconsistent with the minimum procedures necessary to protect the fundamental right of each voter in the ***special instance of a statewide recount under the authority of a single state judicial officer***. ***Our consideration is limited to the present circumstances, for the problem of equal protection in election processes generally presents many complexities***.

531 U.S. at 109 (emphasis added). Interpreting this language, other courts have observed that "the Supreme Court expressly limited its holding in *Bush* 'to the present circumstances' of a standardless 'statewide recount under the authority of a single state judicial officer[.]'" *Donald J. Trump for Pres., Inc.*, 2020 WL 5997680, at \*42 (citing *Bush*, 531 U.S. at 109); *see also Wise v. Circosta*, No. 20-2104, 2020 WL 6156302, at \*5 n.7 (4th Cir. Oct. 20, 2020) (*Bush* "is of limited precedential value.").

Moreover, after narrowly framing the question presented, the *Bush* Court underscored that its holding did not reach cases like this one. "***The question before the Court is not whether local entities, in the exercise of their expertise, may develop different systems for implementing elections***." *Bush*, 531 U.S.at 109 (emphasis added). This case is a quintessential example of a local entity, in the exercise of its expertise, developing a system for implementing elections.

Courts have heeded the Supreme Court's warning and avoided expanding *Bush v. Gore*'s precedential reach in cases like this. In *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), the court observed that *Bush* was "limited to the present circumstances" before concluding that, "[e]ven were *Bush* applicable to more than the one election to which the [Supreme] Court appears to have limited it, Oregon's standard for verifying referendum signatures would be sufficiently uniform and specific to ensure equal treatment of voters." *Id.* at 1106. This was because "[t]he Secretary uniformly instructs county elections officials to verify referendum signatures by determining whether each petition signature matches the signature on the signer's voter registration card," and "all counties refused to consider extrinsic evidence" beyond the referendum and voter card signatures. *Id.* Moreover, *Lemons* rejected the plaintiffs' argument that "differences in the number of signatures rejected by various counties" demonstrated "the absence of a uniform standard," noting that, "[m]ost importantly, uniform standards can produce different results." *Id.* at 1106-07.

Finally, even if Plaintiffs were right that the at-issue procedures violated the Election Code, that violation ***still*** would not give rise to an equal protection claim.

> The problem with this theory is that there does not appear to be any law to support it. Indeed, if this were a true equal-protection problem, then it would transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's "interest" in failing to do more to stop illegal activity. This is not the law. To the contrary, it is well-established that even violations of state election laws by state officials, let alone

17

violations by unidentified third parties, do not give rise to federal constitutional claims except in unusual circumstances.

*Trump*, 2020 WL 5997680, at *46.

Plaintiffs' equal protection theory cannot stand, because enfranchising voters does not disturb equal protection, *Bush v. Gore* does not reach the purely local conduct at-issue, and state law violations do not cause equal protection issues. And, as shown above, Plaintiffs do not have standing and cannot establish that the Montgomery County Board of Elections has violated the Election Close

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Respectfully submitted,

Dated: November 9, 2020

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

By:    /s/ Michele D. Hangley
        Mark A. Aronchick (I.D. No. 20261)
        Michele D. Hangley (I.D. No. 82779)
        Robert A. Wiygul (I.D. No. 310760)
        John B. Hill (I.D. No. 328340)*
        One Logan Square, 27th Floor
        Philadelphia, PA 19103
        Telephone: (215) 496-7050
        Email: mhangley@hangley.com

        Milton Velez
        Office of the Solicitor
        Montgomery County Courthouse
        P.O. Box 311
        Norristown, Pa 19404
        610-278-6285
        Email: Mvelez@montcopa.org

        Philip W. Newcomer
        Montgomery County Solicitor's Office
        One Montgomery Plz, Ste 800
        P.O. Box 311
        Norristown, Pa 19404-0311
        610-278-3033
        Email: pnewcome@montcopa.org

*Counsel for Kenneth E. Lawrence, Valerie Arkoosh, MD, MPH, and Frank Dean*

*Admitted in Pennsylvania; Application for admission to Eastern District of Pennsylvania Pending