```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2                              -  -  -

 3      KATHY BARNETTE and CLAY D.     : CIVIL ACTION NO.
        BREECE                         : 20-cv-05477
 4                                     :
           v.                          :
 5                                     :
        KENNETH E. LAWRENCE, JR.,      :
 6      VALERIE A. ARKOOSH and FRANK   : HEARING TO SHOW
        DEAN                           : CAUSE
 7      _____

 8
                                     James A. Byrne U.S. Courthouse
 9                                   601 Market Street
                                     Philadelphia, PA 19106
10                                   November 4, 2020
                                     Commencing at 9:18 a.m.
11      _____

12                 BEFORE THE HONORABLE TIMOTHY J. SAVAGE
        _____
13

14      APPEARANCES:

15      FOR THE             DILLION MCCANDLESS KING COULTER &
        PLAINTIFFS:         GRAHAM LLP
16                          BY:  THOMAS E. BRETH, ESQUIRE
                            128 West Cunningham Street
17                          Butler, Pennsylvania 16001
                            (724) 283-2200
18                          tbreth@dmkcg.com

19

20                              -  -  -

21                 Ann Marie Mitchell, CRR, RDR, RMR
                          Official Court Reporter
22                          (267) 299-7250

23

24
        Proceedings taken stenographically and prepared utilizing
25      computer-aided transcription
```

```
 1   APPEARANCES CONTINUED:

 2
     FOR THE                 HANGLEY ARONCHICK SEGAL & PUDLIN
 3   DEFENDANTS:             BY:  MICHELE D. HANGLEY, ESQUIRE
                             BY:  ROBERT WIYGUL, ESQUIRE
 4                           BY:  JOHN HILL, ESQUIRE
                             One Logan Square
 5                           27th Floor
                             Philadelphia, Pennsylvania 19103
 6                           (215) 568-6200
                             mhangley@hangley.com
 7                           rwiygul@hangley.com
                             jhill@hangley.com
 8

 9
     FOR THE                 BALLARD SPAHR LLP
10   INTERVENOR              BY:  TERENCE GRUGAN, ESQUIRE
     DEMOCRATIC              1735 Market Street
11   NATIONAL               51st Floor
     COMMITTEE:             Philadelphia, Pennsylvania 19103
12                           (215) 665-8500
                             grugant@ballardspahr.com
13

14

15   FOR THE                 GREENBERG TRAURIG
     INTERVENOR              BY:  A. MICHAEL PRATT, ESQUIRE
16   PENNSYLVANIA           1717 Arch Street
     DEMOCRATIC PARTY:       Suite 400
17                           Philadelphia, Pennsylvania 19103
                             (215) 988-7800
18                           prattam@gtlaw.com

19

20                               -  -  -

21

22

23

24

25
```

1                              -  -  -

2                            I N D E X

3                              -  -  -

4
    Witness              Direct      Cross       Redirect      Recross
5
    LEE SOLTYSIAK    56          62          85
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Court called to order at 9:18 a.m.)

2          THE COURT:  Good morning.

3          RESPONSE:  Good morning, Your Honor.

4          THE COURT:  Please be seated.

5          This is matter of Barnette v. Lawrence, Civil Action

6    20-5477.

7          We are here on a hearing to show cause why a temporary

8    restraining order should not be entered.

9          Are the parties prepared to proceed?

10         MR. BRETH:  On behalf of the plaintiffs, Your Honor,

11   if it please the Court, Thomas Breth, the plaintiffs are

12   prepared to proceed.

13         MS. HANGLEY:  On behalf of defendants, Michele

14   Hangley, also prepared to proceed.

15         THE COURT:  I understand there's a motion outstanding

16   for intervention?

17         MR. GRUGAN:  Yes, Your Honor.  Terence Grugan on

18   behalf of the Democratic National Committee.

19         THE COURT:  Any opposition?

20         MR. BRETH:  No, Your Honor, no opposition.

21         THE COURT:  Very well.  The motion will be granted.

22         The Democratic National Committee --

23         MR. PRATT:  There's a --

24         THE COURT:  Pardon?

25         MR. PRATT:  I'm sorry, Your Honor.  There's a second

1   motion for intervention, Michael --

2           (Court reporter clarification.)

3           MR. PRATT:  Oh, I'm sorry, Your Honor.  I thought we

4   were --

5           THE COURT:  Okay.  I will grant that motion.

6           MR. GRUGAN:  Thank you, Your Honor.

7           THE COURT:  Mr. Pratt, you have a motion?

8           MR. PRATT:  Yes, Your Honor.

9           We filed for a motion for intervention this morning on

10  behalf of the Pennsylvania Democratic --

11          THE COURT:  Any opposition to that motion?

12          MR. BRETH:  Your Honor, no opposition.

13          MS. HANGLEY:  No, Your Honor.

14          THE COURT:  That motion is granted.

15          Any other motions before we get started?

16          (No response.)

17          THE COURT:  All right.  I have read the papers,

18  including the Complaint, and we had a telephone conference with

19  counsel yesterday.  I'm thoroughly familiar with the

20  allegations.

21          As I see it, they come down to two categories.  One,

22  that the defendants illegally pre-canvassed votes.  And two,

23  they were restricting observation of the entire election

24  process at Montgomery County.

25          Is that it, Mr. Breth?

1          MR. BRETH:  Your Honor, within issue one, I believe

2    the issue we were asserting is that they permitted voters to

3    come in and alter their previously cast ballots in an attempt

4    to cure potential defects that had been identified through the

5    election bureau's processing of those ballots.

6          So if that's covered within your issue one, we would

7    agree, but --

8          THE COURT:  Well, I think -- let me see if I can

9    understand exactly your position.

10          You're claiming that the Board of Elections inspected

11    the ballots before Election Day and then identified

12    deficiencies and then contacted, in your words, some of those

13    folks in an attempt to cure the defect; is that correct?

14          MR. BRETH:  Correct, Your Honor.

15          That issue was dealt with by the Pennsylvania Supreme

16    Court in the case that was cited in our brief, but also the

17    Pennsylvania Democratic Party, et al. v. Boockvar, which is the

18    Supreme Court's -- Pennsylvania Supreme Court's September 17,

19    2020 order, where they dealt with five issues, this issue being

20    one of the issues.

21          And in my introductory statement, I'll address

22    comments made by Secretary Boockvar to the Pennsylvania Supreme

23    Court.

24          The actions of the Montgomery County Election Board we

25    believe are in violation of the determinations made by the

1   Pennsylvania Supreme Court and also in violation of the

2   Election Code in the Commonwealth of Pennsylvania.

3            THE COURT:  Try to raise your voice a bit.

4            MR. BRETH:  I'm sorry, Your Honor.  Also --

5            THE COURT:  If you're more comfortable coming to the

6   podium or sitting, that's fine with me.

7            MR. BRETH:  Well, thank you, Your Honor.

8            THE COURT:  Now you can pull that microphone up to

9   you.

10           MR. BRETH:  Thank you, Your Honor.

11           In addition to violation of the holding in the

12   Boockvar case --

13           THE COURT:  What is the holding you're referring to?

14           MR. BRETH:  Well, I'm referring to two parts of that

15   holding -- actually, three parts of the holding, Your Honor.

16   One dealing with the opportunity to cure that was addressed in

17   Count 3 of that case.

18           But also --

19           THE COURT:  What is it that you say the court held

20   with respect to that issue?

21           MR. BRETH:  That the court held that there was no

22   provision within the Election Code to provide an opportunity to

23   cure defects --

24           THE COURT:  Is that exactly what was said?  Or was

25   really what was said is that there was no mandatory requirement

1   that the election board do that?

2           MR. BRETH:  Well, Your Honor, and it goes to the

3   argument of if the Election Code doesn't say that we can't do

4   it, does that mean we can do it.

5           The secretary and the respondents in that case both

6   felt that not only did the Election Code not provide that, but

7   to attempt to do that without clear legislative guidelines

8   would result in exactly what we're dealing with today, Your

9   Honor.

10          THE COURT:  Wasn't the legislative intent of the

11  statute that we're talking about was to enfranchise, not

12  disenfranchise voters?

13          MR. BRETH:  Absolutely the case, Your Honor.  And the

14  Pennsylvania Supreme Court clearly dealt with that issue.  And

15  the Secretary Boockvar, with respect to Count 3, agreed with

16  them, that this isn't disenfranchising voters, that the fact

17  that the Election Code provides --

18          THE COURT:  Who agreed with whom?

19          MR. BRETH:  In Count 3, the respondents in this case

20  and the Secretary of State, Secretary Boockvar, agreed.  It

21  starts on page 16 into 17.

22          THE COURT:  Agreed with what?

23          MR. BRETH:  They agreed that the Election Code made no

24  provision for an opportunity to cure.

25          THE COURT:  Okay.  So your position is that unless

1  they're enabled under the actual statute, they can't do it?

2          MR. BRETH:  Well, they can't do it without running

3  afoul of the United States Constitution, as well the

4  Pennsylvania Election Code.

5          THE COURT:  What's the United States Constitution

6  provision you're referring to?

7          MR. BRETH:  The Equal Protection Clause of the 14th

8  Amendment.

9          THE COURT:  How does that apply here?

10         MR. BRETH:  It applies in -- we cite the court to the

11 US Supreme Court case of Bush v. Gore in 2000.  In that case,

12 in a very similar circumstances down in Florida, where I

13 believe it was Miami-Dade and Broward Counties, there were

14 ballots that were in dispute.  Those two county Board of

15 Elections came up with their own method of determining how they

16 were going to evaluate voter intent.  It's the hanging chad,

17 it's the dimple.

18         The US Supreme Court said, you cannot have county by

19 county boards of election create their own criteria, their own

20 standard to evaluating voter intent.  It has to be uniform.  We

21 have --

22         THE COURT:  We're not talking about intent in this

23 case, are we?

24         MR. BRETH:  Certainly we are.

25         THE COURT:  What's that?

1        MR. BRETH:  Certainly we are.

2        THE COURT:  The intent was that each voter who filed

3   the application wanted to vote.

4        MR. BRETH:  Correct.

5        THE COURT:  Right?  This is -- Gore v. Bush was a

6   post-election, was it not?

7        MR. BRETH:  It was, Your Honor.

8        THE COURT:  All right.  They didn't allow somebody to

9   correct or change the vote after the election.

10        MR. BRETH:  Correct, Your Honor.  Well, there wasn't a

11   mechanism to do that in Florida.  Correct, Your Honor.

12        THE COURT:  Okay.  And here, you're asking us not --

13   when I say us, I'm talking about everybody in general -- to

14   allow persons to correct a defect so that their particular vote

15   will count; is that correct?

16        MR. BRETH:  Well, Your Honor, that's one way of

17   framing the issue.  If the legislature to the General Assembly

18   wanted to enable -- and this is what the Pennsylvania Supreme

19   Court dealt with and discussed at length.  If they wanted to

20   enable voters that had already cast their ballots, if they

21   wanted to give them an opportunity to correct a defect, and

22   it's really not correct a defect, it's an altering of a

23   properly cast ballot that was defective.  They're coming in and

24   altering it.

25        Count 4 --

1          THE COURT:  You said it was a properly prepared?

2          MR. BRETH:  It was properly submitted.

3          It was not properly in the sense that it complied with

4     the Election Code, but they -- it was submitted.  It wasn't

5     something that, I wasn't done with that and the election board

6     took it from me.  They submitted it to the election board as

7     their ballot.

8          One of the issues that you're going to hear testimony

9     today about is Count 4 of the Pennsylvania Supreme Court case.

10    And that dealt with what has commonly been referred to as naked

11    ballots, ballots that came back -- mail-in or absentee ballots

12    that did not contain the privacy envelope.

13         Pennsylvania Supreme Court said that is a mandatory

14    matter.  You must have, not you may have.  It's not a

15    directive.  It is a mandatory requirement for that ballot to be

16    appropriate.

17         You will have testimony today, and we filed

18    declarations, that the Montgomery County Election Board has

19    permitted people to come in and open their sealed and processed

20    ballot, open it up, put the ballot into a privacy envelope,

21    reseal it and resubmit it.

22         There's no provision for that.  There's no

23    guidelines -- not every person is going to have an opportunity

24    to do that.  That's not in dispute.

25         Not only --

1           THE COURT:  What do you mean, not everybody?  Not

2    everybody who submitted a defective ballot?

3           MR. BRETH:  Correct.

4           THE COURT:  Why wouldn't everybody have that

5    opportunity?

6           MR. BRETH:  There isn't a mechanism there to get ahold

7    of them, to notify them, to get them in.  Many of them may not

8    be able to come in to the election board to correct that.  It's

9    only the ones that they've been able to get ahold of that have

10   been available and have come in.

11          And that's just in Montgomery County.  So there's --

12   there's a disparity between those that have submitted defective

13   ballots, have been provided and have been able to cure, to use

14   their terminology, and those that have not; let alone the

15   disparate treatment between all of the other counties that are

16   not engaged in the identical process, a uniform process, that

17   Montgomery County has created.  And that's the analogy --

18          THE COURT:  Haven't you made this same argument before

19   other courts in the Commonwealth?

20          MR. BRETH:  I don't believe I have, Your Honor.  And I

21   say I --

22          THE COURT:  Not you, maybe not you personally, but

23   have other lawyers representing other interests bringing the

24   same claim, like Philadelphia Court of Common Pleas?

25          MR. BRETH:  I'm not sure if somebody went into the

1  Philadelphia Court of Common Pleas.  I'm not familiar with what

2  the Philadelphia Court of Common Pleas, the Philadelphia Board

3  of Elections are doing.  I can tell you what Montgomery County

4  is doing is not in compliance with the Election Code.  It's in

5  violation of the Pennsylvania Supreme Court decision and is

6  creating the same situation that Florida dealt with in 2000.

7        And it's leading down the pathway where we're going to

8  have all of these different counties treating -- potentially

9  treating ballots in non-uniform manners.  And that's really the

10  important issue.

11        THE COURT:  How do you cure that?

12        MR. BRETH:  Pardon me?

13        THE COURT:  How do you cure that?

14        MR. BRETH:  You sequester them.  We have concerns that

15  they're not being sequestered.

16        THE COURT:  Post-election?

17        MR. BRETH:  Right now, Your Honor.  That's part of

18  the --

19        THE COURT:  No.  How do you cure your unequal

20  treatment issue before the election?  Everybody has the

21  opportunity to cure the defect?

22        MR. BRETH:  No.  I think the Pennsylvania -- the

23  Pennsylvania Supreme Court and the Secretary of State

24  acknowledged in the September 17th case, Boockvar case, that

25  the legislature has not created a mechanism by which you can

1  cure a mail-in or absentee ballot, as opposed to voting in

2  person where the legislature did provide a mechanism for

3  individuals that -- if I went and voted in person and somehow I

4  spoiled my ballot, either I ripped it or I messed it up some

5  way, I can turn to an election official and say, I've made a

6  mistake here, I haven't cast my ballot, I made a mistake, they

7  can cure it and have a provisional ballot issued.  That's not

8  what we're talking about.

9            THE COURT:  Let's say I go into the voting machine and

10  I push a button and it doesn't register.  I open the curtain, I

11  go out and say to the machine inspector or the judge of

12  election, something's wrong here.  I want to get my vote done.

13  And they allow me to do that.

14            Is that any different?

15            MR. BRETH:  You're provided a provisional ballot, Your

16  Honor.  Yes, that is absolutely --

17            THE COURT:  Or does the judge of election correct the

18  issue on the spot?

19            MR. BRETH:  No.  They are to issue a provisional

20  ballot.

21            THE COURT:  You don't think so?

22            MR. BRETH:  Well, I can tell you what I believe the

23  Election Code would require.  And the Election Code is to

24  require a provisional ballot and they spoil the original

25  ballot, the original vote.

1          THE COURT:  Who is the party in interest that you're
2    representing in this issue?
3          MR. BRETH:  I represent -- there's two individuals.
4    One is a resident of Berks County, Mr. Breece, and one is a
5    congressional candidate, Kathy Barnette.
6          THE COURT:  So if you wanted to, you could have
7    brought this issue on behalf of an elector in Berks County and
8    ask that the Berks County election board permit them to contact
9    voters to tell them that their ballots are defective and they
10    can cure them before the election.  That wouldn't be equal
11    treatment, wouldn't that?
12          MR. BRETH:  No, it would not.  It would be equal
13    violation of the law.
14          THE COURT:  Because it's not following the
15    Pennsylvania statute.  Correct?
16          MR. BRETH:  Correct.  It's almost, Your Honor, to use
17    an absurd analogy, it's saying we caught somebody voting twice,
18    so I want to go in and vote twice.  That's not the remedy
19    that's appropriate.  The remedy --
20          THE COURT:  Nobody is voting twice here.
21          MR. BRETH:  Well, I think there's a difference of
22    opinion there.
23          When you cast your ballot and you find out that it's
24    defective under the law and you're able to recast that ballot,
25    I think there's a solid argument that you're voting twice.

1          THE COURT:  What's your standing here?

2          MR. BRETH:  Our standing here is that we have a

3   congressional candidate and an elector that both have standing

4   under -- to bring a 14th Amendment equal protection claim.

5          This is different than --

6          THE COURT:  This is a 1983 case?

7          MR. BRETH:  This is a 1983 case.

8          THE COURT:  Go ahead.

9          MR. BRETH:  This is different because there has been

10  much dispute over whether individuals in these types of

11  circumstances have standing to bring an election clause claim.

12  This is not an election clause claim under the 14th Amendment.

13  It's an equal protection claim.

14          In both of these --

15          THE COURT:  Was that merely inartful pleading?

16          MR. BRETH:  No, it was not, Your Honor.  It was a very

17  conscious pleading that the US Supreme Court --

18          THE COURT:  I'm sure an inartful one is conscious,

19  too.

20          MR. BRETH:  Well, I appreciate that similarity, yes.

21          The US Supreme Court has made it very clear as to the

22  parties that have standing to bring an election clause claim.

23          This is a purely an equal protection clause claim, and

24  both of these plaintiffs have standing.

25          THE COURT:  Ms. Hangley.

1          MS. HANGLEY:  To start with standing, Your Honor --

2          THE COURT:  I thought you would start there.

3          MS. HANGLEY:  Okay.  There are a lot of issues to deal

4    with, Your Honor.

5          Beginning with the allegation that these voters have

6    somehow double voted.  These are people who intentionally and

7    properly cast ballots, made an error, on the ballot envelope in

8    some way or on the packaging of the ballot, and are being given

9    the opportunity to correct that error.

10         No one is changing their ballot.  No one is voting

11   twice.

12         This is a procedure that Montgomery County follows and

13   has followed in previous elections, which the plaintiffs have

14   not objected to before.

15         But to begin with standing --

16         THE COURT:  It's difficult.

17         MS. HANGLEY:  -- neither of these plaintiffs have

18   anything more than a generalized complaint that the law in

19   their view is not being followed.

20         Now --

21         THE COURT:  Do you read the Boockvar opinion the same

22   way he does?

23         MS. HANGLEY:  I do not.  No, no.

24         THE COURT:  Okay.

25         MS. HANGLEY:  I'm very familiar with those opinions.

1          The secretary didn't argue --

2          THE COURT:  If something is not required, then it is

3  discretionary?

4          MS. HANGLEY:  Exactly, exactly.  It's -- traditionally

5  some counties have done this.  Other counties haven't.  There's

6  no requirement in the code to do it.  And there's no

7  prohibition in the code on doing it.  There's no reason that

8  counties cannot do it.

9          And in fact, when -- the way that the Pennsylvania

10  election system works is that the system, in some

11  circumstances, automatically notifies voters if their ballots

12  have been canceled or not properly cast.

13          So this is a -- this is a state-wide practice that the

14  Supreme Court --

15          THE COURT:  Is a voter -- Mr. Breth, if a voter is

16  notified that the ballot -- mail-in ballot was defective, could

17  they then just go to the polls and vote personally?

18          MR. BRETH:  No, Your Honor.  There's no provision for

19  that within the Election Code.

20          THE COURT:  So your argument is unless it's specified

21  in the code, you can't do it?

22          MR. BRETH:  Correct.

23          THE COURT:  For everything.

24          MR. BRETH:  That's the Dillon's Rule, Your Honor, and

25  I'll address that after counsel finishes.

1          THE COURT:  Go ahead.

2          MR. BRETH:  Thank you.

3          MS. HANGLEY:  There is -- if Your Honor's question was

4    could a voter vote provisionally, yes, a voter who has made an

5    error on the ballot or is not confident that a ballot was

6    received, can go and vote provisionally.

7          And many voters do.  Again, there's no prohibition on

8    the code for that.  Nor would it make any sense to have a

9    prohibition in the code for that.

10         The purpose of the code is not to track people and

11   keep them from voting, but the spirit of the code and the

12   intention of the code is to allow qualified electors to cast

13   their votes.  And Montgomery County's practices were in

14   furtherance of that, to allow people to avoid being

15   disenfranchised for trivial reasons.

16         So plaintiffs -- we believe there's no argument that

17   this practice was illegal or that the code prohibits it.  Even

18   if there were hypothetically, these plaintiffs don't have

19   standing.

20         They're claiming sort of a vote dilution claim, which

21   has been rejected squarely by courts across the country,

22   including in the Western District, that voters don't have like

23   a free floating right to police other people's votes and

24   complain if --

25         THE COURT:  But as I see Mr. Breth's argument, it is

1    that the County Board of Elections, which is a state actor, and

2    what they're doing is they're violating state law and the

3    federal Constitution.  That's what his argument is.

4           MS. HANGLEY:  I believe --

5           THE COURT:  And then are you saying that his 14th

6    Amendment hook is illusionary?

7           MS. HANGLEY:  My understanding of the argument is that

8    the only hook for a federal constitutional violation is a

9    violation of state law and that this is an attempt to bootstrap

10   a state law dispute into a claimed constitutional violation.

11          As I understand plaintiffs' argument, if the Court

12   agrees or if Pennsylvania courts agree that this was an

13   improper practice under the Election Code, there is no federal

14   claim.

15          I don't see a basis for one in the papers that have

16   been filed or in any of the cases like this that have been

17   filed around the country.

18          THE COURT:  Your claim that deals with the pre-canvass

19   issue and contacting voters, is it your position -- because as

20   I read the Complaint, I believed that it was, but I didn't

21   quite hear that today -- that the board should not have even

22   inspected the ballot applications and ballots?

23          MR. BRETH:  Correct, Your Honor.  They should have --

24   the process --

25          THE COURT:  How would they have then complied with the

1   requirement of a district register?

2          MR. BRETH:  This is the process that the Election Code

3   spells out and the process that has come up through the

4   Secretary Boockvar.

5          The ballots are scanned.  The outside envelope has a

6   barcode.  That barcode is scanned.  That information, that

7   data, goes through the state's -- Commonwealth's SURE system.

8   An email is generated notifying or a communication, I'm

9   assuming it's email, it may be text, notifying the individual

10  that their ballot has been received.

11         THE COURT:  That the ballot has been received?

12         MR. BRETH:  Yes.

13         THE COURT:  What's the district register?

14         MR. BRETH:  The district register?  My understanding

15  is that's information that comes from the Department of State

16  to the individual districts.

17         THE COURT:  Is that correct?

18         MS. HANGLEY:  The district register is a document that

19  each county prepares --

20         THE COURT:  The county prepares, not the Department of

21  State?

22         MS. HANGLEY:  Correct, correct.  I believe a --

23         THE COURT:  What is the purpose of that?

24         MS. HANGLEY:  That goes to each individual polling

25  place so that the poll workers know whether someone has cast,

1  already cast an absentee or mail-in vote or --

2          THE COURT:  Do you agree with that?

3          MR. BRETH:  I believe the data comes through the

4  Department of State.

5          THE COURT:  What is the report?  What is the bottom

6  line of the report?

7          MR. BRETH:  The report is the registered voters within

8  that district.

9          THE COURT:  That has what?

10          MR. BRETH:  Well, that have properly registered to

11  vote, that are eligible to vote in that district.

12          THE COURT:  Now, Ms. Hangley says it's a document that

13  goes to each individual polling place to make sure that a

14  person who has voted by mail who cannot vote in person.

15          Do you agree with that?

16          MR. BRETH:  I don't disagree with that.

17          THE COURT:  You don't disagree?

18          MR. BRETH:  Correct.

19          THE COURT:  Okay.  And so the operative word was

20  people who have voted.

21          MR. BRETH:  Well, my understanding is that --

22          THE COURT:  People who have a defective ballot didn't

23  vote.

24          MR. BRETH:  Well, no.  That's --

25          THE COURT:  There's your difference.

1          MR. BRETH:  Well, in -- I'm not sure I'm following

2  your --

3          THE COURT:  If somebody -- for them to prepare a list

4  of who voted, they have to look at that list to determine who

5  did not vote because their application was defective or their

6  ballot was defective.

7          MR. BRETH:  Well, I don't think it's distinguished --

8          THE COURT:  So that means those persons should be on

9  the list of having voted so that if they show up at the polls,

10  they can vote in person.

11          MR. BRETH:  Anyone that submits a ballot -- even if

12  they don't submit a mail-in or absentee ballot but obtained

13  one, they should be on the list having obtained that.

14          THE COURT:  If I go in and vote -- if I vote by

15  mail --

16          MR. BRETH:  I'm sorry.  Thank you, Your Honor.

17          THE COURT:  If I vote by mail, it's defective, and if

18  I knew it was defective, I knew I had the option to go vote in

19  person?  You say no?

20          MR. BRETH:  No, Your Honor.

21          THE COURT:  So you're counting a defective ballot as a

22  vote?

23          MR. BRETH:  I'm not counting it as a defective ballot,

24  Your Honor.  The Election Code provides that --

25          THE COURT:  So what happens to my vote?

1          MR. BRETH:  It's like any other vote that wasn't

2   properly cast.  It's potentially disqualified.  It's --

3          THE COURT:  Well, when you say potentially.

4          MR. BRETH:  Well, there's a review process.

5          Can I make one distinction --

6          THE COURT:  But that review process comes when?

7          MR. BRETH:  After the election.  After all --

8          THE COURT:  So now my vote has not counted?

9          MR. BRETH:  Well --

10          THE COURT:  Correct?

11          MR. BRETH:  If you submit a defective --

12          THE COURT:  You're saying, too bad, it was defective,

13   so it should be discounted.  Is that your argument?

14          MR. BRETH:  If you submit a defective mail-in

15   ballot -- for example, Your Honor, if you submit a ballot, a

16   naked ballot, so you have not included the privacy envelope,

17   Pennsylvania Supreme Court is clear on it, the Election Code is

18   clear on it --

19          THE COURT:  I know this.

20          MR. BRETH:  -- that there's no mechanism to cure

21   that --

22          THE COURT:  So if I know that, Mr. Breth, okay, ahead

23   of time, I can say, shucks, I want my vote to count, so I'm

24   going to show up at the polls.

25          MR. BRETH:  Yes.

1          THE COURT:  And I can vote?

2          MR. BRETH:  Just so we're following --

3          THE COURT:  Can I vote?

4          MR. BRETH:  Just so we're following each other, Your

5    Honor, I've requested a mail-in ballot, and I've decided that I

6    don't like it, so I'm not going to submit it, I'm going to go

7    and vote in person?

8          THE COURT:  Okay.

9          MR. BRETH:  Yes.  There is a mechanism within the

10   Election Code.

11         THE COURT:  Okay.  What if I have a defective ballot?

12   I don't realize it.  It's not counted.  No one notifies me.

13   What happens to my vote?

14         MR. BRETH:  It will be reviewed.  And ultimately, if

15   it doesn't comply with the Election Code --

16         THE COURT:  But I was never given the opportunity to

17   cure the defective vote.

18         MR. BRETH:  The Election Code doesn't provide for

19   that.  The Pennsylvania Supreme Court indicates that that is

20   not an appropriate --

21         THE COURT:  I'm not so sure that's correct about the

22   US Supreme Court.

23         MR. BRETH:  I'm happy to review and discuss any of the

24   sections, Your Honor, on their decision.

25         THE COURT:  I just don't know that that's exactly what

1   was said.

2           MR. BRETH:  Well, they said it's left to --

3           THE COURT:  In other words, I am losing my vote.

4           MR. BRETH:  With all due respect -- and I know it's

5   not you personally, Your Honor -- but the courts have

6   consistently said there are voting requirements.

7           If the voter fails to meet those requirements in

8   casting their ballot or registering the vote, they're not

9   losing it because they failed to fulfill their obligation to

10  comply with the voting process as it's been laid out by the

11  general assembly.  So --

12          THE COURT:  So I've lost it.  I didn't lose it because

13  it never existed under your argument.  Correct?

14          MR. BRETH:  You didn't do it, Your Honor, in the

15  correct manner.

16          THE COURT:  Uh-huh.

17          MR. BRETH:  So yes, you forfeited it.  It hasn't been

18  taken from you.  You have failed to do that.  Or we've had no

19  rules, Your Honor, regarding elections.  We would throw out

20  election codes and say, everybody can make up their own rules

21  on how they cast their ballot; otherwise, they'll be

22  disenfranchised.  We're a country of rules and application of

23  the law.

24          So does that mean sometimes ballots don't count

25  because the voter didn't comply with the rules?  Yes.  Yes.

1  Otherwise, it's chaos.

2          THE COURT:  Okay.  You agree.

3          MR. BRETH:  Yeah.

4          THE COURT:  The vote's lost?

5          MR. BRETH:  Yeah.  But it's not lost because the

6  system isn't providing the voter with a fair and uniform

7  ability to vote.  It's lost --

8          THE COURT:  But how am I treated any differently than

9  anybody else whose vote counted?

10          MR. BRETH:  There's --

11          THE COURT:  Actually, it should be conversely.  How is

12  somebody whose vote counted treated differently than I was

13  treated?

14          By the way, it didn't happen, but...

15          MR. BRETH:  Let's pick a number, Your Honor.

16          Let's say there's a thousand ballots, mail-in and

17  absentee ballots that were submitted that were defective.

18          Defendants have acknowledged -- I believe the number

19  is 49 individuals who they contacted that were permitted to

20  come in and change their ballot, change the envelope, either

21  sign the declaration, cure the defect.

22          THE COURT:  So is all this about you wanting to

23  sequester 49 ballots?

24          MR. BRETH:  No.  We're not sure whether it's 49.  We

25  want to make sure that the process -- one, that the ballots are

1    sequestered, that they not be co-mingled, that we not continue

2    to permit people to alter their ballots once they've been

3    submitted outside the -- and we're beyond the time period for

4    that to occur, because there's no more walk-in balloting.

5    There's clear guidelines for provisional ballots.  So we're

6    really beyond that.

7         So we're now to a situation where we're still

8    processing I believe over a million mail-in ballots.  I'm not

9    sure how many in Montgomery County.  But there are a large

10   number of mail-in ballots and absentee ballots that still must

11   be -- must need to be processed.  They should be sequestered.

12   They should not be co-mingled and counted until there is a

13   determination as to the validity of the --

14        THE COURT:  That's the relief you're asking for?

15        MR. BRETH:  That's the relief we're asking for.

16        THE COURT:  What's the Democratic National Committee

17   have to say?

18        MR. GRUGAN:  Your Honor, to touch on a point you've

19   raised a few times and we've been kind of going around, you

20   asked the question, and certainly you had reason to, how to

21   cure this issue before the election.  If we brought this suit,

22   how do we ensure that all votes are properly counted?

23        Montgomery County has been doing this process for two

24   weeks.  The plaintiffs have known about it, no doubt, for at

25   least a few days, but waited until the day of the election to

1  file this suit, after every eligible elector has already

2  followed the process and relied on --

3          THE COURT:  What's the significance of that?

4          MR. GRUGAN:  The -- well, the significance, Your

5  Honor, is that it would appear, based on the timing of when

6  they brought the suit, this is not so much a good faith effort

7  to enforce the Election Code as it is an effort to

8  disenfranchise voters; because of the point that you're making

9  that these voters, because of the timing issue now, because now

10  we're after the election, there's no way that these voters

11  who --

12          THE COURT:  I wasn't making any point.  I was asking a

13  question.

14          MR. GRUGAN:  I'm sorry, but -- jumping off from your

15  question.

16          These voters will have lost their vote.  And these are

17  good faith voters who relied -- they did not make a mistake

18  exactly.  Maybe they made a mistake, but then they relied on

19  government officials in correcting that mistake and then

20  exercising their franchise.

21          Now, we do not have the opportunity to -- or did not

22  have the opportunity to correct any issues in the process

23  because of the time of the -- of when this suit was brought, on

24  the day of the election.

25          So I think there is -- what I would consider as a

1   laches argument, it's an equitable argument, that -- there's a

2   strong argument here that this is not a good faith effort to

3   enforce the Election Code, instead, it's just trying to

4   disenfranchise voters who, themselves in good faith, relied on

5   government.

6          That's one point I wanted to make.

7          I also wanted to address -- we talked a little bit

8   about standing.

9          And plaintiffs continue to insist they have standing

10  to bring this suit, but I haven't heard and I haven't seen the

11  papers where there is a concrete, particularized injury alleged

12  to have been suffered by the plaintiff.

13         The allegation continues to be the votes are treated

14  differently in Montgomery County versus Berks County or Bucks

15  County or whatever, but how has this plaintiff suffered harm?

16         What --

17         THE COURT:  Where, Mr. Breth, is the concrete injury?

18         MR. GRUGAN:  I'm sorry?

19         THE COURT:  I'm asking Mr. Breth.

20         MR. BRETH:  The concrete injury is we have two

21  electors, one in Berks County, one in Montgomery County.

22         The candidate also is in a very tight race.  These

23  ballots and the treating of these ballots may very well

24  determine the outcome of the election.

25         So, I mean, there is concrete evidence that this could

1    result in impacting not only the congressional candidate's

2    election, Mrs. Barnette, but also the entire election in the

3    Commonwealth of Pennsylvania.

4           This is a situation where we have a specific time

5    period to designate delegates.  This is a time period that

6    could potentially be brought into jeopardy --

7           THE COURT:  Delegates or electors?

8           MR. BRETH:  Electors.

9           THE COURT:  Go ahead.

10          MR. GRUGAN:  I'll just say that the preference for a

11   candidate to win is not an injury.

12          This plaintiffs' ballot has not been affected in any

13   way.  There's no evidence that any ballot that has been

14   affected would have benefitted her or not benefitted her, so

15   there is no actual concrete injury here.  And the court has

16   already rejected a preference injury that a preferred candidate

17   will lose.  That's not sufficient.  That's not a constitutional

18   injury.

19          THE COURT:  Mr. Pratt?

20          MR. PRATT:  Yes, Your Honor.

21          (Court reporter clarification.)

22          MR. PRATT:  Your Honor, there's quite a bit to

23   unbundle here.  And let me just say that, one, the -- we

24   obviously disagree with Mr. Breth's reading of the Pennsylvania

25   Supreme Court decision.  There is a very big difference between

1   a statute which states that something is mandatory and

2   something that leaves the -- that gives the counties the

3   discretion in which they can do certain things.

4          And that discretion here was whether or not they could

5   contact voters who submitted mail-in ballots.  There's

6   absolutely nothing in the Election Code that says that they are

7   prohibited -- counties are prohibited from doing so, and

8   there's nothing in the Pennsylvania Supreme Court decision that

9   says anything to the contrary.  All it says is that the -- that

10  they are not required to do that.

11         So that is the law.  So Mr. Breth's reading of that

12  case is wrong.

13         The second point I will make is that there is -- there

14  is the difference -- there is a difference.  I know everyone --

15  they want to turn this into Bush v. Gore.  It is far from

16  anything close to that.

17         There is a very big difference between the

18  implementation of an election, which the counties -- that's all

19  that's going on here -- and how you count votes.

20         We're not -- these are not hanging chads.  We're not

21  treating a vote, counting a vote differently from one to

22  another.

23         All they're simply doing is the counties are given

24  discretion.  That county discretionary administration of

25  election is something that has been recognized by state courts

1   and federal courts and the United States -- and the United

2   States Supreme Court forever.  There's a long list of cases.

3   And that's all that's going on.

4        And one thing, Judge Ranjan -- and I was involved in

5   each of these cases.  In the Western District Court of

6   Pennsylvania, Judge Ranjan dealt with equal protection.

7        THE COURT:  He what?

8        MR. PRATT:  He dealt with the equal protection

9   argument and basically says that every simple violation of an

10  Election Code does not create an equal protection argument.

11  Otherwise, you would have equal protection arguments that would

12  be endless brought by very basic violations -- alleged

13  violations of the Election Code.

14       And in fact, Your Honor, we could cite -- and he did a

15  very thorough analysis of the -- of those issues with respect

16  to whether or not counties were either required or not required

17  to use drop boxes.  And again, it's a discretionary matter.  It

18  does not create an equal protection violation.

19       I'm aware, and there's another one -- in fact, Judge

20  Ranjan said there's simply no law that supports that position.

21       MR. BRETH:  Your Honor, with respect to Judge Ranjan,

22  that was a drop box issue.  He deferred to the state court.

23  There was pending state court action on that drop box issue.

24  Subsequently, the Pennsylvania Supreme Court ruled on it.  And

25  as we all know --

1          THE COURT:  Why shouldn't we do that here?

2          MR. BRETH:  Well, because I think that there's a

3   difference.  There's clearly a federal issue here.

4          Subsequent to the decision or the opinion that Judge

5   Ranjan put down as referred by counsel, I personally was in

6   front of Judge Ranjan on an Allegheny County issue.  And I

7   don't know how much publicity it got here, Allegheny County

8   Board of Election issued 28,879 incorrect ballots --

9          THE COURT:  You're putting some miles on.

10          MR. BRETH:  I am putting some miles on, Your Honor.

11   Sorry.

12          But those ballots were issued to individuals, mail-in

13   ballots.  So some of them were mailed back.  Some of them

14   weren't mailed back.

15          They reissued new ballots, so they had their vendor

16   reissue a second ballot to all of these individuals.

17          We dealt with this in Judge Ranjan -- in front of

18   Judge Ranjan, so I'm familiar with the standing arguments, I'm

19   familiar with all this.  The plaintiffs in that case were two

20   congressional candidates, as well as residents of Allegheny

21   County, Beaver County and Butler County.  One of the

22   congressional candidates covered three counties.

23          Thankfully we were able to enter into a consent degree

24   in that case spelling out how those ballots should be handled

25   by the election board and counted.

1          So it's not -- the prior opinion by Judge Ranjan,
2    certainly he was aware of his opinion.  He was certainly aware
3    of the standing issues.  We made an equal protection argument
4    before him.
5          He proceeded with the case.  Thankfully we were able
6    to resolve it through a consent order.
7          THE COURT:  Before it got to the Third Circuit?
8          MR. BRETH:  Or beyond, yes.
9          THE COURT:  Ms. Hangley.
10         MS. HANGLEY:  So there's a few things to unpack here.
11         First of all, I'm also familiar with the Allegheny
12   County case, although I wasn't involved in it.  My
13   understanding is that the county agreed to do what it was
14   already doing and Judge Ranjan never reached any merits of
15   standing or equal protection or any of the other issues.  So
16   that's not a precedent that is I think useful to this Court.
17         A couple of points that plaintiff has made that I want
18   to respond to and also a couple of factual clarifications that
19   I can offer.
20         Mr. Breth argued that there is a rule that if a voter
21   violates a rule or voters have to violate rules and if they
22   don't, they risk being disenfranchised.  That's a part of the
23   Anderson Verdict Test.  And it's true that there are rules,
24   there have to be rules and that voters have to try to follow
25   them.

1          But that law is not that counties cannot --

2          THE COURT:  Well, his argument is that unless the code

3   specifically provides that you can do something, you cannot do

4   it.

5          MS. HANGLEY:  That is the argument, but that is not --

6   there's nothing in the code that says that.  The code gives

7   counties the authority and the discretion to administer the

8   election laws.

9          And they have -- it's a very complicated process.

10  There's a lot of discretion there.  The Pennsylvania Supreme

11  Court has held, for example, that drop boxes, which -- that was

12  a controversial issue from a couple weeks back.  The code

13  doesn't contain the word "drop boxes" or provide for that, but

14  the county has interpreted the code to allow them.  The

15  Pennsylvania Supreme Court agreed.  And so did Judge Ranjan.

16         And with more time, I could give infinite examples of

17  things that are not specifically laid out in the code but are

18  consistent with the code.  Here, it's consistent with code to

19  give voters notice of technical defects on the outside of their

20  ballot envelopes and a lack of a secrecy envelope.  It's

21  consistent with the code.

22         And it's also consistent with every notion of due

23  process and justice.  This is -- as I said at the beginning,

24  the Election Code is not -- it's not meant to be a trap.  It's

25  not -- it's not meant to trick voters into losing their votes.

1          THE COURT:  Well, indeed the legislation is intended

2    to enfranchise voters, is it not?

3          MS. HANGLEY:  That's correct.  And the Pennsylvania

4    Supreme Court indirectly, when interpreting the code,

5    interprets it in favor of enfranchising voters.

6          So plaintiff argued that voters have to follow the

7    rules.  But here, there's not a rule that's being violated.

8          On the issue of the remedy, first on the issue of the

9    laches argument, plaintiffs did -- and they admit in their

10   Complaint -- knew about this process and this issue for at

11   least a couple days before the election.  And in fact, they've

12   known about this process for weeks and even years.

13         THE COURT:  What difference would it make if they

14   notified you a week earlier?

15         MS. HANGLEY:  If the plaintiffs had notified

16   Montgomery County a week earlier, and Montgomery County agreed

17   that this was a serious issue, it seems likely -- and

18   especially if plaintiff had sued --

19         THE COURT:  What could they have done?  Stop notifying

20   people?

21         MS. HANGLEY:  Well, instead of notifying voters there

22   is a technical issue with your ballot, come on in and correct

23   it, they would have said, there's a technical issue with your

24   ballot, go to the polls on Election Day and vote provisionally.

25         Now, because of the timing --

1          THE COURT:  Well, I think Mr. Breth would say, you

2    can't do that either.

3          MS. HANGLEY:  With respect to plaintiff --

4          THE COURT:  Is that correct, Mr. Breth?

5          MR. BRETH:  The only -- if you go to the poll and you

6    have a mail-in ballot, you can surrender -- the Election Code

7    provides a provision that you can surrender your mail-in ballot

8    and --

9          THE COURT:  How would I know that?

10         MR. BRETH:  Being informed.  There's --

11         THE COURT:  So you're saying they could have if they

12   were notified earlier of the problem?

13         MR. BRETH:  No.  Once they've submitted their mail-in

14   ballot and it's been scanned --

15         THE COURT:  Okay.  You say that's done.

16         MR. BRETH:  It's absolutely.  There's no provision to

17   cure it.

18         MS. HANGLEY:  I'm sorry, Your Honor, that's not

19   correct.

20         Anyone can go to the polls and submit a provisional

21   ballot.  And if a voter has submitted their mail-in ballot and

22   it has errors and it's not counted, their provisional ballot

23   will be counted.

24         THE COURT:  What happens if I vote and I change my

25   mind before Election Day?  I can go to the polls, can I not,

1   and vote provisional?

2          MR. BRETH:  You can ask for a provisional, Your Honor.

3   It doesn't mean --  and they'll give you a provisional.

4          THE COURT:  So I can't change my mind?

5          MR. BRETH:  The process that's spelled out in the

6   Election Code is that provisional is not going to be valid

7   because you've cast -- you've submitted a prior ballot.

8          THE COURT:  Not unless you count the first one.

9   Right?

10         MR. BRETH:  Correct.

11         THE COURT:  So I can't change my mind?

12         MR. BRETH:  No.  You can change your mind, Your Honor,

13  you just can't change your vote.

14         THE COURT:  That's empty.

15         MS. HANGLEY:  That's correct, Your Honor.

16         If you submit a mail-in ballot, it goes in and it's

17  counted.  And then you go to the polls and then submit a

18  provisional ballot, the provisional ballot is tossed away or

19  put away --

20         THE COURT:  I think he's right on that.

21         MS. HANGLEY:  That's -- he's --

22         THE COURT:  And I can change my mind but I can't vote.

23  Right?

24         MS. HANGLEY:  Exactly.

25         THE COURT:  You agree with that?

1          MS. HANGLEY:  Exactly.  You can't --

2          THE COURT:  Tell me what would happen if they filed

3   a -- if they brought the suit a week earlier or notified you of

4   their concerns earlier?  I don't see how it changes.

5          MS. HANGLEY:  Every one of those voters would have had

6   the opportunity --

7          THE COURT:  But how?

8          MS. HANGLEY:  -- to submit a provisional ballot.

9          THE COURT:  How would they know that?

10         MS. HANGLEY:  Because the county would still be able

11  to contact people.

12         Unless their argument is that the county is --

13         THE COURT:  Could they?

14         MR. BRETH:  Contact people, Your Honor?

15         THE COURT:  Uh-huh.

16         MR. BRETH:  To cast provisional ballots?

17         THE COURT:  No.  Just to contact them and tell them,

18  there's a defect in your ballot, alert them, there's a problem.

19  Assume they just tell them that.

20         MR. BRETH:  That's fine.  I don't think there's any --

21  I don't think there's a problem --

22         THE COURT:  How about if you then add the advice that

23  you can file a provisional or submit a provisional ballot?  Can

24  they do that?

25         MR. BRETH:  Could they do that?

1            I don't think it's -- I think they're creating a lot

2    of provisional ballots that aren't properly --

3            THE COURT:  That's not my question.

4            Can they or not?

5            MR. BRETH:  Well, they can theoretically do that.  The

6    question is how are they going to treat the provisional ballot

7    when you already have a mail-in ballot or an absentee ballot?

8            THE COURT:  But it was defective.

9            MR. BRETH:  Correct.

10           THE COURT:  And you say that counts as your attempt to

11   vote?

12           MR. BRETH:  Correct.

13           THE COURT:  That counts as your vote, but your vote is

14   not counted.

15           MR. BRETH:  You can't change --

16           THE COURT:  That's the way to say it, isn't it?

17           MR. BRETH:  I think probably so, Your Honor.

18           THE COURT:  Okay.  It counts as your vote but your

19   vote is not counted.

20           MR. BRETH:  Because it was defective.

21           Your Honor, can I address a couple issues?  One --

22           THE COURT:  Wait until she's done.

23           MR. BRETH:  Oh, I'm sorry.

24           THE COURT:  I kind of bounce around.

25           MR. BRETH:  That's correct.

1          MS. HANGLEY:  Since we're on the topic of provisional

2    ballots, I did want to alert the court to a couple of state law

3    developments from yesterday.  It's a fast moving process.

4          THE COURT:  What, there's 51, not 49?

5          MS. HANGLEY:  What, sorry?

6          THE COURT:  There's 51, not 49?

7          MS. HANGLEY:  Well, I'm trying to avoid the papers

8    this morning, Your Honor.

9          But the Secretary of State informed all the counties

10   that they could tell the parties which voters had had

11   canceled -- ballots were rejected for these technical reasons.

12   And many, if not all, of the counties did.

13         The Republican Party challenged counties doing this in

14   two separate courts, the Bucks County Court of Common Pleas and

15   the Philadelphia County Court of Common Pleas.  And both of

16   those courts said -- denied relief, said there was no issue

17   with --

18         THE COURT:  The same issue?

19         MS. HANGLEY:  The same issue.  So whether the counties

20   can tell the parties to tell their voters, listen, there's a

21   problem with your ballot, run to the polls and submit a

22   provisional.

23         So that's an example of a way that voters -- if

24   plaintiffs had filed this suit when they knew about the issue

25   rather than on Election Day, if plaintiffs had done that, those

 1   voters would have gotten the same opportunity to go and file a

 2   provisional ballot.  But they didn't, because instead, they

 3   went to the trouble of going and correcting their ballot

 4   envelopes.

 5          And what plaintiffs are arguing is that those who went

 6   to the trouble of correcting their ballot envelopes get

 7   disenfranchised; those who file provisional ballots do not.

 8          MR. BRETH:  Well, just on that point, Your Honor,

 9   those that weren't provided an opportunity to correct were

10   disenfranchised.  I mean, we're playing this disenfranchisement

11   game.  This isn't about disenfranchising --

12          THE COURT:  You think disenfranchisement is a game?

13          MR. BRETH:  Well, no, Your Honor.  But the game is

14   that they're trying to assert that plaintiffs are trying to

15   disenfranchise voters when they're not.

16          We wish that everybody submitted their ballot

17   absolutely correctly in compliance with the Election Code so

18   that we didn't have any disputes.  We wish that everybody had

19   the ability to come and vote in person or vote by mail or vote

20   by absentee ballot, however they wish.

21          But the Election Code provides provisions for that.

22   I've dealt with that, so I'm not going to reiterate that to

23   Your Honor again.

24          With respect to the timing of this, we filed three

25   declarations.  Those declarations -- individuals in those

1  declaration asserted that the election -- the defendants in

2  this case on November 1st disclosed to them that they were

3  letting people come in and correct naked ballots, opening up

4  the outside envelope, pulling their ballot out, inserting it in

5  a privacy envelope and reinserting it.

6        So this -- we knew this -- what we knew was the

7  Supreme Court on September 17th issued a decision that in our

8  opinion said you can't do this.  There is no mechanism to do

9  this.  The legislatures -- the legislature and the general

10  assembly did not put a mechanism to cure and an opportunity to

11  cure, so we're denying your request to do that.

12        You can -- you can read it.  When it says --

13        THE COURT:  Are there other counties in the

14  Commonwealth that have allowed people to cure?

15        MR. BRETH:  We believe that there are other counties

16  that are engaged in similar conduct, yes.

17        THE COURT:  So all of those you're saying are wrong?

18        MR. BRETH:  Well, what we have now, Your Honor, is --

19  and this is the equal protection argument.

20        You've got some county residents that are being

21  treated differently than other county residents.  It's -- I

22  know it pains people to mention Bush/Gore, but that's the

23  analysis that's applied to this.  That's the analysis that

24  Judge Ranjan would apply to this because we had that discussion

25  with him on the Allegheny County issue.

1          The other issue is the Dillon's rule, Your Honor.

2   We've heard mention to it.  The Dillon's rule is actually, it

3   starts with a US Supreme Court decision in Hunter v. The City

4   of Pittsburgh, 207 US 161, 178 through 179.  It's a 1907 case.

5   It is applicable.  There are various cases, as has been applied

6   to the City of Philadelphia, who is a home rule charter county

7   in the Commonwealth of Pennsylvania.  It's applicable to both

8   home rule charter counties and non-home rule charter counties.

9          More recent cases, Asherton, A-S-H-E-R-T-O-N, v. FDIC,

10  519 US 213, 218 through 219.  That's a 1979 case.

11         Then finally, Your Honor, Pennsylvania Restaurant &

12  Lodge Association v. The City of Pittsburgh, 211 Atlantic 3rd

13  810 at 816, PA 2019.

14         All of these cases stand for the -- and the Dillon's

15  rule stands for the proposition that governmental entities

16  operating under statutory authority are limited in their

17  authority as defined by the statute.

18         So I represent a lot of school districts, Your Honor.

19  I have this issue come up all the time.  Why can't we do this

20  or why can't we do that.  They're governed in the Commonwealth

21  of Pennsylvania by the Pennsylvania Public School Code.

22         If the School Code doesn't authorize the Board of

23  School Directors to do something, they can't do it.  It's no

24  different than any other governmental entity that's operating

25  under statutory authority.  If the statute does not provide you

1  the authority to do something, you are prohibited from doing

2  it.

3         THE COURT:  That's the crux of the argument?

4         MR. BRETH:  Pardon me?

5         THE COURT:  That's the crux of your argument?

6         MR. BRETH:  It really is, Your Honor.

7         That's the thrust of it.  Not only the Pennsylvania

8  Supreme Court, but the thrust of, they can't do this unless the

9  Election Code provides them the authority to do this.  And by

10 doing it, and the Pennsylvania Supreme Court hints at this,

11 when Justice Wecht refers to there's no uniform statewide

12 system to correct -- to provide electors the ability to correct

13 their absentee ballots.  The reference to statewide is an

14 acknowledgment that we can't do it county by county without

15 violating the equal protection clause.

16        Your Honor, there are a number of issues.  I'm trying

17 to end this today.  We would be happy to turn around a brief in

18 a very short period of time for Your Honor on these issues.  I

19 know we haven't had an opportunity to brief things.  I know we

20 don't have a response, including the standing issue, all of

21 those things, we'd be happy to produce a brief.

22        I don't --

23        THE COURT:  5:00?

24        MR. BRETH:  5:00 today?

25        THE COURT:  Yeah.

1          MR. BRETH:  Could I do 9:00 in the morning possibly?

2     I'm remote, Your Honor.

3          THE COURT:  You can do it tomorrow morning.

4          MR. BRETH:  We would be happy to do that.

5          If there's no objection, Your Honor, we filed

6     declarations.  Those individuals are here to testify today.

7          THE COURT:  On the issue that we're all discussing?  I

8     haven't gotten to the observation of the process yet.

9          I assume that's where your witnesses are.

10         MR. BRETH:  No.  Actually, the witnesses are with

11    respect to how they're handling ballots.  Those are the

12    witnesses that were actually provided a tour but had direct

13    conversations with the defendant -- I apologize -- Frank Dean,

14    the mail-in election director of Montgomery County.  They

15    actually had direct conversations on how they were treating the

16    ballots.  There's three declarations that were filed.  They're

17    here to testify today, but I believe we're satisfied with their

18    declarations.

19         THE COURT:  Ms. Hangley, your position?  Mr. Pratt,

20    Mr. Grugan?  Think about it.

21         MS. HANGLEY:  No objection to that, Your Honor.

22         MR. PRATT:  No objection.

23         MR. GRUGAN:  No objection, Your Honor.

24         THE COURT:  Then we'll go with the declarations.

25         MR. BRETH:  Thank you, Your Honor.

1          THE COURT:  That's what you all agreed to.  Right?  I

2    don't want to misstate the question here.

3          Or do you want the witnesses to testify?  That's

4    really what it is.

5          MS. HANGLEY:  Your Honor, could we have the

6    opportunity to put in our own declarations?  We also brought a

7    witness, but --

8          THE COURT:  Or witnesses, that's fine.  I don't care.

9    We can do witnesses if you all want.

10         MS. HANGLEY:  We have no objection to going with -- to

11   accepting the plaintiffs' declarations.

12         We can put on our witness or -- although he wouldn't

13   really have anything to respond to, or we could submit a

14   declaration from our witness, whichever the Court prefers.

15         THE COURT:  It might be quicker for all of us if we

16   just do the witnesses.  By the time we get to deciding whether

17   or not we're going to do it, we could have heard the testimony.

18   Call your witnesses.

19         MR. BRETH:  Your Honor, I believe they've indicated

20   they're fine with the declarations.  We'd be fine with the

21   declarations.

22         THE COURT:  With their declaration?

23         MR. BRETH:  With respect to our declarations, we're

24   fine with that being admitted.

25         With respect to their declarations, I don't know what

1  their declarations are, so I'm a little bit handicapped --

2        THE COURT:  They're handicapped too.

3        MR. BRETH:  Well, I think they have our declarations.

4  I know they have our declarations, because we filed them.

5        I'm not opposed, if their witness is here today, if

6  he'd like to testify today.  I understand they have a witness

7  here today.  Or if they file a declaration, if the declaration

8  is limited to --

9        THE COURT:  It's your call.  What do you want to do?

10        MS. HANGLEY:  We'll put our witness on, Your Honor.

11        THE COURT:  Okay.

12        MS. HANGLEY:  Your Honor, would you like us to respond

13  to the Dillon's law argument?

14        THE COURT:  Yeah.  Keep going.  We'll call the

15  witness, but not right now.  Let's hear the rest of this.

16        MS. HANGLEY:  Okay.  The plaintiffs' law firm has made

17  this argument in cases across the Commonwealth.  It's been

18  summarily rejected in the Pennsylvania Voters Alliance case in

19  the Middle District on October 21.  And it is Dillon --

20  Dillon's law is not applicable here.

21        And there are many reasons for why this -- this state

22  law principle, starting from a 1860 case, doesn't -- shouldn't

23  guide this Court.  But probably the simplest and most direct

24  one is that the Pennsylvania Election Code contains an explicit

25  delegation of authority to the county boards of elections.  And

1    that's in Pennsylvania Statute 25 Section 2642.

2              The counties -- the boards of elections has the

3    authority to make and issue such rules, regulations and

4    instructions not inconsistent with law as they may deem

5    necessary for the administration of elections.

6              And here, if plaintiffs are conceding that allowing

7    cure is not inconsistent with law, then this -- this statutory

8    provision clearly authorizes it.  Dillon's rule is not -- does

9    not apply.

10             THE COURT:  Mr. Pratt, Mr. Grugan, I assume you

11   concur?

12             MR. PRATT:  Yes, Your Honor.

13             MR. GRUGAN:  Yes, Your Honor.

14             MR. BRETH:  It's absolutely inconsistent with the law.

15             THE COURT:  Pardon?

16             MR. BRETH:  It's absolutely inconsistent with the law,

17   Your Honor, if you're --

18             THE COURT:  I know.  You've been saying that all

19   morning.  I think I get it.

20             MR. BRETH:  Thank you.

21             THE COURT:  Do you want to go on to the second issue?

22             MR. BRETH:  Certainly, Your Honor.

23             THE COURT:  The observation of the process.

24             MS. HANGLEY:  If I make an objection.

25             The TRO filed yesterday does not deal with the

1   observation of the process.  We were under the impression that

2   that was not an issue for today.

3          THE COURT:  You're not prepared to address it?

4          MS. HANGLEY:  We will address it, but we do object to

5   the -- we haven't seen declarations on this.  It wasn't in the

6   TRO.

7          THE COURT:  I'm going to listen to it.

8          MS. HANGLEY:  Understood.

9          MR. BRETH:  Your Honor, I'll keep it brief.

10          Obviously this is becoming less as time passes, less

11   of a significant issue in comparison to the ballots.

12          But the Election Code is clear that candidate

13   representatives, candidates, when the canvassing and

14   pre-canvassing process begins, they are entitled to be in the

15   room is the language that's utilized in the Election Code.  The

16   purpose of them being there is to observe the ballots as they

17   are being opened and tabulated and reviewed.

18          The Montgomery --

19          THE COURT:  But you also saw a video of it?

20          MR. BRETH:  Correct.

21          THE COURT:  Which would capture the electors' vote?

22          MR. BRETH:  We don't know that, Your Honor.  I don't

23   know -- I don't know how sophisticated, if we got the casino --

24   if we're talking about at the blackjack table video or if

25   whether we're talking about --

1          THE COURT:  Are you familiar with that?

2          MR. BRETH:  Vaguely, Your Honor.

3          Or whether we're talking about in a back lot parking

4    lot video.  That's the difficulty we have.

5          This issue I think could be resolved rather easily.

6    If they're preserving and turning over the video, that would

7    help my folks evaluate whether it's sufficient or not.

8          But we're really -- it's a really simple argument.

9    I'm not understanding why they shouldn't be in the room with

10   all -- I understand social distancing and the protocol.

11         THE COURT:  The thing about social distancing, each

12   candidate is entitled to have a representative.  Correct?

13         MR. BRETH:  Correct.

14         THE COURT:  And how many people are on the ballot?

15         MR. BRETH:  Quite a few, Your Honor.

16         THE COURT:  So each one of those is entitled to a

17   representative?

18         MR. BRETH:  Correct, Your Honor.

19         THE COURT:  How can we observe social distancing?

20         MR. BRETH:  It's going to be somewhat difficult, Your

21   Honor.  I acknowledge that.

22         THE COURT:  How long do you think that count will

23   take?

24         MR. BRETH:  A significant period of time, Your Honor.

25         THE COURT:  Do you want to respond?

1          MS. HANGLEY:  Sure.

2          THE COURT:  I know you have responded to that, because

3     you did write something about the video.  Or maybe I saw it in

4     the exhibits -- I saw it in the exhibits to the Complaint.

5          MS. HANGLEY:  Your Honor --

6          THE COURT:  It's preserving what takes place and it's

7     going to be available to anybody at any time later.

8          MS. HANGLEY:  That's -- I understand what's in the

9     exhibits is the county's position.  We did not brief this

10    because it was not in their claim for relief or in the TRO.

11         THE COURT:  But you do agree that under the Election

12    Code of Pennsylvania that indeed each candidate is entitled to

13    have a representative as a watcher?

14         MS. HANGLEY:  Correct.  They're entitled to -- the

15    statute says they are entitled to -- permitted to remain in the

16    room.  The code says nothing about being permitted to hover, to

17    be a certain distance away.

18         In the Philadelphia -- last night, the Philadelphia

19    elections court ruled that the arrangements in Philadelphia

20    were acceptable, where there's a cordoned-off area at one side

21    of the Convention Center room, a very, very large space.  And

22    there's also a video there.

23         Here, the plaintiffs -- they don't, as far as I know,

24    have any evidence of what the arrangements are in Montgomery

25    County, what they -- why they feel like they are being

1    hampered.

2            And I also don't have any argument really for why this

3    should be in the Eastern District of Pennsylvania rather than

4    the Montgomery County elections court.  It is a pure state law

5    issue with no --

6            THE COURT:  Now, how do you have a federal hook on

7    that one, Mr. Breth?

8            MR. BRETH:  On that one, Your Honor, quite honestly,

9    this is the weaker of our two, and we're happy to withdraw it.

10   It was something we raised initially --

11           THE COURT:  You're withdrawing the observation issue?

12           MR. BRETH:  We'll withdraw the observation.

13           THE COURT:  Very well.  We're proceeding solely on the

14   pre-canvass.

15           MR. BRETH:  Just so we're clear, Your Honor, so I'm

16   clear on this --

17           THE COURT:  Without prejudice to you pursuing it

18   elsewhere.

19           MR. BRETH:  Absolutely, Your Honor.  Due to the timing

20   and the significance of our issue with respect to the ballots,

21   that's where we'd like the Court's attention.

22           THE COURT:  So you don't have to waste your time,

23   Ms. Hangley, responding to that.

24           MS. HANGLEY:  I would never say anything about voting

25   is a waste of time, Your Honor.

1            THE COURT:  No, no.  The observation issue.

2            MS. HANGLEY:  Correct.

3            THE COURT:  You said you didn't have enough time to

4   get ready for it.

5            MS. HANGLEY:  Uh-huh.

6            THE COURT:  All right.  So where are we?

7            MR. BRETH:  I believe, Your Honor, from the

8   plaintiffs' side, our declarations have been admitted and we'd

9   look to the defense if they want to call a witness.

10           THE COURT:  Do you want to call a witness?

11           MS. HANGLEY:  Yes, Your Honor.

12           THE COURT:  Okay.

13           MS. HANGLEY:  Your Honor, can we request a five-minute

14  break?

15           THE COURT:  Sure.

16           MS. HANGLEY:  Thank you.

17           (Recess at 10:24 a.m. until 10:34 a.m.)

18           THE COURT:  Please be seated.

19           Do you have a witness?

20           MS. HANGLEY:  Yes.  Defendants called Mr. Lee

21  Soltysiak.

22           LEE SOLTYSIAK, DEFENDANT'S WITNESS was duly sworn.

23           MS. HANGLEY:  Your Honor, would you prefer that

24  Mr. Soltysiak take his mask off or keep it on?

25           THE COURT:  Are you okay with it on?

1                 THE WITNESS:  If you are.

2                 THE COURT:  Are you okay with it on?

3                 THE WITNESS:  I am.

4                 THE COURT:  All right, fine.

5                           DIRECT EXAMINATION

6    BY MS. HANGLEY:

7    Q.   Mr. Soltysiak, can you tell me what your job is?

8    A.   I am the chief operating officer for Montgomery County and

9    the chief clerk of the election board.

10   Q.   And does that position involve election responsibilities?

11   A.   Yes, it does.

12   Q.   Broadly, what are those?

13   A.   To oversee generally the administration of the election in

14   Montgomery County.

15                THE COURT:  Pull the microphone a little closer to

16   you.  Okay?  You can bend it.

17   BY MS. HANGLEY:

18   Q.   How long have you had that role?

19   A.   Approximately three years.

20   Q.   And you're aware -- how long has the county had the

21   policies described today with regard to curing deficient

22   absentee and mail-in ballots?

23   A.   This policy has been in place years prior to this

24   election.

25   Q.   And can you describe what the county's practice has been

1   in past elections?

2   A.   When ballots were received into voter services, either --

3   well, in the past by mail, they would be reviewed by county

4   voter services staff for general completeness of the

5   declarations page.

6        And in the cases where ballots were observed to be

7   potentially deficient in some way with regard to the

8   declarations, the ballot was returned to the voter by mail.

9   Q.   And what would the voter do with that ballot?

10  A.   They were provided instructions as to what their options

11  were to fill in the deficiency that was identified on the

12  exterior envelope or that they could vote provisionally.

13  Q.   And do you have any reason to believe one way or the other

14  whether the parties, political parties in Montgomery County,

15  were aware of this practice?

16  A.   I believe they were.

17  Q.   And what's the basis for that?

18  A.   That this has been a practice, like I said, years leading

19  up to this election.  And it's my understanding that both

20  parties have, over the years, requested information along these

21  lines with regard to ballots that were set aside for

22  potentially not being able to be counted.

23  Q.   And by information along these lines, do you mean the list

24  of ballots set aside?

25  A.   Correct.

1  Q.   And in this election, in the November election, did the

2  Republican party make that request to you?

3  A.   They did.

4  Q.   Do you recall approximately when that was?

5  A.   Some day last week.  I apologize on the exact date.

6  Q.   Okay.  Was it before Election Day?

7  A.   It was before Election Day, yeah.

8  Q.   And what did you do in response?

9  A.   We supplied the list of voters whose ballots fell into

10  this category to both parties.

11  Q.   And what's your understanding of why the parties -- what

12  the parties did with that information?

13  A.   I understand parties reached out.  I don't know exactly

14  how they handled the list or in what manners they reached out,

15  but they were contacting voters to let them know of the

16  deficiency potentially in their ballot and that they can come

17  into the county office building to correct it or that they

18  could vote provisional.

19  Q.   That was going to be my next question.

20        For every voter who gets this kind of communication,

21  either from the county or from a party, what are the options

22  that a voter has if they've been notified that there's

23  something wrong with their ballot?

24  A.   Well, I can speak to the communication from the county

25  that we made directly to voters.  And that is that they can

1   come into our office building in Norristown where their ballots

2   were segregated and they could correct whatever the deficiency

3   was, whether it was a declaration issue or the lack of a

4   secrecy envelope, or that they could vote provisionally if they

5   were -- at that point they decided voting in person was a

6   better option.

7   Q.   And you've heard argument about this subject, but to

8   clarify, if a voter -- if a voter's absentee or mail-in ballot

9   has a deficient declaration or envelope, and the voter casts a

10  provisional ballot, what happens to whether either of those

11  ballots are counted?

12  A.   The first ballot received is the ballot counted.

13       In the case that you -- the example you just cited, the

14  provisional ballot would be counted because the original ballot

15  would have, at the time of the pre-canvass, been deemed not

16  acceptable.

17  Q.   And what about the example that I believe the judge said,

18  where a voter changes their mind and goes in -- submits an

19  absentee ballot, changes their mind, goes in and submits a

20  provisional ballot?

21  A.   If the absentee ballot was received by the county and

22  accepted, the provisional ballot would not count.

23  Q.   The fact that -- did Montgomery County communicate with

24  the press the fact that it was allowing voters to come in and

25  cure ballots?

1   A.   We did.

2   Q.   Can you tell me about those communications?

3   A.   There was an interview with the Philadelphia Inquirer,

4   also with Channel 10.  I recall those specifically.  There were

5   other press questions from various outlets that I don't recall

6   specifically.

7   Q.   Were those interviews with you personally?

8   A.   Pardon me?

9   Q.   Who from Montgomery County had those interviews?

10  A.   That was me.

11  Q.   So you spoke to at least two media outlets?

12  A.   That's right.

13  Q.   And do you know whether or not those outlets published

14  anything about Montgomery County's processes?

15  A.   They did.

16  Q.   Do you know what those were?

17  A.   They were as I described here, that Montgomery County was

18  making an effort to reach out to voters who have attempted to

19  submit their ballot to the county and that in some way their --

20  their ballot was potentially deficient and that they were

21  alerted to the fact that they could come in and correct that

22  deficiency or that they could vote provisionally.

23        MS. HANGLEY:  Your Honor, if I may, I would request

24  permission to submit evidence of that press coverage to show

25  when it was.

1            THE COURT:  And what?

2            MS. HANGLEY:  I'd like to submit evidence of that

3    press coverage to demonstrate that this was in the press before

4    Election Day.

5            THE COURT:  Any objection?

6            MR. BRETH:  Without seeing it, Your Honor, I just

7    reserve the right to object.

8            I don't think that I necessarily have an objection,

9    but without seeing what is being submitted and the consistency

10   and accuracy of what's being reported, I would like to reserve

11   the right to object to that.

12           THE COURT:  Okay.

13   BY MS. HANGLEY:

14   Q.   Mr. Soltysiak, this is my last topic.

15        Plaintiffs have asked you to sequester and not count -- if

16   I understand their argument correctly -- ballots that were

17   cured, that voters came in and corrected.

18        How many of those ballots are there in Montgomery County?

19   A.   The total is 93.

20   Q.   Yesterday did Montgomery County communicate to the press a

21   different number?

22   A.   Unfortunately, yes.

23   Q.   What was that number?

24   A.   49.

25   Q.   How do we get from 49 to 93?

1   A.   When the staff was directed to sequester those ballots,

2   unfortunately, the first number that was communicated to me was

3   the first batch of those ballots was 49.  The other 44 were yet

4   to be sorted in a way that they could be pulled and

5   sequestered, but they were all done so.

6   Q.   Have you now identified -- are you confident that you've

7   identified every ballot in question?

8   A.   We have.

9   Q.   And where are those ballots now?  Are they being counted?

10  A.   We've agreed to set them aside, and they are in a locked

11  cabinet in a locked room under 24-hour surveillance.

12            MS. HANGLEY:  That's all I have, Your Honor.

13            THE COURT:  Anything from over here?

14            MR. GRUGAN:  Not from me, Your Honor.

15            MR. PRATT:  Nothing from me, Your Honor.

16            THE COURT:  Go ahead, Mr. Breth.

17            MR. BRETH:  Thank you, Your Honor.

18                         CROSS-EXAMINATION

19  BY MR. BRETH:

20  Q.   Mr. Soltysiak, am I pronouncing that correctly?

21  A.   You are.

22  Q.   I'll continue to try to.

23       Just with respect to those totals, you're not testifying

24  today that there were only 93 ballots, mail-in and/or absentee

25  ballots that were defective, are you?

1  A.   I am not.

2  Q.   That 93 is the number of ballots that were defective and

3  that have been changed by the voter?

4  A.   That's correct.

5  Q.   Do you know how many defective ballots Montgomery County

6  has detected, absentee or mail-in?

7  A.   I'm sorry, can you repeat that?

8  Q.   Correct.  93 have been changed.

9       How many total have been identified as being defective,

10 absentee and mail-in?

11 A.   Well, prior to the canvass starting at 7:00 a.m., none of

12 those ballots were deemed to be defective, they were just set

13 aside, because that's a judgment that can't be made prior to

14 7:00 a.m.

15      Yeah.  I don't recall the total number.  And there were a

16 couple of different categories, including ballots that were

17 returned as undeliverable in that batch.  So I believe the

18 total number was approximately 2,700 ballots that was

19 communicated to both parties.

20           THE COURT:  How many?

21           THE WITNESS:  2,700.

22 BY MR. BRETH:

23 Q.   And that was as of what date and time?

24 A.   One of the days over the weekend.  I don't recall when the

25 parties received that list over the weekend exactly.

1  Q.   Okay.  So it would have been -- at the latest, it would

2  have been Sunday, November 1st, if I understand your testimony.

3  That was the last day of the weekend.

4  A.   At the very latest, right.  Exactly.  I think it was

5  Saturday, but I can't be certain.

6  Q.   And how were those defective ballots identified?

7  A.   When the mail arrives at the mail processing center,

8  either by USPS or the delivery of our drop boxes, that mail is

9  reviewed by county staff.  And observations are made about the

10 declaration itself, of whether or not it is complete.  And if

11 it is observable that there is not a privacy envelope, those

12 ballots were set aside.  And the remainder were processed

13 through the sorting machine and then bundled and put into a

14 locked room.

15 Q.   Okay.  So the -- how do you -- I don't want to use the

16 terminology to describe what you just described.  I think you

17 said inspection.  Is that the correct terminology?  The ballots

18 as they come in are inspected?

19 A.   Reviewed, looked at.

20        THE COURT:  Did he use the word "inspect"?

21        MR. BRETH:  I think that's why I was --

22        THE COURT:  You want him to use the word "inspect."

23        MR. BRETH:  Well, no.  It's been used in the past,

24 Your Honor, and that's why I was a little bit unsure.

25 BY MR. BRETH:

1   Q.   Review and inspected, is that a fair characterization of

2   what is being done?

3          MS. HANGLEY:  Objection.

4          THE COURT:  Overruled.

5          THE WITNESS:  The ballots are manually looked at as

6   they are received.

7   BY MR. BRETH:

8   Q.   Okay.  So in this -- as the ballots are manually looked

9   at, who's conducting that manual review?

10  A.   County voter services staff.

11  Q.   Board of election employees?

12  A.   Correct.

13  Q.   This is prior to the ballots, if I'm understanding you,

14  being processed through the statewide SURE system?  I'm sorry.

15  A.   Yeah, are you asking me if that's true?

16  Q.   Yes.

17  A.   That's correct.

18  Q.   Yeah.  And the purpose behind this -- and I'm sorry, I've

19  already forgotten what we agreed to refer to it as, this manual

20  review, the purpose behind that is what?

21  A.   To identify any potential defects on -- that are

22  observable on the voter's ballot.  There is also, on occasion,

23  ballots mixed in that aren't Montgomery County ballots that we

24  need to return to other counties.  And anything else that is,

25  frankly, not a ballot that is intended to be a ballot that

1  arrives with us, that comes out during that manual check.

2  Q.   Now, would you agree with me that this election cycle, the

3  primary and the general election that we're in right now, is

4  the first time that the Commonwealth of Pennsylvania

5  implemented mail-in ballots other than absentee ballots; is

6  that right?

7  A.   That is correct.

8  Q.   So when you've testified regarding prior years, those

9  prior years would relate solely to absentee ballots.  Correct?

10  A.   That is correct.

11  Q.   Okay.  Of the 2,700 that were identified as late as

12  Sunday, do you know how many as you sit here today have been

13  identified as defective in one manner or another?

14          THE COURT:  I'm not clear on that question.

15          MR. BRETH:  I'll rephrase the question.

16  BY MR. BRETH:

17  Q.   You indicated as of the weekend -- so that would be at the

18  latest point Sunday -- that the number that have been processed

19  and identified was 2,700.  That's a rough number?

20  A.   Very rough, yeah.

21  Q.   Is that correct?

22  A.   That is correct.

23  Q.   Well, hasn't there been additional absentee and mail-in

24  ballots received by the Board of Elections since Sunday?

25  A.   That is correct.

1  Q.   And you're going to continue to receive them potentially

2  all the way through Friday?

3  A.   That is correct.

4  Q.   And if I understand your testimony, the Board of Elections

5  will conduct the same procedure of manually reviewing them

6  prior to sending them through the SURE system?

7  A.   That is incorrect.

8  Q.   Okay.  So there's going to be a change in how you handle

9  processing those?

10  A.   That is correct.  At the point of canvass beginning.

11  Q.   Okay.  And when does the point of canvass beginning in

12  your opinion -- begin, I'm sorry?

13  A.   7:00 a.m. on Election Day.  The pre-canvass.

14  Q.   Okay.  So it began yesterday at 7:00 a.m.?

15  A.   That is correct.

16  Q.   So between Sunday, the weekend number of 2,700, were there

17  any processed on Monday going into -- up to 6:59 a.m. on

18  Tuesday morning?

19  A.   I believe they were.

20  Q.   And do you know how many were processed?

21  A.   Not exactly.

22  Q.   Do you have an inexact estimate of how many, above and

23  beyond the 2,700?

24  A.   I think we're talking about two different numbers now.

25  I'm referring to the 93 that were cured up until Monday.

1  Q.   I'm not talking about the ones that, to use your

2  terminology, were cured.  I'm talking about the total number

3  that were identified as being defective through the process

4  you've just described.

5          THE COURT:  As of?

6          MR. BRETH:  As of --

7  BY MR. BRETH:

8  Q.   Well, you said the process ended 7:00 a.m. Election Day,

9  which was Tuesday the 3rd.

10         So as of, you know, when canvassing started.

11 A.   I don't know the exact --

12 Q.   I'm asking if you know an inexact number, an estimate.

13 A.   I don't imagine it grew much more than that in a day, but

14 I cannot be sure as I sit here what that number was.

15 Q.   Okay.  Is there a reason why you're treating the absentee

16 and mail-in ballots received after 7:00 a.m. November 3rd,

17 Election Day, differently than you're treating the absentee and

18 mail-in ballots that were received prior to that?

19 A.   The reason is that prior to the pre-canvass beginning at

20 7:00 a.m., county boards of election -- elections aren't

21 permitted to reject the ballot.  So prior to canvass starting,

22 ballots were simply set aside so that we could alert voters of

23 their opportunity to correct any potential deficiency on their

24 ballot.

25 Q.   Well, I think you indicated some were accepted.  Is that

1   accurate?

2            THE COURT:   Some of what?

3            MR. BRETH:   Some of the ballots that were received

4   were accepted.

5            And I took that to be versus rejected.

6            THE WITNESS:   Oh.   They were just observed not to have

7   a potentially fatal flaw in the declarations.

8   BY MR. BRETH:

9   Q.   Okay.   That's the definition of the term "accepted"?

10  A.   In this instance, yes.

11  Q.   Okay.   Are all of the ballots, whether they are accepted

12  or rejected -- and I'm going to -- just so that we're clear,

13  I'm still going to continue to talk about ballots, mail-in and

14  absentee ballots received prior to 7:00 a.m. on Election Day.

15           MS. HANGLEY:   Objection.

16           THE COURT:   Basis?

17           MS. HANGLEY:   There was no testimony that ballots were

18  rejected or accepted under the meaning of the Election Code

19  before pre-canvassing began on Election Day.   I'm not

20  understanding --

21           THE COURT:   You know what I think the problem is?   I

22  think, Mr. Breth, you and the witness are talking about two

23  different things.

24           MR. BRETH:   I'm sorry, Your Honor.

25           THE COURT:   It appears that you and the witness are

1  talking about two different things.

2          MR. BRETH:  Well, that's why I'm trying to get

3  clarification.

4          He used the term "accepted," I believe.  That's why I

5  asked him how he's defining the term "accepted."  He said, I

6  believe --

7          THE COURT:  Well, don't tell him.  Ask him the

8  question.

9          MR. BRETH:  Okay.

10  BY MR. BRETH:

11  Q.  You've used the term "rejected."

12          As I understand your testimony -- and you can correct me

13  if I'm wrong, please -- that means that there has been a defect

14  identified in the mail-in or absentee ballot?

15  A.  A potential defect.

16  Q.  A potential defect.

17          As of Sunday, this past Sunday, the 1st, approximately

18  2,700 ballots had been identified as being defective

19  potentially.  That number --

20          I'm sorry, if you can verbally.  And you may be, I just

21  can't hear you.

22          So I see your head nodding, and I'm assuming that's a yes,

23  but I'm not sure if the court reporter is getting it as a yes.

24  A.  What number are you asking me to confirm?

25  Q.  As of this past Sunday, November 1st, there was

1  approximately 2,700 defective ballots, mail-in or absentee.

2  A.   Can I -- there's an email perhaps in an exhibit that has

3  the exact number.  I don't want to keep misrepeating it.

4  Q.   There's an -- I'm sorry, I didn't mean to interrupt you.

5  A.   Right.  I believe it is approximately 2,700.

6  Q.   Okay.  And there's an Excel spreadsheet that's been

7  distributed?

8  A.   That is correct.

9  Q.   Okay.  And you've indicated that that number potentially

10  could have grown by the processing of ballots on Monday, all

11  the way up to canvassing at 7:00 a.m. on Election Day.

12  Correct?

13  A.   Correct.

14  Q.   Okay.  But you're not sure of that exact number.  Correct?

15  A.   Correct.

16  Q.   Okay.  Now what I'm going to switch to is, that's the

17  defective ballots, the rejected, so to speak.

18        MS. HANGLEY:  Objection.

19        THE COURT:  Overruled.

20  BY MR. BRETH:

21  Q.   The accepted ballots -- you used the term "accepted."  And

22  I believe when I asked what you meant or the definition of

23  accepted, you indicated those are the ones that aren't

24  defective or potentially defective that have been sequestered

25  over in a different area, those are the ones that move further

1  along the process.

2      Is that a fair representation of your testimony?

3          MS. HANGLEY:  Again, I'll object to the repeated

4  characterization of the testimony as something Mr. Soltysiak --

5          THE COURT:  He can characterize it any way he wants.

6  I'm the one who's listening to the testimony.  And I'm sure I

7  can make my own conclusion of that characterization.

8          MS. HANGLEY:  Thank you, Your Honor.

9          THE WITNESS:  I'm sorry, can you repeat?

10 BY MR. BRETH:

11 Q.  Of course, Mr. Soltysiak.

12     Could you explain to me what you meant by accepted from a

13 procedural standpoint, please?

14 A.  Any ballot that was observed not to have an observable

15 potential defect was sorted so that it can be then processed

16 and officially accepted or rejected as the canvass begins at

17 7:00 on Election Day.

18         THE COURT:  Let me ask you if this is a correct

19 characterization.

20         You look at them initially, and if there's an obvious

21 defect, you segregate them.

22         And then on further review, when you do the actual

23 count or canvass, then you'll inspect them more carefully and

24 then you weed out more; is that correct?

25         THE WITNESS:  That is correct.

1          THE COURT:  All right.  I get it.

2   BY MR. BRETH:

3   Q.   With respect to the ones that have been identified as

4   potentially having defects, and those that have not, are all of

5   them scanned into the statewide SURE system?

6   A.   They are.

7   Q.   Okay.  And when does that occur?  Let's start with the

8   ones that you've identified as potentially having defects, when

9   does that scanning into the state system occur?

10  A.   Once they are received by the county.  There's some --

11  however long it takes to scan them once they're received by the

12  county.

13  Q.   Are they scanned prior to the manual review, or are they

14  scanned after?

15  A.   After and during.

16  Q.   And the same thing obviously with respect to the ones that

17  no potential defect is identified.  Correct?

18  A.   Correct.

19  Q.   And the purpose of scanning them into the statewide system

20  is what?

21  A.   To alert the voter that their ballot had been received.

22  Q.   Any other reason that you scan them?

23  A.   So the county knows that we have received it as well.

24  Q.   With respect to the manual review, how do you identify

25  whether -- because I'm assuming you're looking at the outside

1  envelope.

2      How do you determine whether there is a privacy envelope

3  inside that outer envelope?

4  A.   It is possible, on a manual review of a ballot,

5  to literally observe that there's a ballot in the envelope not

6  in a secrecy envelope, which is in part the point I think of

7  having the secrecy envelope.  So on the manual review, some of

8  those ballots are identified in that manner.

9      And also our sorting machine has the ability to sort

10  ballots by a particular weight.  So an underweight ballot would

11  go into a separate bin for a manual review.

12  Q.   And is that something that you as an election board has to

13  calibrate that scanning machine specifically to do that

14  function, to separate out what I would call underweight

15  ballots?

16  A.   Correct.

17  Q.   With respect to the manual, I'm assuming, if I understand

18  your testimony, correct me if I'm wrong, by feel, you might

19  feel that there's an inside ballot -- inside envelope, I'm

20  sorry?

21  A.   I've heard it described that way.

22  Q.   You've not participated in that process?

23  A.   I have not.

24  Q.   It's obviously not something that I'm assuming that you

25  could hold up to the light and determine through that method,

1  do you know?

2  A.   I do know that you can observe a ballot inside an outer

3  envelope that is not inside a secrecy envelope.

4           THE COURT:  Mr. Breth, what is the point of all of

5  this?

6           MR. BRETH:  Well, I'm trying to understand the

7  process, Your Honor, because the allegation is that there is

8  the authority to deviate from the Election Code.  And I can

9  certainly shorten it up, Your Honor, if that's a polite nudging

10 me along.

11          THE COURT:  It's not a nudging and I'm not rushing

12 you.  I'm just trying to understand where you're going.

13          MR. BRETH:  Okay.  I'm trying to understand the

14 process.

15          The plaintiffs have alleged that their handling of

16 these ballots is inconsistent with the Election Code, so fully

17 understanding --

18          THE COURT:  Do you mean to tell me that the Election

19 Code has a provision for that?

20          MR. BRETH:  Yes.

21          THE COURT:  About feeling the documents or sorting

22 machines for weight?

23          MR. BRETH:  No, no, no.  There is guidance with

24 respect to them being scanned.

25          THE COURT:  By statute?

1          MR. BRETH:  The -- actually, the Election Code says

2     they need to be secured in their containers, locked, so all of

3     this manual touching and inspecting, however you want to

4     characterize it, reviewing it, this is in violation of the

5     Election Code.  The scanning is --

6          THE COURT:  You just defined it to mean it doesn't

7     seem to be a violation of that.

8          MR. BRETH:  They're not being scanned, Your Honor,

9     solely being scanned.

10         There's directive from the secretary that they're to

11    be scanned into the SURE system.  Other than that, they're

12    supposed to be in locked containers.  The evaluation --

13         THE COURT:  This is somewhat going back to the crux of

14    your main argument that if the code doesn't say you can do it,

15    you can't do it?

16         MR. BRETH:  Correct.

17         THE COURT:  All right.

18         MR. BRETH:  Or if the code says you're supposed to

19    treat it, in this case, treat it in a specific manner.  The

20    code does speak to how they're to be treated, the guidance does

21    speak to how they're to be treated for the purpose of scanning.

22    And it says that's all you're supposed to do until they're

23    canvassed, so the code does address that.

24         That's why I'm asking the questions here, so I have an

25    understanding --

1          THE COURT:  I'll see this in your brief?

2          MR. BRETH:  Absolutely, Your Honor.

3   BY MR. BRETH:

4   Q.   Of the defective ballots -- and I'm going to use the

5   number 2,700 approximately, because that seems to be the number

6   that you're comfortable with as of the weekend.

7          And, I'm sorry, you're shaking -- please --

8          THE COURT:  If that's the number you're comfortable

9   asking, then go ahead.

10  BY MR. BRETH:

11  Q.   Please.  I'm not trying to push your testimony.

12         If you need to explain a number, please explain.

13  A.   A large amount of that 2,700 was mail that was returned to

14  voter services as either undeliverable or return to sender,

15  because it is, by law, unable to be forwarded.  So those

16  ballots literally never reached the voter.

17  Q.   Of that 2,700 -- do you have a number of -- if it's not

18  2,700, what's the number?

19  A.   I do not know the exact number.

20  Q.   Okay.  Let's say 1,300 for our discussions.  Okay?  I'm

21  not asking you to admit the 1,300, I'm just trying to pick a

22  number that we can have a conversation about.  Okay?

23  A.   And what is the 1,300?  I'm sorry.

24  Q.   That are defective.  That are actual ballots that should

25  have been -- absentee or mail-in ballots that actually should

1  have been sent to Montgomery County's board of election.  You

2  received when you went through your manual review and

3  determined that they may potentially be defective?

4  A.  That is correct.

5  Q.  Okay.  So of that number, were you able to contact -- my

6  understanding is that the Board of Elections made efforts to

7  contact the voters for each of those ballots?

8  A.  To the extent we had contact information for the voter.

9  Q.  Okay.  And how would you have contact information -- first

10 of all, how would you identify the voter?

11 A.  On the ballot that they returned, that we would be able to

12 look up their voter registration and voter information, their

13 address and contact information if they provided it.

14 Q.  But on the -- correct me if I'm wrong, on the exterior

15 ballot or the exterior envelope, there's no identifier other

16 than a barcode that would give you the voter's name, address,

17 district, political affiliation, there's none of those

18 indicators other than a barcode?  Am I wrong about that?

19 A.  You are.

20 Q.  Okay.  What's on the outside of the envelope?

21 A.  The name and address of the voter, as well as the barcode.

22 Q.  Okay.  And that's how you're identifying the voter is the

23 name and address that's on the outer envelope?

24 A.  Correct.

25 Q.  So when you indicate that you contact or attempt to

1  contact the voters that you have that information, is that the

2  sole source of that information, or are there other sources of

3  information that are utilized?

4  A.   We have the information that is -- whatever information is

5  in the SURE system that the voter provided.

6  Q.   So when you run the ballot through the SURE system, it

7  reads the barcode and provides that information to you, and you

8  use that -- the Montgomery County election board used that

9  information to attempt to contact the individuals?

10  A.   Correct.

11  Q.   Of the fictitious number that I'm using for our

12  discussion, 1,300, how many of those individuals -- were you

13  able to contact all 1,300?

14  A.   I don't believe so.

15  Q.   Do you know what percentage you were able to contact?

16  A.   I do not know the percentage.

17  Q.   Of that 1,300, 91 actually came in and were permitted to

18  either put a secrecy ballot in the inside their outer -- or,

19  I'm sorry, I keep saying ballot -- secrecy envelope inside

20  their outer envelope or correct some other defect?

21  A.   I believe I said 93, but that's correct.

22  Q.   Okay.  This process changed as of 7:00 a.m. on Election

23  Day.  Correct?

24  A.   That's correct.

25  Q.   That's when the pre-canvassing/canvassing began?

1  A.   Correct.

2  Q.   So if I'm understanding you, as of that date, there was no

3  longer any manual review of mail-in or absentee ballots?

4  A.   There was -- just to the extent that there were ballots

5  needing to be sorted out that we may have received from other

6  counties, there is a lot of manual handling of the mail as it

7  comes in.  But you are correct that our process changed at

8  7:00 a.m. on election morning.

9  Q.   So there were no efforts to attempt to contact the voters

10  that utilized absentee or mail-in ballots to provide them with

11  an opportunity to correct the defect?  As of 7:00 a.m. on

12  Election Day, that stopped?

13  A.   As of 7:00 a.m. Election Day, we were permitted to make

14  those judgments on those ballots as to whether or not they

15  would be accepted and scanned or in fact rejected and canceled.

16       So at that point, those ballots that were deemed to

17  actually have a defect in one manner or another, those ballots

18  were canceled.  And if an email was on file in the SURE system,

19  those voters would have received an email alerting them to the

20  fact that their ballot had been canceled and advising them that

21  they can go to the -- to vote in person and vote provisionally

22  if they chose to.

23            THE COURT:  Wait a minute.

24            You're talking about a 13-hour window?

25            THE WITNESS:  I'm sorry?

1          THE COURT:  You're talking about a 13-hour window?

2   After 7:00 a.m. yesterday, you would contact somebody?

3          THE WITNESS:  The voter is automatically notified

4   one -- of the status change of their ballot.

5          So once that judgment is made at the pre-canvass, the

6   ballot is canceled and the voter is immediately, if we have an

7   email, notified of that status change.

8          THE COURT:  All right.

9   BY MR. BRETH:

10  Q.   And who is making that judgment?

11  A.   That judgment is made at the canvass -- at the pre-canvass

12  at that time of day by folks appointed by the election board to

13  make those judgments.

14  Q.   Do you know who --

15         THE COURT:  I don't think this comes within the scope

16  of your Complaint, Mr. Breth.  And I'm going to tell you that

17  now.

18         MR. BRETH:  Thank you, Your Honor.  I'll move on.

19  BY MR. BRETH:

20  Q.   So through this process, the recourse for those

21  individuals is to cast a provisional ballot?

22  A.   At that point on Election Day, that is correct.

23  Q.   Okay.  Do you know how those provisional ballots are

24  treated?

25  A.   They are cast at the polling location, and they are

1  handled at the end of tabulation once it's been determined

2  whether or not a ballot had been received and accepted by voter

3  services.

4  Q.   If a ballot, to use your terminology, a ballot hadn't been

5  accepted --

6         THE COURT:  At what time?

7         MR. BRETH:  Post-7:00 a.m. Election Day.  In the

8  pre-canvassing --

9         THE COURT:  That's outside the scope of your

10  Complaint.  I gave you a lot of leeway, but now you're just

11  going a little bit too far.

12         MR. BRETH:  That's fine, Your Honor.  I misunderstood

13  the directive that you gave me.  I now understand.

14  BY MR. BRETH:

15  Q.   Mr. Soltysiak --

16  A.   Correct.

17  Q.   Mr. Soltysiak, you've testified with respect to board

18  policy.

19      Would you agree with me that the Board of Elections is a

20  governmental entity under the laws of the Commonwealth of

21  Pennsylvania, they're subject to the Sunshine Act, they have

22  public meetings, et cetera?

23         MS. HANGLEY:  Object.

24         THE COURT:  Does it matter what he thinks?

25         MR. BRETH:  Well, no, it really doesn't, Your Honor,

1   but I'm --

2           THE COURT:   Then why ask the question?

3           MR. BRETH:   I'm just trying to get the witness's

4   knowledge with respect to the operations.   He's been proffered

5   as the elections clerk.

6           THE COURT:   Well, you're asking him a question the

7   answer of which we all know.

8           MR. BRETH:   I'll rephrase.

9   BY MR. BRETH:

10  Q.   The election board has public meetings.   Correct?

11  A.   They do.

12          MS. HANGLEY:   Object, beyond the scope.

13          MR. BRETH:   He's testified with respect to policies.

14  I'll get to the issues.

15          THE COURT:   Ask him about policies.

16          MR. BRETH:   Thank you, Your Honor.

17  BY MR. BRETH:

18  Q.   Are there written policies that define or outline the

19  procedure you just talked about?

20  A.   I believe there are.

21  Q.   You believe there are or you know there are?

22  A.   I do believe there are.   I have not -- I don't have them.

23  Q.   You don't have them with you today?

24  A.   No, I do not.

25  Q.   Would you be able to produce those --

1    A.    If we have them.

2    Q.    -- if the Court so asked you to do that?

3    A.    Yes, if we have them.  I'm just not certain.  If we've got

4    them, if we have them, we can do that.

5    Q.    Okay.  Do you know whether the Board of Elections approved

6    those policies and the implementation of those policies?

7    A.    I don't know that.

8              MS. HANGLEY:  Same objection.

9              THE COURT:  He doesn't know.

10             MR. BRETH:  I'm sorry, I heard the objection, I didn't

11   hear the answer.

12             THE WITNESS:  The current election board --

13             THE COURT:  No.

14             THE WITNESS:  I'm sorry.

15   BY MR. BRETH:

16   Q.    How did you learn of this procedure?  You were hired three

17   years ago, I believe you indicated.

18         How did you learn of the procedure in handling these

19   ballots?  And once again, just so I'm clear, this is

20   pre-7:00 a.m. on Election Day.

21   A.    That is the way that voter services has handled ballots of

22   this nature.  And when I took the job, that was my

23   understanding.

24             THE COURT:  So you know it because you saw it?

25             THE WITNESS:  That is correct.

1  BY MR. BRETH:

2  Q.   Okay.  Was this verbally explained to you by anyone or was

3  it just your observation?

4  A.   It was verbally explained.

5  Q.   And who explained it to you?

6  A.   Our solicitor for voter services.

7        MR. BRETH:  That's all the questions I have at this

8  time, Your Honor.

9        Thank you.

10        THE COURT:  Ms. Hangley?

11        MS. HANGLEY:  Thank you.  A very short list of

12  questions.

13                    REDIRECT EXAMINATION

14  BY MR. BRETH:

15  Q.   First, Mr. Soltysiak, the word "ballot" has been thrown

16  around a lot in the cross-examination, and I want to make sure

17  that the record is clear as to what it means -- what that

18  testimony meant.

19        You were asked a question about whether voters were

20  changing their ballots.

21        And during this cure process, was any voter permitted to

22  change their ballot?

23  A.   They were not.

24  Q.   What were they permitted to change?

25  A.   Only to provide the deficiency that was identified on the

1 outer envelope or to put their ballot inside of the secrecy

2 envelope if it was in fact missing one.

3 Q.   And you were asked about when ballots were scanned into

4 the SURE system.

5      Are ballots scanned into the SURE system before Election

6 Day?

7 A.   Only as -- as having been received.

8 Q.   Is that the ballot itself that's being scanned?

9 A.   Oh, no.  The ballot is not being scanned.

10 Q.   And has Montgomery County always had scanners for ballot

11 envelopes?

12 A.   We have not.

13 Q.   And before Montgomery County had scanners for the ballot

14 envelopes, how did Montgomery County update its records to show

15 whether ballots had come in or not?

16 A.   It was a manual process.

17 Q.   And are you aware of how other counties determine whether

18 ballots have come in or not in Pennsylvania?

19 A.   Not intimately.

20 Q.   Do you know whether all counties in Pennsylvania have

21 scanners?

22 A.   I don't know if they all have them now, but -- yeah.

23 Q.   And you were asked a question about absentee versus

24 mail-in ballots.

25      Are procedures different for absentee and mail-in ballots?

1  A.    Not with regard to handling them once they're received.

2          MS. HANGLEY:  That's all I have, Your Honor.

3          THE COURT:  Anything, Mr. Grugan, Mr. Pratt?

4          MR. GRUGAN:  No, Your Honor.

5          MR. PRATT:  No questions.

6          THE COURT:  Thank you, sir.  You may step down.

7          Ms. Hangley, do you have anything else?

8          MS. HANGLEY:  No further witnesses, Your Honor.

9          THE COURT:  Anybody over there have any witnesses?

10         MR. GRUGAN:  We do not, Your Honor.

11         MR. PRATT:  No, Your Honor.

12         THE COURT:  Are you satisfied with the declarations in

13  lieu of live testimony?

14         MS. HANGLEY:  Yes.  We'll -- we are satisfied with the

15  declarations in lieu of live testimony.

16         MR. PRATT:  Same, Your Honor, we're satisfied.

17         MR. GRUGAN:  Yes as well, Your Honor.

18         THE COURT:  Anything else from any of the parties?

19         MS. HANGLEY:  Yes, Your Honor.

20         I understand the plaintiffs will be filing a

21  supplemental brief, and we would like an opportunity to respond

22  to that.

23         THE COURT:  That's fine.  How much time do you need?

24         MS. HANGLEY:  24 hours.

25         THE COURT:  That's fine.  9:00 Friday.

1          MR. PRATT:  Your Honor, and that would be the same for

2   the Democratic Party?

3          THE COURT:  Yes.

4          MR. PRATT:  Thank you.

5          THE COURT:  Interveners can have the same time, 9:00

6   on Friday.

7          MR. GRUGAN:  Thank you, Your Honor.

8          THE COURT:  Mr. Breth?

9          MR. BRETH:  Yes, Your Honor.

10         THE COURT:  What is it that you say jeopardized the

11  integrity of the election?

12         MR. BRETH:  The unilateral deviation and the handling

13  of these ballots.

14         You can't have county-by-county deviation from the

15  uniform standards established in the Election Code and have

16  equal treatment under the 14th Amendment.

17         THE COURT:  How does it jeopardize the integrity of

18  the election?

19         MR. BRETH:  Well, Montgomery County has created their

20  own standards for evaluating whether they're going to give an

21  opportunity to some, not all, but some of the voters to come in

22  and correct defects that if not corrected result in those

23  ballots being rejected.

24         THE COURT:  Where is the integrity of the election

25  affected?

1               MR. BRETH:  Well, Berks County could do something

2     different.  Butler County --

3               THE COURT:  So you didn't sue them.  You sued

4     Montgomery County.  You could have sued Berks County and asked

5     them -- said, you should be doing exactly what Montgomery

6     County is doing.

7               MR. BRETH:  No.  We believe --

8               THE COURT:  Is there a reason you chose Montgomery

9     County as opposed to Berks County?

10              MR. BRETH:  Berks is the one that's deviating from the

11    Election Code.

12              THE COURT:  What?

13              MR. BRETH:  Berks is the one deviating from the

14    Election Code.

15              THE COURT:  Do you mean Montgomery County?

16              MR. BRETH:  I'm sorry.  Montgomery County.  I'm

17    getting a little punchy here.

18              THE COURT:  You almost lost the case there.

19              MR. BRETH:  I almost lost a client.

20              Montgomery County is the one that's deviating from the

21    Election Code, Your Honor.  That's the reason they're being

22    sued.

23              And, Your Honor, it's very similar and it's the same

24    legal --

25              THE COURT:  But on an equal protection argument, you

1  could have sued Berks because they weren't giving those people

2  equal opportunity that Montgomery County had given to the

3  voters.

4       MR. BRETH:  They're providing them every opportunity

5  that they're required to provide under the Election Code and

6  they're doing it in accordance with the Election Code.  That's

7  the thrust --

8       THE COURT:  What do they do?  I don't have any

9  evidence of that.

10      MR. BRETH:  You don't -- quite honestly, Your Honor,

11  you don't need the evidence that everyone else is doing it

12  consistent with the Election Code.

13      THE COURT:  I don't need it.  I just need to know that

14  Montgomery County is not doing it.

15      MR. BRETH:  Correct.

16      THE COURT:  And how do you prevail in your unequal

17  treatment?

18      MR. BRETH:  The same way as the court in Bush v. Gore

19  did the analysis with respect to the two counties that

20  deviated from these standards --

21      THE COURT:  I don't have any evidence of that.

22      MR. BRETH:  Sure, you do.  You have --

23      THE COURT:  How do I know Berks County didn't deviate?

24      MR. BRETH:  Well, because you have no evidence that

25  they deviated.  The presumption is --

```
1              THE COURT:  You're exactly right.

2              MR. BRETH:  Okay.  I'll get you a declaration, Your

3    Honor.

4              THE COURT:  The filing is done.

5              MR. BRETH:  Okay.

6              THE COURT:  I don't understand how the integrity of

7    the election was affected.  That's what I'm looking for.

8              MR. BRETH:  Because they deviated from the Election

9    Code, Your Honor.  That's the thrust of the argument, is that

10   any time --

11             THE COURT:  Right.  That is the thrust of your

12   argument.  And the crux of that particular issue is, from your

13   point of view, that because the Election Code does not

14   specifically allow Montgomery County to do what Montgomery

15   County did that it could not do it.

16             MR. BRETH:  Right.

17             THE COURT:  Okay.  I just want to make sure.

18             What do you say about the unequal treatment?

19             MS. HANGLEY:  Questions are clear that unequal

20   treatment, the Bush v. Gore theory doesn't apply to the

21   procedures and processes.  Some counties have drop boxes, some

22   don't.  That's fine under equal protection.  Different counties

23   have different kinds of voting machines.  Different counties

24   have different processes.  Some -- some get more communications

25   from their Boards of Elections than others do.
```

1              There is no equal protection rule that counties have

2    to follow to go with the lowest common denominator and that you

3    pick the county that makes it hardest for voters to vote, that

4    seems to be the argument.  You pick the county that's the

5    lowest common denominator and all the other counties have to

6    match that.

7              That, to our knowledge, has never -- that argument has

8    never been accepted by any court.

9              And the standing arguments are obvious as well.  But

10   this is not an equal protection issue.

11             And in response to Your Honor's earlier question,

12   nothing about this process threatened the integrity of the

13   election.

14             THE COURT:  How am I not surprised that was your

15   response?

16             Okay.  Anything else from the parties?

17             MR. BRETH:  No, Your Honor.  Thank you.

18             THE COURT:  Have you had enough time to be heard?

19             MR. BRETH:  Yes.  Thank you, Your Honor.  Very much

20   so.

21             MS. HANGLEY:  Yes.  Thank you, Your Honor.

22             MR. PRATT:  Yes, Your Honor, thank you.

23             MR. GRUGAN:  Thank you.

24             THE COURT:  All right.  You can submit your brief,

25   Mr. Breth, 9:00 tomorrow.

1          9:00 on Friday for the defendants and the interveners.

2          RESPONSE:  Thank you, Your Honor.

3          (Proceedings concluded at 11:26 a.m.)

4

5

6

7          I certify that the foregoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10   _____

11   Ann Marie Mitchell, CRR, RDR, RMR
     Official Court Reporter

12

     Date:  4th day of November, 2020

13

14

15

16

17

18

19

20

21

22

23

24

25

**1,300** [6] - 77:20, 77:21, 77:23, 79:12, 79:13, 79:17
**10** [1] - 60:4
**10:24** [1] - 55:17
**10:34** [1] - 55:17
**11:26** [1] - 93:3
**13-hour** [2] - 80:24, 81:1
**14th** [5] - 9:7, 16:4, 16:12, 20:5, 88:16
**16** [1] - 8:21
**161** [1] - 45:4
**17** [2] - 6:18, 8:21
**178** [1] - 45:4
**179** [1] - 45:4
**17th** [2] - 13:24, 44:7
**1860** [1] - 49:22
**1907** [1] - 45:4
**1979** [1] - 45:10
**1983** [2] - 16:6, 16:7
**1st** [4] - 44:2, 64:2, 70:17, 70:25
**2,700** [13] - 63:18, 63:21, 66:11, 66:19, 67:16, 67:23, 70:18, 71:1, 71:5, 77:5, 77:13, 77:17, 77:18
**20-5477** [1] - 4:6
**2000** [2] - 9:11, 13:6
**2019** [1] - 45:13
**2020** [2] - 6:19, 93:12
**207** [1] - 45:4
**21** [1] - 49:19
**211** [1] - 45:12
**213** [1] - 45:10
**218** [1] - 45:10
**219** [1] - 45:10
**24** [1] - 87:24
**24-hour** [1] - 62:11
**25** [1] - 50:1
**2642** [1] - 50:1
**28,879** [1] - 34:8
**3** [3] - 7:17, 8:15, 8:19
**3rd** [3] - 45:12, 68:9, 68:16
**4** [2] - 10:25, 11:9
**44** [1] - 62:3
**49** [8] - 27:19, 27:23, 27:24, 42:4, 42:6, 61:24, 61:25, 62:3
**4th** [1] - 93:12
**51** [2] - 42:4, 42:6
**519** [1] - 45:10
**56** [1] - 3:5
**5:00** [2] - 46:23, 46:24
**62** [1] - 3:5
**6:59** [1] - 67:17
**7:00** [15] - 63:11, 63:14, 67:13, 67:14, 68:8, 68:16, 68:20, 69:14, 71:11, 72:17, 79:22, 80:8, 80:11, 80:13, 81:2

**810** [1] - 45:13
**816** [1] - 45:13
**85** [1] - 3:5
**91** [1] - 79:17
**93** [7] - 61:19, 61:25, 62:24, 63:2, 63:8, 67:25, 79:21
**9:00** [5] - 47:1, 87:25, 88:5, 92:25, 93:1
**9:18** [1] - 4:1
**a.m** [21] - 4:1, 55:17, 63:11, 63:14, 67:13, 67:14, 67:17, 68:8, 68:16, 68:20, 69:14, 71:11, 79:22, 80:8, 80:11, 80:13, 81:2, 82:7, 84:20, 93:3
**ability** [4] - 27:7, 43:19, 46:12, 74:9
**able** [13] - 12:8, 12:9, 12:13, 15:24, 34:23, 35:5, 40:10, 57:22, 78:5, 78:11, 79:13, 79:15, 83:25
**above-entitled** [1] - 93:8
**absentee** [29] - 11:11, 14:1, 12:1, 23:12, 27:17, 28:10, 41:7, 43:20, 46:13, 56:22, 59:8, 59:19, 59:21, 62:24, 63:6, 63:10, 66:5, 66:9, 66:23, 68:15, 68:17, 69:14, 70:14, 71:1, 77:25, 80:3, 80:10, 86:23, 86:25
**absolutely** [9] - 8:13, 14:16, 32:6, 38:16, 43:17, 50:14, 50:16, 54:19, 77:2
**absurd** [1] - 15:17
**acceptable** [2] - 53:20, 59:16
**accepted** [17] - 59:22, 68:25, 69:4, 69:9, 69:11, 69:18, 70:4, 70:5, 71:21, 71:23, 72:12, 72:16, 80:15, 82:2, 82:5, 92:8
**accepting** [1] - 48:11
**accordance** [1] - 90:6
**accuracy** [1] - 61:10
**accurate** [1] - 69:1
**acknowledge** [1] - 52:21
**acknowledged** [2] - 13:24, 27:18
**acknowledgment** [1] - 46:14
**Act** [1] - 82:21
**action** [1] - 33:23
**Action** [1] - 4:5
**actions** [1] - 6:24
**actor** [1] - 20:1
**actual** [4] - 9:1, 31:15, 72:22, 77:24
**add** [1] - 40:22
**addition** [1] - 7:11
**additional** [1] - 66:23
**address** [1] - 6:21, 18:25, 30:7, 41:21, 51:3, 51:4,

76:23, 78:13, 78:16, 78:21, 78:23
**addressed** [1] - 7:16
**administer** [1] - 36:7
**administration** [3] - 32:24, 50:5, 56:13
**admit** [2] - 37:9, 77:21
**admitted** [2] - 48:24, 55:8
**advice** [1] - 40:22
**advising** [1] - 80:20
**affected** [4] - 31:12, 31:14, 88:25, 91:7
**affiliation** [1] - 78:17
**afoul** [1] - 9:3
**ago** [1] - 84:17
**agree** [6] - 6:7, 20:12, 22:2, 22:15, 27:2, 39:25, 53:11, 66:2, 82:19
**agreed** [11] - 8:15, 8:18, 8:20, 8:22, 8:23, 35:13, 36:15, 37:16, 48:1, 62:10, 65:19
**agrees** [1] - 20:12
**ahead** [6] - 16:8, 19:1, 24:22, 31:9, 62:16, 77:9
**ahold** [2] - 12:6, 12:9
**al** [1] - 6:17
**alert** [4] - 40:18, 42:2, 68:22, 73:21
**alerted** [1] - 60:21
**alerting** [1] - 80:19
**allegation** [3] - 17:5, 30:13, 75:7
**allegations** [1] - 5:20
**alleged** [3] - 30:11, 33:12, 75:15
**Allegheny** [5] - 34:6, 34:7, 34:20, 35:11, 44:25
**Alliance** [1] - 49:18
**allow** [7] - 10:8, 10:14, 14:13, 19:12, 19:14, 36:14, 91:14
**allowed** [1] - 44:14
**allowing** [2] - 50:6, 59:24
**almost** [3] - 15:16, 89:18, 89:19
**alone** [1] - 12:14
**alter** [2] - 6:3, 28:2
**altering** [2] - 10:22, 10:24
**Amendment** [5] - 9:8, 16:4, 16:12, 20:6, 88:16
**amount** [1] - 77:13
**analogy** [2] - 12:17, 15:17
**analysis** [4] - 33:15, 44:23, 90:19
**Anderson** [1] - 35:23
**Ann** [1] - 93:11
**answer** [2] - 83:7, 84:11
**apologize** [2] - 47:13, 58:5
**appear** [1] - 29:5

**applicable** [3] - 45:5, 45:7, 49:20
**application** [3] - 10:3, 23:5, 26:22
**applications** [1] - 20:22
**applied** [2] - 44:23, 45:5
**applies** [1] - 9:10
**apply** [4] - 9:9, 44:24, 50:9, 91:20
**appointed** [1] - 81:12
**appreciate** [1] - 16:20
**appropriate** [3] - 11:16, 15:19, 25:20
**approved** [1] - 84:5
**area** [2] - 53:20, 71:25
**argue** [1] - 18:1
**argued** [2] - 35:20, 37:6
**arguing** [1] - 43:5
**argument** [36] - 8:3, 12:18, 15:25, 18:20, 19:16, 19:25, 20:3, 20:7, 20:11, 24:13, 26:13, 30:1, 30:2, 33:9, 33:10, 35:3, 36:2, 36:5, 37:9, 40:12, 44:19, 46:3, 46:5, 49:13, 49:17, 52:8, 54:2, 59:7, 61:16, 76:14, 89:25, 91:9, 91:12, 92:4, 92:7
**arguments** [3] - 33:11, 34:18, 92:9
**arrangements** [2] - 53:19, 53:24
**arrives** [2] - 64:7, 66:1
**Asherton** [1] - 45:9
**ASHERTON** [1] - 45:9
**aside** [6] - 57:21, 57:24, 62:10, 63:13, 64:12, 68:22
**Assembly** [1] - 10:17
**assembly** [2] - 26:11, 44:10
**assert** [1] - 43:14
**asserted** [1] - 44:1
**asserting** [1] - 6:2
**Association** [1] - 45:12
**assume** [3] - 40:19, 47:9, 50:10
**assuming** [5] - 21:9, 70:22, 73:25, 74:17, 74:24
**Atlantic** [1] - 45:12
**attempt** [8] - 6:3, 6:13, 8:7, 20:9, 41:10, 78:25, 79:9, 80:9
**attempted** [1] - 60:18
**attention** [1] - 54:21
**authority** [9] - 36:7, 45:16, 45:17, 45:25, 46:1, 46:9, 49:25, 50:3, 75:8
**authorize** [1] - 45:22
**authorizes** [1] - 50:8
**automatically** [2] - 18:11, 81:3
**available** [2] - 12:10, 53:7

**avoid** [2] - 19:14, 42:7
**aware** [6] - 33:19, 35:2, 56:20, 57:15, 86:17
**bad** [1] - 24:12
**ballot** [119] - 10:23, 11:7, 11:15, 11:20, 12:2, 14:1, 14:4, 14:6, 14:7, 14:15, 14:20, 14:24, 14:25, 15:23, 15:24, 17:7, 17:8, 17:10, 18:16, 19:5, 20:22, 21:10, 21:11, 22:22, 23:6, 23:11, 23:12, 23:21, 23:23, 24:15, 24:16, 25:5, 25:11, 26:8, 26:21, 27:20, 31:12, 31:13, 34:16, 36:20, 37:22, 37:24, 38:6, 38:7, 38:14, 38:21, 38:22, 39:7, 39:16, 39:18, 40:8, 40:18, 40:23, 41:6, 41:7, 42:21, 43:2, 43:3, 43:6, 43:16, 43:20, 44:4, 52:14, 57:8, 57:9, 58:16, 58:23, 59:8, 59:10, 59:12, 59:14, 59:19, 59:20, 59:21, 59:22, 60:19, 60:20, 62:7, 65:22, 65:25, 68:21, 68:24, 70:14, 72:14, 73:21, 74:4, 74:5, 74:10, 74:19, 75:2, 78:11, 78:15, 79:6, 79:18, 79:19, 80:20, 81:4, 81:6, 81:21, 82:2, 82:4, 85:15, 85:22, 86:1, 86:8, 86:9, 86:10, 86:13
**balloting** [1] - 28:4
**ballots** [118] - 6:3, 6:5, 6:11, 9:14, 10:20, 11:11, 12:13, 13:9, 15:9, 17:7, 18:11, 20:22, 21:5, 26:24, 27:16, 27:17, 27:23, 27:25, 28:2, 28:5, 28:8, 28:10, 30:23, 32:5, 34:8, 34:12, 34:13, 34:15, 34:24, 40:16, 41:2, 42:2, 42:11, 43:7, 44:3, 46:13, 47:11, 47:16, 51:11, 51:16, 54:20, 56:22, 57:2, 57:6, 57:21, 57:24, 58:9, 59:1, 59:11, 59:25, 61:16, 61:18, 62:1, 62:3, 62:9, 62:24, 62:25, 63:2, 63:5, 63:12, 63:16, 63:18, 64:6, 64:12, 64:17, 65:5, 65:8, 65:13, 65:23, 66:5, 66:9, 66:24, 68:16, 68:18, 68:22, 69:3, 69:11, 69:13, 69:14, 69:17, 70:18, 71:1, 71:10, 71:17, 71:21, 74:8, 74:10, 74:15, 75:16, 77:4, 77:16, 77:24, 77:25, 78:7, 80:3, 80:4, 80:10, 80:14, 80:16, 80:17, 81:23, 84:19, 84:21, 85:20, 86:3, 86:5, 86:15,

86:18, 86:24, 86:25, 88:13, 88:23
**barcode** [6] - 21:6, 78:16, 78:18, 78:21, 79:7
**Barnette** [3] - 4:5, 15:5, 31:2
**based** [1] - 29:5
**basic** [1] - 33:12
**basis** [3] - 20:15, 57:17, 69:16
**batch** [2] - 62:3, 63:17
**Beaver** [1] - 34:21
**becoming** [1] - 51:10
**began** [3] - 67:14, 69:19, 79:25
**begin** [2] - 17:15, 67:12
**beginning** [5] - 17:5, 36:23, 67:10, 67:11, 68:19
**begins** [2] - 51:14, 72:16
**behalf** [5] - 4:10, 4:13, 4:18, 5:10, 15:7
**behind** [2] - 65:18, 65:20
**bend** [1] - 56:16
**benefitted** [2] - 31:14
**Berks** [12] - 15:4, 15:7, 15:8, 30:14, 30:21, 89:1, 89:4, 89:9, 89:10, 89:13, 90:1, 90:23
**better** [1] - 59:6
**between** [5] - 12:12, 12:15, 31:25, 32:17, 67:16
**beyond** [5] - 28:3, 28:6, 35:8, 67:23, 83:12
**big** [2] - 31:25, 32:17
**bin** [1] - 74:11
**bit** [6] - 7:3, 30:7, 31:22, 49:1, 64:24, 82:11
**blackjack** [1] - 51:24
**board** [16] - 8:1, 11:5, 11:6, 12:8, 15:8, 20:21, 34:25, 56:9, 65:11, 74:12, 78:1, 79:8, 81:12, 82:17, 83:10, 84:12
**Board** [13] - 6:10, 6:24, 9:14, 11:18, 13:2, 20:1, 34:8, 45:22, 66:24, 67:4, 78:6, 82:19, 84:5
**boards** [4] - 9:19, 49:25, 50:2, 68:20
**Boards** [1] - 91:25
**Boockvar** [8] - 6:17, 6:22, 7:12, 8:15, 8:20, 13:24, 17:21, 21:4
**bootstrap** [1] - 20:9
**bottom** [1] - 22:5
**bounce** [1] - 41:24
**box** [2] - 33:22, 33:23
**boxes** [5] - 33:17, 36:11, 36:13, 64:8, 91:21
**break** [1] - 55:14
**Breece** [1] - 15:4

**BRETH** [218] - 4:10, 4:20, 5:12, 6:1, 6:14, 7:4, 7:7, 7:10, 7:14, 7:21, 8:2, 8:13, 8:19, 8:23, 9:2, 9:7, 9:10, 9:24, 10:1, 10:4, 10:7, 10:10, 10:16, 11:2, 12:3, 12:6, 12:20, 12:25, 13:12, 13:14, 13:17, 13:22, 14:15, 14:19, 14:22, 15:3, 15:12, 15:16, 15:21, 16:2, 16:7, 16:9, 16:16, 16:20, 18:18, 18:22, 18:24, 19:2, 20:23, 21:2, 21:12, 21:14, 22:3, 22:7, 22:10, 22:16, 22:18, 22:21, 22:24, 23:1, 23:7, 23:11, 23:16, 23:20, 23:23, 24:1, 24:4, 24:7, 24:9, 24:11, 24:14, 24:20, 24:25, 25:2, 25:4, 25:9, 25:14, 25:18, 25:23, 26:2, 26:4, 26:14, 26:17, 27:3, 27:5, 27:10, 27:15, 27:24, 28:15, 30:20, 31:8, 33:21, 34:2, 34:10, 35:8, 38:5, 38:10, 38:13, 38:16, 39:2, 39:5, 39:10, 39:12, 40:14, 40:16, 40:20, 40:25, 41:5, 41:9, 41:12, 41:15, 41:17, 41:20, 41:23, 41:25, 43:8, 43:13, 44:15, 44:18, 46:4, 46:6, 46:24, 47:1, 47:4, 47:10, 47:25, 48:19, 48:23, 49:3, 50:14, 50:16, 50:20, 50:22, 51:9, 51:20, 51:22, 52:2, 52:13, 52:15, 52:18, 52:20, 52:24, 54:8, 54:12, 54:15, 54:19, 55:7, 61:6, 62:17, 62:19, 63:22, 64:21, 64:23, 64:25, 65:7, 66:15, 66:16, 68:6, 68:7, 69:3, 69:8, 69:24, 70:2, 70:9, 70:10, 71:20, 72:10, 73:2, 75:6, 75:13, 75:20, 75:23, 76:1, 76:8, 76:16, 76:18, 77:2, 77:3, 77:10, 81:9, 81:18, 81:19, 82:7, 82:12, 82:14, 82:25, 83:3, 83:8, 83:9, 83:13, 83:16, 83:17, 84:10, 84:15, 85:1, 85:7, 85:14, 88:9, 88:12, 88:19, 89:1, 89:7, 89:10, 89:13, 89:16, 89:19, 90:4, 90:10, 90:15, 90:18, 90:22, 90:24, 91:2, 91:5, 91:8, 91:16, 92:17, 92:19
**Breth** [16] - 4:11, 5:25, 18:15, 24:22, 30:17, 30:19, 35:20, 38:1, 38:4, 54:7, 62:16, 69:22, 75:4, 81:16, 88:8, 92:25
**Breth's** [3] - 19:25, 31:24, 32:11

**brief** [9] - 6:16, 46:17, 46:19, 46:21, 51:9, 53:9, 77:1, 87:21, 92:24
**bring** [4] - 16:4, 16:11, 16:22, 30:10
**bringing** [1] - 12:23
**broadly** [1] - 56:12
**brought** [8] - 15:7, 28:21, 29:6, 29:23, 31:6, 33:12, 40:3, 48:6
**Broward** [1] - 9:13
**Bucks** [2] - 30:14, 42:14
**building** [2] - 58:17, 59:1
**bundled** [1] - 64:13
**bureau's** [1] - 6:5
**Bush** [5] - 9:11, 10:5, 32:15, 90:18, 91:20
**Bush/Gore** [1] - 44:22
**but..** [1] - 27:14
**Butler** [1] - 34:21
**butler** [1] - 89:2
**button** [1] - 14:10
**cabinet** [1] - 62:11
**calibrate** [1] - 74:13
**canceled** [6] - 18:12, 42:11, 80:15, 80:18, 80:20, 81:6
**candidate** [8] - 15:5, 16:3, 30:22, 31:11, 31:16, 51:12, 52:12, 53:12
**candidate's** [1] - 31:1
**candidates** [3] - 34:20, 34:22, 51:13
**cannot** [6] - 9:18, 18:8, 22:14, 36:1, 36:3, 68:14
**canvass** [14] - 20:18, 54:14, 59:15, 63:11, 67:10, 67:11, 67:13, 68:19, 68:21, 72:16, 72:23, 81:5, 81:11
**canvassed** [2] - 5:22, 76:23
**canvassing** [6] - 51:13, 51:14, 68:10, 69:19, 71:11, 82:8
**canvassing/canvassing** [1] - 79:25
**capture** [1] - 51:21
**care** [1] - 48:8
**carefully** [1] - 72:23
**case** [27] - 6:16, 7:12, 7:17, 8:5, 8:13, 8:19, 9:11, 9:23, 11:9, 13:24, 16:6, 16:7, 32:12, 34:19, 34:24, 35:5, 35:12, 44:2, 45:4, 45:10, 49:18, 49:22, 59:13, 76:19, 89:18
**cases** [8] - 20:16, 33:2, 33:5, 45:5, 45:9, 45:14, 49:17, 57:6
**casino** [1] - 51:23
**cast** [16] - 6:3, 10:20, 10:23, 14:6, 15:23, 17:7, 18:12,

19:12, 21:25, 22:1, 24:2, 26:21, 39:7, 40:16, 81:21, 81:25
**casting** [1] - 26:8
**casts** [1] - 59:9
**categories** [2] - 5:21, 63:16
**category** [1] - 58:10
**caught** [1] - 15:17
**center** [1] - 64:7
**Center** [1] - 53:21
**certain** [4] - 32:3, 53:17, 64:5, 84:3
**certainly** [7] - 9:24, 10:1, 28:20, 35:2, 50:22, 75:9
**certify** [1] - 93:7
**cetera** [1] - 82:22
**chad** [1] - 9:16
**chads** [1] - 32:20
**challenged** [1] - 42:13
**change** [15] - 10:9, 27:20, 38:24, 39:4, 39:11, 39:12, 39:13, 39:22, 41:15, 67:8, 81:4, 81:7, 85:22, 85:24
**changed** [4] - 63:3, 63:8, 79:22, 80:7
**changes** [3] - 40:4, 59:18, 59:19
**changing** [2] - 17:10, 85:20
**Channel** [1] - 60:4
**chaos** [1] - 27:1
**characterization** [4] - 65:1, 72:4, 72:7, 72:19
**characterize** [2] - 72:5, 76:4
**charter** [3] - 45:6, 45:8
**check** [1] - 66:1
**chief** [2] - 56:8, 56:9
**chose** [2] - 80:22, 89:8
**Circuit** [1] - 35:7
**circumstances** [3] - 9:12, 16:11, 18:11
**cite** [2] - 9:10, 33:14
**cited** [2] - 6:16, 59:13
**City** [3] - 45:3, 45:6, 45:12
**Civil** [1] - 4:5
**claim** [11] - 12:24, 16:4, 16:11, 16:12, 16:13, 16:22, 16:23, 19:20, 20:14, 20:18, 53:10
**claimed** [1] - 20:10
**claiming** [2] - 6:10, 19:20
**clarification** [3] - 5:2, 31:21, 70:3
**clarifications** [1] - 35:18
**clarify** [1] - 59:8
**Clause** [1] - 9:7
**clause** [5] - 16:11, 16:12, 16:22, 16:23, 46:15
**clear** [13] - 8:7, 16:21, 24:17, 24:18, 28:5, 51:12, 54:15,

54:16, 66:14, 69:12, 84:19, 85:17, 91:19
**clearly** [3] - 8:14, 34:3, 50:8
**clerk** [2] - 56:9, 83:5
**client** [1] - 89:19
**close** [1] - 32:16
**closer** [1] - 56:15
**co** [2] - 28:1, 28:12
**co-mingled** [2] - 28:1, 28:12
**code** [24] - 18:6, 18:7, 18:21, 19:8, 19:9, 19:10, 19:11, 19:12, 19:17, 36:2, 36:6, 36:12, 36:14, 36:17, 36:18, 36:21, 37:4, 53:16, 76:14, 76:18, 76:20, 76:23
**Code** [51] - 7:2, 7:22, 8:3, 8:6, 8:17, 8:23, 9:4, 11:4, 13:4, 14:23, 18:19, 20:13, 21:2, 23:24, 24:17, 25:10, 25:15, 25:18, 29:7, 30:3, 32:6, 33:10, 33:13, 36:24, 38:6, 39:6, 43:17, 43:21, 45:21, 45:22, 46:9, 49:24, 51:12, 51:15, 53:12, 69:18, 75:8, 75:16, 75:19, 76:1, 76:5, 88:15, 89:11, 89:14, 89:21, 90:5, 90:6, 90:12, 91:9, 91:13
**codes** [1] - 26:20
**comfortable** [3] - 7:5, 77:6, 77:8
**coming** [2] - 7:5, 10:23
**comments** [1] - 6:22
**Committee** [3] - 4:18, 4:22, 28:16
**Common** [5] - 12:24, 13:1, 13:2, 42:14, 42:15
**common** [2] - 92:2, 92:5
**commonly** [1] - 11:10
**Commonwealth** [9] - 7:2, 12:19, 31:3, 44:14, 45:7, 45:20, 49:17, 66:4, 82:20
**Commonwealth's** [1] - 21:7
**communicate** [2] - 59:23, 61:20
**communicated** [2] - 62:2, 63:19
**communication** [3] - 21:8, 58:20, 58:24
**communications** [2] - 60:2, 91:24
**comparison** [1] - 51:11
**complain** [1] - 19:24
**complaint** [1] - 17:18
**Complaint** [6] - 5:18, 20:20, 37:10, 53:4, 81:16, 82:10
**complete** [1] - 64:10
**completeness** [1] - 57:4
**compliance** [2] - 13:4, 43:17
**complicated** [1] - 36:9

**complied** [2] - 11:3, 20:25
**comply** [3] - 25:15, 26:10, 26:25
**conceding** [1] - 50:6
**concerns** [2] - 13:14, 40:4
**concluded** [1] - 93:3
**conclusion** [1] - 72:7
**concrete** [5] - 30:11, 30:17, 30:20, 30:25, 31:15
**concur** [1] - 50:11
**conduct** [2] - 44:16, 67:5
**conducting** [1] - 65:9
**conference** [1] - 5:18
**confident** [2] - 19:5, 62:6
**confirm** [1] - 70:24
**congressional** [5] - 15:5, 16:3, 31:1, 34:20, 34:22
**conscious** [2] - 16:17, 16:18
**consent** [2] - 34:23, 35:6
**consider** [1] - 29:25
**consistency** [1] - 61:9
**consistent** [5] - 36:18, 36:21, 36:22, 90:12
**consistently** [1] - 26:6
**Constitution** [3] - 9:3, 9:5, 20:3
**constitutional** [3] - 20:8, 20:10, 31:17
**contact** [17] - 15:8, 32:5, 40:11, 40:14, 40:17, 78:5, 78:7, 78:8, 78:9, 78:13, 78:25, 79:1, 79:9, 79:13, 79:15, 80:9, 81:2
**contacted** [2] - 6:12, 27:19
**contacting** [2] - 20:19, 58:15
**contain** [2] - 11:12, 36:13
**containers** [2] - 76:2, 76:12
**contains** [1] - 49:24
**continue** [5] - 28:1, 30:9, 62:22, 67:1, 69:13
**continues** [1] - 30:13
**contrary** [1] - 32:9
**controversial** [1] - 36:12
**Convention** [1] - 53:21
**conversation** [1] - 77:22
**conversations** [2] - 47:13, 47:15
**conversely** [1] - 27:11
**cordoned** [1] - 53:20
**cordoned-off** [1] - 53:20
**correct** [97] - 6:13, 6:14, 10:4, 10:9, 10:10, 10:11, 10:14, 10:15, 10:21, 10:22, 12:3, 12:8, 14:17, 15:15, 15:16, 17:9, 18:22, 20:23, 21:17, 21:22, 22:18, 24:10, 25:21, 26:13, 26:15, 29:22, 37:3, 37:22, 38:4, 38:19, 39:10, 39:15, 41:9, 41:12, 41:25, 43:9, 44:3, 46:12,

51:20, 52:12, 52:13, 52:18, 53:14, 55:2, 57:25, 58:17, 59:2, 60:21, 63:4, 63:8, 64:17, 65:12, 65:17, 66:7, 66:9, 66:10, 66:21, 66:22, 66:25, 67:3, 67:10, 67:15, 68:23, 70:12, 71:8, 71:12, 71:13, 71:14, 71:15, 72:18, 72:24, 72:25, 73:17, 73:18, 74:16, 74:18, 76:16, 78:4, 78:14, 78:24, 79:10, 79:20, 79:21, 79:23, 79:24, 80:1, 80:7, 80:11, 81:22, 82:16, 83:10, 84:25, 88:22, 90:15, 93:7
**corrected** [2] - 61:17, 88:22
**correcting** [3] - 29:19, 43:3, 43:6
**correctly** [3] - 43:17, 61:16, 62:20
**counsel** [3] - 5:19, 18:25, 34:5
**Count** [5] - 7:17, 8:15, 8:19, 10:25, 11:9
**count** [9] - 10:15, 24:23, 26:24, 32:19, 39:8, 52:22, 59:22, 61:15, 72:23
**counted** [17] - 24:8, 25:12, 27:9, 27:12, 28:12, 28:22, 34:25, 38:22, 38:23, 39:17, 41:14, 41:19, 57:22, 59:11, 59:12, 59:14, 62:9
**counties** [32] - 12:15, 13:8, 18:5, 18:8, 32:2, 32:7, 32:18, 32:23, 33:16, 34:22, 36:1, 36:7, 42:9, 42:12, 42:13, 42:19, 44:13, 44:15, 45:8, 50:2, 65:24, 80:6, 86:17, 86:20, 90:19, 91:21, 91:22, 91:23, 92:1, 92:5
**Counties** [1] - 9:13
**counting** [3] - 23:21, 23:23, 32:21
**country** [3] - 19:21, 20:17, 26:22
**counts** [3] - 41:10, 41:13, 41:18
**county** [33] - 9:14, 9:18, 9:19, 21:19, 21:20, 32:24, 35:13, 36:14, 40:10, 40:12, 44:20, 44:21, 45:6, 46:14, 49:25, 56:20, 57:3, 58:17, 58:21, 58:24, 59:21, 60:19, 64:9, 65:10, 68:20, 73:10, 73:12, 73:23, 88:14, 92:3, 92:4
**County** [62] - 5:24, 6:24, 11:18, 12:11, 12:17, 13:3, 15:4, 15:7, 15:8, 17:12, 20:1, 28:9, 28:23, 30:14, 30:15,

30:21, 34:6, 34:7, 34:21, 35:12, 37:16, 42:14, 42:15, 44:25, 47:14, 53:25, 54:4, 56:8, 56:14, 57:14, 59:23, 60:9, 60:17, 61:18, 61:20, 63:5, 65:23, 79:8, 86:10, 86:13, 86:14, 88:19, 89:1, 89:2, 89:4, 89:6, 89:9, 89:15, 89:16, 89:20, 90:2, 90:14, 90:23, 91:14, 91:15
**County's** [3] - 19:13, 60:14, 78:1
**county's** [2] - 53:9, 56:25
**county-by-county** [1] - 88:14
**couple** [7] - 35:17, 35:18, 36:12, 37:11, 41:21, 42:2, 63:16
**course** [1] - 72:11
**Court** [38] - 4:1, 6:16, 6:23, 7:1, 8:14, 9:11, 9:18, 10:19, 11:9, 11:13, 12:24, 13:1, 13:2, 13:5, 13:23, 16:17, 16:21, 18:14, 24:17, 25:19, 25:22, 31:25, 32:8, 33:2, 33:5, 33:24, 35:16, 36:11, 36:15, 37:4, 42:14, 42:15, 44:7, 45:3, 46:8, 46:10, 49:23, 93:11
**court** [7] - 5:2, 31:21, 33:22, 33:23, 53:19, 54:4, 92:8
**Court's** [3] - 6:18, 54:21
**courts** [8] - 12:19, 19:21, 20:12, 26:5, 32:25, 33:1, 42:14, 42:16
**coverage** [2] - 60:24, 61:3
**covered** [2] - 6:6, 34:22
**create** [3] - 9:19, 33:10, 33:18
**created** [3] - 12:17, 13:25, 88:19
**creating** [2] - 13:6, 41:1
**criteria** [1] - 9:19
**CROSS** [1] - 62:18
**cross** [1] - 85:16
**Cross** [1] - 3:4
**CROSS-EXAMINATION** [1] - 62:18
**cross-examination** [1] - 85:16
**CRR** [1] - 93:11
**crux** [4] - 46:3, 46:5, 76:13, 91:12
**cure** [24] - 6:4, 6:13, 7:16, 7:23, 8:24, 12:13, 13:11, 13:13, 13:19, 13:21, 14:1, 14:7, 15:10, 14:20, 25:17, 27:21, 28:21, 38:17, 44:10, 44:11, 44:14, 50:7, 59:25, 85:21
**cured** [3] - 61:17, 67:25, 68:2

**curing** [1] - 56:21
**current** [1] - 84:12
**curtain** [1] - 14:10
**cycle** [1] - 66:2
**Dade** [1] - 9:13
**data** [2] - 21:7, 22:3
**date** [3] - 58:5, 63:23, 80:2
**Date** [1] - 93:12
**days** [3] - 28:25, 37:11, 63:24
**deal** [2] - 17:3, 50:25
**dealing** [2] - 7:16, 8:8
**deals** [1] - 20:18
**dealt** [10] - 6:15, 6:19, 8:14, 10:19, 11:10, 13:6, 33:6, 33:8, 34:17, 43:22
**Dean** [1] - 47:13
**decided** [2] - 25:5, 59:5
**deciding** [1] - 48:16
**decision** [7] - 13:5, 25:24, 31:25, 32:8, 34:4, 44:7, 45:3
**declaration** [10] - 27:21, 44:1, 48:14, 48:22, 49:7, 59:3, 59:9, 64:10, 91:2
**declarations** [23] - 11:18, 43:25, 47:6, 47:16, 47:18, 47:24, 48:6, 48:11, 48:20, 48:21, 48:23, 48:25, 49:1, 49:3, 49:4, 51:5, 55:8, 57:5, 57:8, 69:7, 87:12, 87:15
**deem** [1] - 50:4
**deemed** [3] - 59:15, 63:12, 80:16
**defect** [16] - 6:13, 10:14, 10:21, 10:22, 13:21, 27:21, 40:18, 70:13, 70:15, 70:16, 72:15, 72:21, 73:17, 79:20, 80:11, 80:17
**defective** [37] - 10:23, 12:2, 12:12, 15:9, 15:24, 18:16, 22:22, 23:5, 23:6, 23:17, 23:18, 23:21, 23:23, 24:11, 24:12, 24:14, 25:11, 25:17, 27:17, 41:8, 41:20, 62:25, 63:2, 63:5, 63:9, 63:12, 64:6, 66:13, 68:3, 70:18, 71:1, 71:17, 71:24, 77:4, 77:24, 78:3
**defects** [7] - 6:4, 7:23, 36:19, 65:21, 73:4, 73:8, 88:22
**defendant** [1] - 47:13
**DEFENDANT'S** [1] - 55:22
**defendants** [4] - 4:13, 5:22, 27:18, 44:1, 55:20, 93:1
**defense** [1] - 55:9
**deferred** [1] - 33:22
**deficiencies** [1] - 6:12
**deficiency** [6] - 57:11, 58:16, 59:2, 60:22, 68:23, 85:25
**deficient** [4] - 56:21, 57:7, 59:9, 60:20

**define** [1] - 83:18
**defined** [2] - 45:17, 76:6
**defining** [1] - 70:5
**definition** [2] - 69:9, 71:22
**degree** [1] - 34:23
**delegates** [2] - 31:5, 31:7
**delegation** [1] - 49:25
**delivery** [1] - 64:8
**Democratic** [6] - 4:18, 4:22, 5:10, 6:17, 28:16, 88:2
**demonstrate** [1] - 61:3
**denied** [1] - 42:16
**denominator** [2] - 92:2, 92:5
**denying** [1] - 44:11
**Department** [3] - 21:15, 21:20, 22:4
**describe** [2] - 56:25, 64:16
**described** [5] - 56:21, 60:17, 64:16, 68:4, 74:21
**designate** [1] - 31:5
**detected** [1] - 63:6
**determination** [1] - 28:13
**determinations** [1] - 6:25
**determine** [3] - 23:4, 30:24, 74:2, 74:25, 86:17
**determined** [2] - 78:3, 82:1
**determining** [1] - 9:15
**developments** [1] - 42:3
**deviate** [2] - 75:8, 90:23
**deviated** [3] - 90:20, 90:25, 91:8
**deviating** [3] - 89:10, 89:13, 89:20
**deviation** [2] - 88:12, 88:14
**difference** [8] - 15:21, 22:25, 31:25, 32:14, 32:17, 34:3, 37:13
**different** [17] - 13:8, 14:14, 16:5, 16:9, 45:24, 61:21, 63:16, 67:24, 69:23, 70:1, 71:25, 86:25, 89:2, 91:22, 91:23, 91:24
**differently** [6] - 27:8, 27:12, 30:14, 32:21, 44:21, 68:17
**difficult** [2] - 17:16, 52:20
**difficulty** [1] - 52:4
**Dillon** [1] - 49:19
**Dillon's** [7] - 18:24, 45:1, 45:2, 45:14, 49:13, 49:20, 50:8
**dilution** [1] - 19:20
**dimple** [1] - 9:17
**direct** [3] - 47:12, 47:15, 49:23
**Direct** [1] - 3:4
**DIRECT** [1] - 56:5
**directed** [1] - 62:1
**directive** [3] - 11:15, 76:10, 82:13

**directly** [1] - 58:25
**director** [1] - 47:14
**Directors** [1] - 45:23
**disagree** [3] - 22:16, 22:17, 31:24
**disclosed** [1] - 44:2
**discounted** [1] - 24:13
**discretion** [5] - 32:3, 32:4, 32:24, 36:7, 36:10
**discretionary** [3] - 18:3, 32:24, 33:17
**discuss** [1] - 25:23
**discussed** [1] - 10:19
**discussing** [1] - 47:7
**discussion** [2] - 44:24, 79:12
**discussions** [1] - 77:20
**disenfranchise** [4] - 8:12, 29:8, 30:4, 43:15
**disenfranchised** [5] - 19:15, 26:22, 35:22, 43:7, 43:10
**disenfranchisement** [2] - 43:10, 43:12
**disenfranchising** [2] - 8:16, 43:11
**disparate** [1] - 12:15
**disparity** [1] - 12:12
**dispute** [4] - 9:14, 11:24, 16:10, 20:10
**disputes** [1] - 43:18
**disqualified** [1] - 24:2
**distance** [1] - 53:17
**distancing** [3] - 52:10, 52:11, 52:19
**distinction** [1] - 24:5
**distinguished** [1] - 23:7
**distributed** [1] - 71:7
**District** [4] - 19:22, 33:5, 49:19, 54:3
**district** [7] - 21:1, 21:13, 21:14, 21:18, 22:8, 22:11, 78:17
**districts** [2] - 21:16, 45:18
**document** [2] - 21:18, 22:12
**documents** [1] - 75:21
**done** [10] - 11:5, 14:12, 18:5, 37:19, 38:15, 41:22, 42:25, 62:5, 65:2, 91:4
**double** [1] - 17:6
**doubt** [1] - 28:24
**down** [5] - 5:21, 9:12, 13:7, 34:5, 87:6
**drop** [7] - 33:17, 33:22, 33:23, 36:11, 36:13, 64:8, 91:21
**due** [3] - 26:4, 36:22, 54:19
**duly** [1] - 55:22
**during** [3] - 66:1, 73:15, 85:21
**easily** [1] - 52:5

**Eastern** [1] - 54:3
**effort** [4] - 29:6, 29:7, 30:2, 60:18
**efforts** [2] - 78:6, 80:9
**either** [10] - 14:4, 27:20, 33:16, 38:2, 57:2, 58:21, 59:10, 64:8, 77:14, 79:18
**election** [59] - 5:23, 6:5, 8:1, 9:19, 10:6, 10:9, 11:5, 11:6, 12:8, 13:16, 13:20, 14:5, 14:12, 14:17, 15:8, 15:10, 16:11, 16:12, 16:22, 18:10, 24:7, 26:20, 28:21, 28:25, 29:10, 29:24, 30:24, 31:2, 32:18, 32:25, 34:25, 36:8, 37:11, 44:1, 47:14, 56:9, 56:10, 56:13, 56:24, 57:19, 58:1, 65:11, 66:2, 66:3, 68:20, 74:12, 78:1, 79:8, 80:8, 81:12, 83:10, 84:12, 88:11, 88:18, 88:24, 91:7, 92:13
**Election** [73] - 6:11, 6:24, 7:2, 7:22, 8:3, 8:6, 8:17, 8:23, 9:4, 11:4, 11:18, 13:4, 14:23, 18:19, 20:13, 21:2, 23:24, 24:17, 25:10, 25:15, 25:18, 29:7, 30:3, 32:6, 33:10, 33:13, 34:8, 36:24, 37:24, 38:6, 38:25, 39:6, 42:25, 43:17, 43:21, 46:9, 49:24, 51:12, 51:15, 53:11, 58:6, 58:7, 61:4, 67:13, 68:8, 68:17, 69:14, 69:18, 69:19, 71:11, 72:17, 75:8, 75:16, 75:18, 76:1, 76:5, 79:22, 80:12, 80:13, 81:22, 82:7, 84:20, 86:5, 88:15, 89:11, 89:14, 89:21, 90:5, 90:6, 90:12, 91:8, 91:13
**elections** [10] - 17:13, 26:19, 49:25, 50:2, 50:5, 53:19, 54:4, 57:1, 68:20, 83:5
**Elections** [10] - 6:10, 9:15, 13:3, 20:1, 66:24, 67:4, 78:6, 82:19, 84:5, 91:25
**elector** [3] - 15:7, 16:3, 29:1
**electors** [5] - 19:12, 30:21, 31:7, 31:8, 46:12
**electors'** [1] - 51:21
**eligible** [2] - 22:11, 29:1
**elsewhere** [1] - 54:18
**email** [6] - 21:8, 21:9, 71:2, 80:18, 80:19, 81:7
**employees** [1] - 65:11
**empty** [1] - 39:14
**enable** [2] - 10:18, 10:20
**enabled** [1] - 9:1
**end** [2] - 46:17, 82:1
**ended** [1] - 68:8

**endless** [1] - 33:12
**enforce** [2] - 29:7, 30:3
**enfranchise** [2] - 8:11, 37:2
**enfranchising** [1] - 37:5
**engaged** [2] - 12:16, 44:16
**ensure** [1] - 28:22
**enter** [1] - 34:23
**entered** [1] - 4:8
**entire** [2] - 5:23, 31:2
**entities** [1] - 45:15
**entitled** [7] - 51:14, 52:12, 52:16, 53:12, 53:14, 53:15, 93:8
**entity** [2] - 45:24, 82:20
**envelope** [29] - 11:12, 11:20, 11:7, 21:5, 24:16, 27:20, 36:20, 44:4, 44:5, 57:12, 59:4, 59:9, 64:11, 74:1, 74:2, 74:3, 74:5, 74:6, 74:7, 74:19, 75:3, 78:15, 78:20, 78:23, 79:19, 79:20, 86:1, 86:2
**envelopes** [5] - 36:20, 43:4, 43:6, 86:11, 86:14
**equal** [20] - 15:10, 15:12, 16:4, 16:13, 16:23, 33:6, 33:8, 33:10, 33:11, 33:18, 35:3, 35:15, 44:19, 46:15, 88:16, 89:25, 90:2, 91:22, 92:1, 92:10
**Equal** [1] - 9:7
**equitable** [1] - 30:1
**error** [3] - 17:7, 17:9, 19:5
**errors** [1] - 38:22
**especially** [1] - 37:18
**established** [1] - 88:15
**estimate** [2] - 67:22, 68:12
**et** [2] - 6:17, 82:22
**evaluate** [2] - 9:16, 52:7
**evaluating** [2] - 9:20, 88:20
**evaluation** [1] - 76:12
**evidence** [9] - 30:25, 31:13, 53:24, 60:24, 61:2, 90:9, 90:11, 90:21, 90:24
**exact** [5] - 58:5, 68:11, 71:3, 71:14, 77:19
**exactly** [15] - 6:9, 7:24, 8:8, 18:4, 25:25, 29:18, 39:24, 40:1, 58:13, 63:25, 64:4, 67:21, 89:5, 91:1
**examination** [1] - 85:16
**EXAMINATION** [3] - 56:5, 62:18, 85:13
**example** [5] - 24:15, 36:11, 42:23, 59:13, 59:17
**examples** [1] - 36:16
**Excel** [1] - 71:6
**exercising** [1] - 29:20
**exhibit** [1] - 71:2
**exhibits** [3] - 53:4, 53:9
**existed** [1] - 26:13

**explain** [3] - 72:12, 77:12
**explained** [3] - 85:2, 85:4, 85:5
**explicit** [1] - 49:24
**extent** [2] - 78:8, 80:4
**exterior** [3] - 57:12, 78:14, 78:15
**fact** [11] - 8:16, 18:9, 33:14, 33:19, 37:11, 59:23, 59:24, 60:21, 80:15, 80:20, 86:2
**factual** [1] - 35:18
**failed** [2] - 26:9, 26:18
**fails** [1] - 26:7
**fair** [3] - 27:6, 65:1, 72:2
**faith** [4] - 29:6, 29:17, 30:2, 30:4
**familiar** [7] - 5:19, 13:1, 17:25, 34:18, 34:19, 35:11, 52:1
**far** [3] - 32:15, 53:23, 82:11
**fast** [1] - 42:3
**fatal** [1] - 69:7
**favor** [1] - 37:5
**FDIC** [1] - 45:9
**federal** [6] - 20:3, 20:8, 20:13, 33:1, 34:3, 54:6
**fell** [1] - 58:9
**felt** [1] - 8:6
**few** [4] - 28:19, 28:25, 35:10, 52:15
**fictitious** [1] - 79:11
**file** [6] - 29:1, 40:23, 43:1, 43:7, 49:7, 80:18
**filed** [12] - 5:9, 10:2, 11:17, 20:16, 20:17, 40:2, 42:24, 43:24, 47:5, 47:16, 49:4, 50:25
**filing** [2] - 87:20, 91:4
**fill** [1] - 57:11
**finally** [1] - 45:11
**fine** [11] - 7:6, 40:20, 48:8, 48:20, 48:24, 56:4, 82:12, 87:23, 87:25, 91:22
**finishes** [1] - 18:25
**firm** [1] - 49:16
**first** [9] - 35:11, 37:8, 39:8, 59:12, 62:2, 62:3, 66:4, 78:9, 85:15
**five** [2] - 6:19, 55:13
**five-minute** [1] - 55:13
**flaw** [1] - 69:7
**floating** [1] - 19:23
**Florida** [3] - 9:12, 10:11, 13:6
**folks** [3] - 6:13, 52:7, 81:12
**follow** [3] - 35:24, 37:6, 92:2
**followed** [3] - 17:13, 17:19, 29:2
**following** [4] - 15:14, 23:1, 25:2, 25:4

**follows** [1] - 17:12
**foregoing** [1] - 93:7
**forever** [1] - 33:2
**forfeited** [1] - 26:17
**forgotten** [1] - 65:19
**forwarded** [1] - 77:15
**framing** [1] - 10:17
**franchise** [1] - 29:20
**Frank** [1] - 47:13
**frankly** [1] - 65:25
**free** [1] - 19:23
**Friday** [4] - 67:2, 87:25, 88:6, 93:1
**front** [2] - 34:6, 34:17
**fulfill** [1] - 26:9
**fully** [1] - 75:16
**function** [1] - 74:14
**furtherance** [1] - 19:14
**game** [3] - 43:11, 43:12, 43:13
**general** [5] - 10:13, 26:11, 44:9, 57:4, 66:3
**General** [1] - 10:17
**generalized** [1] - 17:18
**generally** [1] - 56:13
**generated** [1] - 21:8
**given** [4] - 17:8, 25:16, 32:23, 90:2
**Gore** [5] - 9:11, 10:5, 32:15, 90:18, 91:20
**governed** [1] - 45:20
**government** [2] - 29:19, 30:5
**governmental** [3] - 45:15, 45:24, 82:20
**grant** [1] - 5:5
**granted** [2] - 4:21, 5:14
**grew** [1] - 68:13
**grown** [1] - 71:10
**GRUGAN** [15] - 4:17, 5:6, 28:18, 29:4, 29:14, 30:18, 31:10, 47:23, 50:13, 62:14, 87:4, 87:10, 87:17, 88:7, 92:23
**Grugan** [4] - 4:17, 47:20, 50:10, 87:3
**guidance** [2] - 75:23, 76:20
**guide** [1] - 49:23
**guidelines** [3] - 8:7, 11:23, 28:5
**hampered** [1] - 54:1
**handicapped** [2] - 49:1, 49:2
**handle** [1] - 67:8
**handled** [4] - 34:24, 58:14, 82:1, 84:21
**handling** [6] - 47:11, 75:15, 80:6, 84:18, 87:1, 88:12
**hanging** [2] - 9:16, 32:20
**HANGLEY** [76] - 4:13, 5:13, 17:1, 17:3, 17:17, 17:23,

17:25, 18:4, 19:3, 20:4, 20:7, 21:18, 21:22, 21:24, 35:10, 36:5, 37:3, 37:15, 37:21, 38:3, 38:18, 39:15, 39:21, 39:24, 40:1, 40:5, 40:8, 40:10, 42:1, 42:5, 42:7, 42:19, 47:21, 48:5, 48:10, 49:10, 49:12, 49:16, 50:24, 51:4, 51:8, 53:1, 53:5, 53:8, 53:14, 54:24, 55:2, 55:5, 55:11, 55:13, 55:16, 55:20, 55:23, 56:6, 56:17, 60:23, 61:2, 61:13, 62:12, 65:3, 69:15, 69:17, 71:18, 72:3, 72:8, 82:23, 83:12, 84:8, 85:11, 87:2, 87:8, 87:14, 87:19, 87:24, 91:19, 92:21
**Hangley** [8] - 4:14, 16:25, 22:12, 35:9, 47:19, 54:23, 85:10, 87:7
**happy** [5] - 25:23, 46:17, 46:21, 47:4, 54:9
**hardest** [1] - 92:3
**harm** [1] - 30:15
**head** [1] - 70:22
**hear** [5] - 11:8, 20:21, 49:15, 70:21, 84:11
**heard** [7] - 30:10, 45:2, 48:17, 59:7, 74:21, 84:10, 92:18
**hearing** [1] - 4:7
**held** [3] - 7:19, 7:21, 36:11
**help** [1] - 52:7
**hints** [1] - 46:10
**hired** [1] - 84:16
**hold** [1] - 74:25
**holding** [4] - 7:11, 7:13, 7:15
**home** [3] - 45:6, 45:8
**honestly** [2] - 54:8, 90:10
**Honor** [136] - 4:3, 4:10, 4:17, 4:20, 4:25, 5:3, 5:6, 5:8, 5:12, 5:13, 6:1, 6:14, 7:4, 7:7, 7:10, 7:15, 8:2, 8:9, 8:13, 10:7, 10:10, 10:11, 10:16, 12:20, 13:17, 14:16, 15:16, 16:16, 17:1, 17:4, 18:18, 18:24, 20:23, 23:16, 23:20, 23:24, 24:15, 25:5, 25:24, 26:5, 26:14, 26:19, 27:15, 28:18, 29:5, 31:20, 31:22, 33:14, 33:21, 34:10, 38:18, 39:2, 39:12, 39:15, 40:14, 41:17, 41:21, 42:8, 43:8, 43:13, 43:23, 44:18, 45:1, 45:11, 45:18, 46:6, 46:16, 46:18, 47:2, 47:5, 47:21, 47:23, 47:25, 48:5, 48:19, 49:10, 49:12, 50:12, 50:13, 50:17, 50:22, 51:9, 51:22, 52:2, 52:15, 52:18,

52:21, 52:24, 53:5, 54:8, 54:15, 54:19, 54:25, 55:7, 55:11, 55:13, 55:23, 60:23, 61:6, 62:12, 62:14, 62:15, 62:17, 64:24, 69:24, 72:8, 75:7, 75:9, 76:8, 77:2, 81:18, 82:12, 82:25, 83:16, 85:8, 87:2, 87:4, 87:8, 87:10, 87:11, 87:16, 87:17, 87:19, 88:1, 88:7, 88:9, 89:21, 89:23, 90:10, 91:3, 91:9, 92:17, 92:19, 92:21, 92:22, 93:2
**Honor's** [2] - 19:3, 92:11
**hook** [3] - 20:6, 20:8, 54:6
**hours** [1] - 87:24
**hover** [1] - 53:16
**Hunter** [1] - 45:3
**hypothetically** [1] - 19:18
**identical** [1] - 12:16
**identified** [6] - 6:4, 6:11, 57:11, 62:6, 62:7, 63:9, 64:6, 66:11, 66:13, 66:19, 68:3, 70:14, 70:18, 73:3, 73:8, 73:17, 74:8, 85:25
**identifier** [1] - 78:15
**identify** [3] - 65:21, 73:24, 78:10
**identifying** [1] - 78:22
**illegal** [1] - 19:17
**illegally** [1] - 5:22
**illusionary** [1] - 20:6
**imagine** [1] - 68:13
**immediately** [1] - 81:6
**impacting** [1] - 31:1
**implementation** [2] - 32:18, 84:6
**implemented** [1] - 66:5
**important** [1] - 13:10
**impression** [1] - 51:1
**improper** [1] - 20:13
**inartful** [2] - 16:15, 16:18
**included** [1] - 24:16
**including** [4] - 5:18, 19:22, 46:20, 63:16
**inconsistent** [5] - 50:4, 50:7, 50:14, 50:16, 75:16
**incorrect** [2] - 34:8, 67:7
**indeed** [2] - 37:1, 53:12
**indicate** [1] - 78:25
**indicated** [6] - 48:19, 66:17, 68:25, 71:9, 71:23, 84:17
**indicates** [1] - 25:19
**indicators** [1] - 78:18
**indirectly** [1] - 37:4
**individual** [4] - 21:9, 21:16, 21:24, 22:13
**individuals** [11] - 14:3, 15:3, 16:10, 27:19, 34:12, 34:16, 43:25, 47:6, 79:9, 79:12,

81:21
**inexact** [2] - 67:22, 68:12
**infinite** [1] - 36:16
**information** [16] - 21:6, 21:15, 57:20, 57:23, 58:12, 78:8, 78:9, 78:12, 78:13, 79:1, 79:2, 79:3, 79:4, 79:7, 79:9
**informed** [2] - 38:10, 42:9
**injury** [7] - 30:11, 30:17, 30:20, 31:11, 31:15, 31:16, 31:18
**Inquirer** [1] - 60:3
**inserting** [1] - 44:4
**inside** [8] - 74:3, 74:19, 75:2, 75:3, 79:18, 79:19, 86:1
**insist** [1] - 30:9
**inspect** [3] - 64:20, 64:22, 72:23
**inspected** [4] - 6:10, 20:22, 64:18, 65:1
**inspecting** [1] - 76:3
**inspection** [1] - 64:17
**inspector** [1] - 14:11
**instance** [1] - 69:10
**instead** [3] - 30:3, 37:21, 43:2
**instructions** [2] - 50:4, 57:10
**integrity** [5] - 88:11, 88:17, 88:24, 91:6, 92:12
**intended** [2] - 37:1, 65:25
**intent** [5] - 8:10, 9:16, 9:20, 9:22, 10:2
**intention** [1] - 19:12
**intentionally** [1] - 17:6
**interest** [1] - 15:1
**interests** [1] - 12:23
**interpreted** [1] - 36:14
**interpreting** [1] - 37:4
**interprets** [1] - 37:5
**interrupt** [1] - 71:4
**interveners** [2] - 88:5, 93:1
**intervention** [3] - 4:16, 5:1, 5:9
**interview** [1] - 60:3
**interviews** [2] - 60:7, 60:9
**intimately** [1] - 86:19
**introductory** [1] - 6:21
**involve** [1] - 56:10
**involved** [2] - 33:4, 35:12
**issue** [49] - 6:1, 6:2, 6:6, 6:15, 6:19, 7:20, 8:14, 10:17, 13:10, 13:20, 14:18, 14:19, 15:2, 15:7, 20:19, 28:21, 29:9, 33:22, 33:23, 34:3, 34:6, 36:12, 37:8, 37:10, 37:17, 37:22, 37:23, 42:16, 42:18, 42:19, 42:24, 44:25, 45:1, 45:19, 46:20, 47:7, 50:3, 50:21, 51:2, 51:11,

52:5, 54:5, 54:11, 54:20, 55:1, 59:3, 91:12, 92:10
**issued** [4] - 14:7, 34:8, 34:12, 44:7
**issues** [12] - 6:19, 6:20, 11:8, 17:3, 29:22, 33:15, 35:3, 35:15, 41:21, 46:16, 46:18, 83:14
**itself** [2] - 64:10, 86:8
**jeopardize** [1] - 88:17
**jeopardized** [1] - 88:10
**jeopardy** [1] - 31:6
**job** [2] - 56:7, 84:22
**Judge** [12] - 33:4, 33:6, 33:19, 33:21, 34:4, 34:6, 34:17, 34:18, 35:1, 35:14, 36:15, 44:24
**judge** [3] - 14:11, 14:17, 59:17
**judgment** [2] - 63:13, 81:5, 81:10, 81:11
**judgments** [2] - 80:14, 81:13
**jumping** [1] - 29:14
**justice** [1] - 36:23
**Justice** [1] - 46:11
**Kathy** [1] - 15:5
**keep** [6] - 19:11, 49:14, 51:9, 55:24, 71:3, 79:19
**kind** [3] - 28:19, 41:24, 58:20
**kinds** [1] - 91:23
**knowledge** [2] - 83:4, 92:7
**known** [2] - 28:24, 37:12
**knows** [1] - 73:23
**laches** [2] - 30:1, 37:9
**lack** [2] - 36:20, 59:3
**laid** [2] - 26:10, 36:17
**language** [1] - 51:15
**large** [3] - 28:9, 53:21, 77:13
**last** [4] - 53:18, 58:5, 61:14, 64:3
**late** [1] - 66:11
**latest** [3] - 64:1, 64:4, 66:18
**law** [21] - 15:13, 15:24, 17:18, 20:2, 20:9, 20:10, 26:23, 32:11, 33:20, 36:1, 42:2, 49:13, 49:16, 49:20, 49:22, 50:4, 50:7, 50:14, 50:16, 54:4, 77:15
**Lawrence** [1] - 4:5
**laws** [2] - 36:8, 82:20
**lawyers** [1] - 12:23
**leading** [2] - 13:7, 57:18
**learn** [2] - 84:16, 84:18
**least** [3] - 28:25, 37:11, 60:11
**leaves** [1] - 32:2
**LEE** [2] - 3:5, 55:22
**Lee** [1] - 55:20
**leeway** [1] - 82:10

**left** [1] - 26:2
**legal** [1] - 89:24
**legislation** [1] - 37:1
**legislative** [2] - 8:7, 8:10
**legislature** [4] - 10:17, 13:25, 14:2, 44:9
**legislatures** [1] - 44:9
**length** [1] - 10:19
**less** [2] - 51:10
**letting** - 44:3
**lieu** [2] - 87:13, 87:15
**light** [1] - 74:25
**likely** [1] - 37:17
**limited** [2] - 45:16, 49:8
**line** [1] - 22:6
**lines** [2] - 57:21, 57:23
**list** [10] - 23:3, 23:4, 23:9, 23:13, 33:2, 57:23, 58:9, 58:14, 63:25, 85:11
**listen** [2] - 42:20, 51:7
**listening** [1] - 72:6
**literally** [2] - 74:5, 77:16
**live** [2] - 87:13, 87:15
**location** [1] - 81:25
**locked** [5] - 62:10, 62:11, 64:14, 76:2, 76:12
**Lodge** [1] - 45:12
**look** [4] - 23:4, 55:9, 72:20, 78:12
**looked** [3] - 64:19, 65:5, 65:8
**looking** [2] - 73:25, 91:7
**lose** [2] - 26:12, 31:17
**losing** [3] - 26:3, 26:9, 36:25
**lost** [7] - 26:12, 27:4, 27:5, 27:7, 29:16, 89:18, 89:19
**lowest** [2] - 92:2, 92:5
**machine** - 14:9, 14:11, 64:13, 74:9, 74:13
**machines** [2] - 75:22, 91:23
**mail** [47] - 11:11, 14:1, 18:16, 22:1, 22:14, 23:12, 23:15, 23:17, 24:14, 25:5, 27:16, 28:8, 28:10, 32:5, 34:12, 38:6, 38:7, 38:13, 38:21, 39:16, 41:7, 43:19, 47:14, 56:22, 57:3, 57:8, 59:8, 62:24, 63:6, 63:10, 64:7, 64:8, 66:5, 66:23, 68:16, 68:18, 69:13, 70:14, 71:1, 77:13, 77:25, 80:3, 80:6, 80:10, 86:24, 86:25
**mail-in** [36] - 11:11, 14:1, 18:16, 22:1, 22:14, 23:12, 24:14, 25:5, 27:16, 28:8, 28:10, 32:5, 34:12, 38:6, 38:7, 38:13, 38:21, 39:16, 41:7, 47:14, 56:22, 59:8, 62:24, 63:6, 63:10, 66:5, 66:23, 68:16, 68:18, 69:13, 70:14, 71:1, 77:25, 80:3, 80:10,

86:24, 86:25
**mailed** [2] - 34:13, 34:14
**main** [1] - 76:14
**mandatory** [4] - 7:25, 11:13, 11:15, 32:1
**manner** [5] - 26:15, 66:13, 74:8, 76:19, 80:17
**manners** [2] - 13:9, 58:14
**manual** [14] - 65:9, 65:19, 66:1, 73:13, 73:24, 74:4, 74:7, 74:11, 74:17, 76:3, 78:2, 80:3, 80:6, 86:16
**manually** [3] - 65:5, 65:8, 67:5
**Marie** [1] - 93:11
**mask** [1] - 55:24
**match** [1] - 92:6
**matter** [4] - 4:5, 11:14, 33:17, 82:24, 93:8
**mean** [11] - 8:4, 12:1, 26:24, 30:25, 39:3, 43:10, 57:23, 71:4, 75:18, 76:6, 89:15
**meaning** [1] - 69:18
**means** [3] - 23:8, 70:13, 85:17
**meant** [5] - 36:24, 36:25, 71:22, 72:12, 85:18
**mechanism** [8] - 10:11, 12:6, 13:25, 14:2, 24:20, 25:9, 44:8, 44:10
**media** [1] - 60:11
**meet** [1] - 26:7
**meetings** [2] - 82:22, 83:10
**mention** [2] - 44:22, 45:2
**merely** [1] - 16:15
**merits** [1] - 35:14
**messed** [1] - 14:4
**method** [2] - 9:15, 74:25
**Miami** [1] - 9:13
**Miami-Dade** [1] - 9:13
**Michael** [1] - 5:1
**Michele** [1] - 4:13
**microphone** [2] - 7:8, 56:15
**Middle** [1] - 49:19
**might** [2] - 48:15, 74:18
**miles** [2] - 34:9, 34:10
**million** [1] - 28:8
**mind** [7] - 38:25, 39:4, 39:11, 39:12, 39:22, 59:18, 59:19
**mingled** [2] - 28:1, 28:12
**minute** [2] - 55:13, 80:23
**misrepeating** [1] - 71:3
**missing** [1] - 86:2
**misstate** [1] - 48:2
**mistake** [5] - 14:6, 29:17, 29:18, 29:19
**misunderstood** [1] - 82:12
**Mitchell** [1] - 93:11
**mixed** [1] - 65:23

**Monday** [3] - 67:17, 67:25, 71:10
**Montgomery** [45] - 5:24, 6:24, 11:18, 12:11, 12:17, 13:3, 17:12, 19:13, 28:9, 28:23, 30:14, 30:21, 37:16, 47:14, 51:18, 53:24, 54:4, 56:8, 56:14, 57:14, 59:23, 60:9, 60:14, 60:17, 61:18, 61:20, 63:5, 65:23, 78:1, 79:8, 86:10, 86:13, 86:14, 88:19, 89:4, 89:5, 89:8, 89:15, 89:16, 89:20, 90:2, 90:14, 91:14
**morning** [9] - 4:2, 4:3, 5:9, 42:8, 47:1, 47:3, 50:19, 67:18, 80:8
**most** [1] - 49:23
**motion** [8] - 4:15, 4:21, 5:1, 5:5, 5:7, 5:9, 5:11, 5:14
**motions** [1] - 5:15
**move** [2] - 71:25, 81:18
**moving** [1] - 42:3
**MR** [249] - 4:10, 4:17, 4:20, 4:23, 4:25, 5:3, 5:6, 5:8, 5:12, 6:1, 6:14, 7:4, 7:7, 7:10, 7:14, 7:21, 8:2, 8:13, 8:19, 8:23, 9:2, 9:7, 9:10, 9:24, 10:1, 10:4, 10:7, 10:10, 10:16, 11:2, 12:3, 12:6, 12:20, 12:25, 13:12, 13:14, 13:17, 13:22, 14:15, 14:19, 14:22, 15:3, 15:12, 15:16, 15:21, 16:2, 16:7, 16:9, 16:16, 16:20, 18:18, 18:22, 18:24, 19:2, 20:23, 21:2, 21:12, 21:14, 22:3, 22:7, 22:10, 22:16, 22:18, 22:21, 22:24, 23:1, 23:7, 23:11, 23:16, 23:20, 23:23, 24:1, 24:4, 24:7, 24:9, 24:11, 24:14, 24:20, 24:25, 25:2, 25:4, 25:9, 25:14, 25:18, 25:23, 26:2, 26:4, 26:14, 26:17, 27:3, 27:5, 27:10, 27:15, 27:24, 28:15, 28:18, 29:4, 29:14, 30:18, 30:20, 31:8, 31:10, 31:20, 31:22, 33:8, 33:21, 34:2, 34:10, 35:8, 38:5, 38:10, 38:13, 38:16, 39:2, 39:5, 39:10, 39:12, 40:14, 40:16, 40:20, 40:25, 41:5, 41:9, 41:12, 41:15, 41:17, 41:20, 41:23, 41:25, 43:8, 43:13, 44:15, 44:18, 46:4, 46:6, 46:24, 47:1, 47:4, 47:10, 47:22, 47:23, 47:25, 48:19, 48:23, 49:3, 50:12, 50:13, 50:14, 50:16, 50:20, 50:22, 51:9,

51:20, 51:22, 52:2, 52:13, 52:15, 52:18, 52:20, 52:24, 54:8, 54:12, 54:15, 54:19, 55:7, 61:6, 62:14, 62:15, 62:17, 62:19, 63:22, 64:21, 64:23, 64:25, 65:7, 66:15, 66:16, 68:6, 68:7, 69:3, 69:8, 69:24, 70:2, 70:9, 70:10, 71:20, 72:10, 73:2, 75:6, 75:13, 75:20, 75:23, 76:1, 76:8, 76:16, 76:18, 77:2, 77:3, 77:10, 81:9, 81:18, 81:19, 82:7, 82:12, 82:14, 82:25, 83:3, 83:8, 83:9, 83:13, 83:16, 83:17, 84:10, 84:15, 85:1, 85:7, 85:14, 87:4, 87:5, 87:10, 87:11, 87:16, 87:17, 88:1, 88:4, 88:7, 88:9, 88:12, 88:19, 89:1, 89:7, 89:10, 89:13, 89:16, 89:19, 90:4, 90:10, 90:15, 90:18, 90:22, 90:24, 91:2, 91:5, 91:8, 91:16, 92:17, 92:19, 92:22, 92:23
**MS** [76] - 4:13, 5:13, 17:1, 17:3, 17:17, 17:23, 17:25, 18:4, 19:3, 20:4, 20:7, 21:18, 21:22, 21:24, 35:10, 36:5, 37:3, 37:15, 37:21, 38:3, 38:18, 39:15, 39:21, 39:24, 40:1, 40:5, 40:8, 40:10, 42:1, 42:5, 42:7, 42:19, 47:21, 48:5, 48:10, 49:10, 49:12, 49:16, 50:24, 51:4, 51:8, 53:1, 53:5, 53:8, 53:14, 54:24, 55:2, 55:5, 55:11, 55:13, 55:16, 55:20, 55:23, 56:6, 56:17, 60:23, 61:2, 61:13, 62:12, 65:3, 69:15, 69:17, 71:18, 72:3, 72:8, 82:23, 83:12, 84:8, 85:11, 87:2, 87:8, 87:14, 87:19, 87:24, 91:19, 92:21
**must** [3] - 11:14, 28:10, 28:11
**naked** [3] - 11:10, 24:16, 44:3
**name** [3] - 78:16, 78:21, 78:23
**National** [3] - 4:18, 4:22, 28:16
**nature** [1] - 84:22
**necessarily** [1] - 61:8
**necessary** [1] - 50:5
**need** [8] - 28:11, 65:24, 76:2, 77:12, 87:23, 90:11, 90:13
**needing** [1] - 80:5
**never** [7] - 25:16, 26:13, 35:14, 54:24, 77:16, 92:7, 92:8

**new** [1] - 34:15
**next** [1] - 58:19
**night** [1] - 53:18
**nobody** [1] - 15:20
**non** [2] - 13:9, 45:8
**non-home** [1] - 45:8
**non-uniform** [1] - 13:9
**none** [2] - 63:11, 78:17
**Norristown** [1] - 59:1
**nothing** [6] - 32:6, 32:8, 36:6, 53:16, 62:15, 92:12
**notice** [1] - 36:19
**notified** [8] - 18:16, 37:14, 37:15, 38:12, 40:3, 58:22, 81:3, 81:7
**notifies** [2] - 18:11, 25:12
**notify** [1] - 12:7
**notifying** [4] - 21:8, 21:9, 37:19, 37:21
**notion** [1] - 36:22
**November** [6] - 44:2, 58:1, 64:2, 68:16, 70:25, 93:12
**nudging** [2] - 75:9, 75:11
**number** [31] - 27:15, 27:18, 28:10, 46:16, 61:21, 61:23, 62:2, 63:2, 63:15, 63:18, 66:18, 66:19, 67:16, 68:2, 68:12, 68:14, 70:19, 70:24, 71:3, 71:9, 71:14, 77:5, 77:8, 77:12, 77:17, 77:18, 77:19, 77:22, 78:5, 79:11
**numbers** [1] - 67:24

**object** [6] - 51:4, 61:7, 61:11, 72:3, 82:23, 83:12
**objected** [1] - 17:14
**objection** [13] - 47:5, 47:21, 47:22, 47:23, 48:10, 50:24, 61:5, 61:8, 65:3, 69:15, 71:18, 84:8, 84:10
**obligation** [1] - 26:9
**observable** [3] - 64:11, 65:22, 72:14
**observation** [8] - 5:23, 47:8, 50:23, 51:1, 54:11, 54:12, 55:1, 85:3
**observations** [1] - 64:9
**observe** [4] - 51:16, 52:19, 74:5, 75:2
**observed** [3] - 57:6, 69:6, 72:14
**obtained** [2] - 23:12, 23:13
**obvious** [2] - 72:20, 92:9
**obviously** [4] - 31:24, 51:10, 73:16, 74:24
**occasion** [1] - 65:22
**occur** [3] - 28:4, 73:7, 73:9
**October** [1] - 49:19
**offer** [1] - 35:19
**office** [2] - 58:17, 59:1
**officer** [1] - 56:8

**Official** [1] - 93:11
**official** [1] - 14:5
**officially** [1] - 72:16
**officials** [1] - 29:19
**once** [8] - 28:2, 38:13, 73:10, 73:11, 81:5, 82:1, 84:19, 87:1
**one** [43] - 5:21, 6:1, 6:6, 6:20, 7:16, 10:16, 11:8, 15:4, 16:18, 17:10, 20:15, 23:13, 24:5, 25:12, 27:25, 30:6, 30:21, 31:23, 32:21, 33:4, 33:19, 34:21, 39:8, 40:5, 41:21, 49:24, 52:16, 53:20, 54:7, 54:8, 57:13, 63:24, 66:13, 72:6, 80:17, 81:4, 86:2, 89:10, 89:13, 89:20
**ones** [7] - 12:9, 68:1, 71:23, 71:25, 73:3, 73:8, 73:16
**open** [3] - 11:19, 11:20, 14:10
**opened** [1] - 51:17
**opening** [1] - 44:3
**operating** [3] - 45:16, 45:24, 56:8
**operations** [1] - 83:4
**operative** [1] - 22:19
**opinion** [7] - 15:22, 17:21, 34:4, 35:1, 35:2, 44:8, 67:12
**opinions** [1] - 17:25
**opportunity** [23] - 7:16, 7:22, 8:24, 10:21, 11:23, 12:5, 13:21, 17:9, 25:16, 29:21, 29:22, 40:6, 43:1, 43:9, 44:10, 46:19, 48:6, 68:23, 80:11, 87:21, 88:21, 90:2, 90:4
**opposed** [3] - 14:1, 49:5, 89:9
**opposition** [4] - 4:19, 4:20, 5:11, 5:12
**option** [2] - 23:18, 59:6
**options** [2] - 57:10, 58:21
**order** [4] - 4:1, 4:8, 6:19, 35:6
**original** [3] - 14:24, 14:25, 59:14
**otherwise** [3] - 26:21, 27:1, 33:11
**outcome** [1] - 30:24
**outer** [6] - 74:3, 75:2, 78:23, 79:18, 79:20, 86:1
**outlets** [3] - 60:5, 60:11, 60:13
**outline** [1] - 83:18
**outside** [7] - 21:5, 28:3, 36:19, 44:4, 73:25, 78:20, 82:9
**outstanding** [1] - 4:15
**overruled** [2] - 65:4, 71:19

**oversee** [1] - 56:13
**own** [7] - 9:15, 9:19, 26:20, 48:6, 72:7, 88:20

**PA** [1] - 45:13
**packaging** [1] - 17:8
**page** [2] - 8:21, 57:5
**pains** [1] - 44:22
**papers** [4] - 5:17, 20:15, 30:11, 42:7
**pardon** [5] - 4:24, 13:12, 46:4, 50:15, 60:8
**parking** [1] - 52:3
**part** [3] - 13:17, 35:22, 74:6
**participated** [1] - 74:22
**particular** [3] - 10:14, 74:10, 91:12
**particularized** [1] - 30:11
**parties** [15] - 4:9, 16:22, 42:10, 42:20, 57:14, 57:20, 58:10, 58:11, 58:12, 58:13, 63:19, 63:25, 87:18, 92:16
**parts** [2] - 7:14, 7:15
**party** [3] - 15:1, 58:2, 58:21
**Party** [3] - 6:17, 42:13, 88:2
**passes** [1] - 51:10
**past** [5] - 57:1, 57:3, 64:23, 70:17, 70:25
**pathway** [1] - 13:7
**pending** [1] - 33:23
**Pennsylvania** [43] - 5:10, 6:15, 6:17, 6:18, 6:22, 7:1, 7:2, 8:14, 9:4, 10:18, 11:9, 11:13, 13:5, 13:22, 13:23, 15:15, 18:9, 20:12, 24:17, 25:19, 31:3, 31:24, 32:8, 33:6, 33:24, 36:10, 36:15, 37:3, 45:7, 45:11, 45:21, 46:7, 46:10, 49:18, 49:24, 50:1, 53:12, 54:3, 66:4, 82:21, 86:18, 86:20
**people** [15] - 11:19, 17:6, 19:10, 19:14, 22:20, 22:22, 28:2, 37:20, 40:11, 40:14, 44:3, 44:14, 44:22, 52:14, 90:1
**people's** [1] - 19:23
**percentage** [2] - 79:15, 79:16
**perhaps** [1] - 71:2
**period** [5] - 28:3, 31:5, 46:18, 52:24
**permission** [1] - 60:24
**permit** [2] - 15:8, 28:2
**permitted** [10] - 6:2, 11:19, 27:19, 53:15, 53:16, 68:21, 79:17, 80:13, 85:21, 85:24
**person** [11] - 11:23, 14:2, 14:3, 22:14, 23:10, 23:19, 25:7, 43:19, 59:5, 80:21
**personally** [5] - 12:22, 18:17,

26:5, 34:5, 60:7
**persons** [2] - 10:14, 23:8
**Philadelphia** [10] - 12:24, 13:1, 13:2, 42:15, 45:6, 53:18, 53:19, 60:3
**pick** [4] - 27:15, 77:21, 92:3, 92:4
**Pittsburgh** [2] - 45:4, 45:12
**place** [4] - 21:25, 22:13, 53:6, 56:23
**plaintiff** [6] - 30:12, 30:15, 35:17, 37:6, 37:18, 38:3
**plaintiffs** [21] - 4:10, 4:11, 16:24, 17:13, 17:17, 19:16, 19:18, 28:24, 30:9, 34:19, 37:9, 37:15, 42:24, 42:25, 43:5, 43:14, 50:6, 53:23, 61:15, 75:15, 87:20
**plaintiffs'** [5] - 20:11, 31:12, 48:11, 49:16, 55:8
**playing** [1] - 43:10
**pleading** [2] - 16:15, 16:17
**Pleas** [5] - 12:24, 13:1, 13:2, 42:14, 42:15
**podium** [1] - 7:6
**point** [15] - 28:18, 29:8, 29:12, 30:6, 32:13, 43:8, 59:5, 66:18, 67:10, 67:11, 74:6, 75:4, 80:16, 81:22, 91:13
**points** [1] - 35:17
**police** [1] - 19:23
**policies** [6] - 56:21, 83:13, 83:15, 83:18, 84:6
**policy** [2] - 56:23, 82:18
**polite** [1] - 75:9
**political** [2] - 57:14, 78:17
**poll** [2] - 21:25, 38:5
**polling** [3] - 21:24, 22:13, 81:25
**polls** [8] - 18:17, 23:9, 24:24, 37:24, 38:20, 38:25, 39:17, 42:21
**position** [7] - 6:9, 8:25, 20:19, 33:20, 47:19, 53:9, 56:10
**possible** [1] - 74:4
**possibly** [1] - 47:1
**post** [2] - 10:6, 13:16
**post-7:00** [1] - 82:7
**post-election** [2] - 10:6, 13:16
**potential** [7] - 6:4, 65:21, 68:23, 70:15, 70:16, 72:15, 73:17
**potentially** [16] - 13:8, 24:2, 24:3, 31:6, 57:7, 57:22, 58:16, 60:20, 67:1, 69:7, 70:19, 71:9, 71:24, 73:4, 73:8, 78:3

**practice** [6] - 18:13, 19:17, 20:13, 56:25, 57:15, 57:18
**practices** [1] - 19:13
**Pratt** [5] - 5:7, 31:19, 47:19, 50:10, 87:3
**PRATT** [16] - 4:23, 4:25, 5:3, 5:8, 31:20, 31:22, 33:8, 47:22, 50:12, 62:15, 87:5, 87:11, 87:16, 88:1, 88:4, 92:22
**pre** [12] - 5:22, 20:18, 51:14, 54:14, 59:15, 67:13, 68:19, 69:19, 79:25, 81:5, 81:11, 82:8
**pre-7:00** [1] - 84:20
**pre-canvass** [7] - 20:18, 54:14, 59:15, 67:13, 68:19, 81:5, 81:11
**pre-canvassed** [1] - 5:22
**pre-canvassing** [3] - 51:14, 69:19, 82:8
**pre-canvassing/**
**canvassing** [1] - 79:25
**precedent** [1] - 35:16
**prefer** [1] - 55:23
**preference** [2] - 31:10, 31:16
**preferred** [1] - 31:16
**prefers** [1] - 48:14
**prejudice** [1] - 54:17
**prepare** [1] - 23:3
**prepared** [5] - 4:9, 4:12, 4:14, 11:1, 51:3
**prepares** [2] - 21:19, 21:20
**preserving** [2] - 52:6, 53:6
**press** [6] - 59:24, 60:5, 60:24, 61:3, 61:20
**presumption** [1] - 90:25
**prevail** [1] - 90:16
**previous** [1] - 17:13
**previously** [1] - 6:3
**primary** [1] - 66:3
**principle** [1] - 49:22
**privacy** [6] - 11:12, 11:20, 24:16, 44:5, 64:11, 74:2
**problem** [5] - 38:12, 40:18, 40:21, 42:21, 69:21
**procedural** [1] - 72:13
**procedure** [5] - 17:12, 67:5, 83:19, 84:16, 84:18
**procedures** [2] - 86:25, 91:21
**proceed** [3] - 4:9, 4:12, 4:14
**proceeded** [1] - 35:5
**proceeding** [1] - 54:13
**Proceedings** [1] - 93:3
**proceedings** [1] - 93:8
**process** [35] - 5:24, 12:16, 20:24, 21:2, 21:3, 24:4, 24:6, 26:10, 27:25, 28:23, 29:2, 29:22, 36:9, 36:23, 37:10,

37:12, 39:5, 42:3, 47:8, 50:23, 51:1, 51:14, 68:3, 68:8, 72:1, 74:22, 75:7, 75:14, 79:22, 80:7, 81:20, 85:21, 86:16, 92:12
**processed** [8] - 11:19, 28:11, 64:12, 65:14, 66:18, 67:17, 67:20, 72:15
**processes** [3] - 60:14, 91:21, 91:24
**processing** [5] - 6:5, 28:8, 64:7, 67:9, 71:10
**produce** [2] - 46:21, 83:25
**proffered** [1] - 83:4
**prohibited** [3] - 32:7, 46:1
**prohibition** [3] - 18:7, 19:7, 19:9
**prohibits** [1] - 19:17
**pronouncing** [1] - 62:20
**properly** [10] - 10:23, 11:1, 11:2, 11:3, 17:7, 18:12, 22:10, 24:2, 28:22, 41:2
**proposition** [1] - 45:15
**Protection** [1] - 9:7
**protection** [16] - 16:4, 16:13, 16:23, 33:6, 33:8, 33:10, 33:11, 33:18, 35:3, 35:15, 44:19, 46:15, 89:25, 91:22, 92:1, 92:10
**protocol** [1] - 52:10
**provide** [10] - 7:22, 8:6, 14:2, 25:18, 36:13, 45:25, 46:12, 80:10, 85:25, 90:5
**provided** [7] - 12:13, 14:15, 43:9, 47:12, 57:10, 78:13, 79:5
**provides** [7] - 8:17, 23:24, 36:3, 38:7, 43:21, 46:9, 79:7
**providing** [2] - 27:6, 90:4
**provision** [9] - 7:22, 8:24, 9:6, 11:22, 18:18, 38:7, 38:16, 50:8, 75:19
**provisional** [30] - 14:7, 14:15, 14:19, 14:24, 28:5, 38:20, 38:22, 39:1, 39:2, 39:3, 39:6, 39:18, 40:8, 40:16, 40:23, 41:2, 41:6, 42:1, 42:22, 43:2, 43:7, 58:18, 59:10, 59:14, 59:20, 59:22, 81:21, 81:23
**provisionally** [7] - 19:4, 19:6, 37:24, 57:12, 59:4, 60:22, 80:21
**provisions** [1] - 43:21
**Public** [1] - 45:21
**public** [2] - 82:22, 83:10
**publicity** [1] - 34:7
**published** [1] - 60:13
**pull** [2] - 7:8, 56:15
**pulled** [1] - 62:4

**pulling** [1] - 44:4
**punchy** [1] - 89:17
**pure** [1] - 54:4
**purely** [1] - 16:23
**purpose** [7] - 19:10, 21:23, 51:16, 65:18, 65:20, 73:19, 76:21
**pursuing** [1] - 54:17
**push** [2] - 14:10, 77:11
**put** [10] - 11:20, 34:5, 39:19, 44:10, 48:6, 48:12, 49:10, 64:13, 79:18, 86:1
**putting** [2] - 34:9, 34:10

**Q**

**qualified** [1] - 19:12
**questions** [6] - 60:5, 76:24, 85:7, 85:12, 87:5, 91:19
**quicker** [1] - 48:15
**quite** [5] - 20:21, 31:22, 52:15, 54:8, 90:10

**R**

**race** [1] - 30:22
**raise** [1] - 7:3
**raised** [2] - 28:19, 54:10
**Ranjan** [12] - 33:4, 33:6, 33:20, 33:21, 34:5, 34:6, 34:17, 34:18, 35:1, 35:14, 36:15, 44:24
**rather** [3] - 42:25, 52:5, 54:3
**RDR** [1] - 93:11
**reach** [1] - 60:18
**reached** [4] - 35:14, 58:13, 58:14, 77:16
**read** [4] - 5:17, 17:21, 20:20, 44:12
**reading** [2] - 31:24, 32:11
**reads** [1] - 79:7
**ready** [1] - 55:4
**realize** [1] - 25:12
**really** [11] - 7:25, 10:22, 13:9, 28:6, 46:6, 48:4, 48:13, 52:8, 54:2, 82:25
**reason** [8] - 18:7, 28:20, 57:13, 68:15, 68:19, 73:22, 89:8, 89:21
**reasons** [3] - 19:15, 42:11, 49:21
**recast** [1] - 15:24
**receive** [1] - 67:1
**received** [23] - 19:6, 21:10, 21:11, 57:2, 59:12, 59:21, 63:25, 65:6, 66:24, 68:16, 68:18, 69:3, 69:14, 73:10, 73:11, 73:21, 73:23, 78:2, 80:5, 80:19, 82:2, 86:7, 87:1
**recent** [1] - 45:9
**recess** [1] - 55:17
**recognized** [1] - 32:25
**record** [2] - 85:17, 93:8
**records** [1] - 86:14
**recourse** [1] - 81:20
**Recross** [1] - 3:4

**REDIRECT** [1] - 85:13
**Redirect** [1] - 3:4
**refer** [1] - 65:19
**reference** [1] - 46:13
**referred** [2] - 11:10, 34:5
**referring** [4] - 7:13, 7:14, 9:6, 67:25
**refers** [1] - 46:11
**regard** [4] - 56:21, 57:7, 57:21, 87:1
**regarding** [2] - 26:19, 66:8
**register** [5] - 14:10, 21:1, 21:13, 21:14, 21:18
**registered** [2] - 22:7, 22:10
**registering** [1] - 26:8
**registration** [1] - 78:12
**regulations** [1] - 50:3
**reinserting** [1] - 44:5
**reissue** [1] - 34:16
**reissued** [1] - 34:15
**reiterate** [1] - 43:22
**reject** [1] - 68:21
**rejected** [12] - 19:21, 31:16, 42:11, 49:18, 69:5, 69:12, 69:18, 70:11, 71:17, 72:16, 80:15, 88:23
**relate** [1] - 66:9
**relied** [4] - 29:2, 29:17, 29:18, 30:4
**relief** [4] - 28:14, 28:15, 42:16, 53:10
**remain** [1] - 53:15
**remainder** [1] - 64:12
**remedy** [3] - 15:18, 15:19, 37:8
**remote** [1] - 47:2
**repeat** [2] - 63:7, 72:9
**repeated** [1] - 72:3
**rephrase** [2] - 66:15, 83:8
**report** [3] - 22:5, 22:6, 22:7
**reported** [1] - 61:10
**reporter** [3] - 5:2, 31:21, 70:23
**Reporter** [1] - 93:11
**represent** [2] - 15:3, 45:18
**representation** [1] - 72:2
**representative** [3] - 52:12, 52:17, 53:13
**representatives** [1] - 51:13
**representing** [2] - 12:23, 15:2
**Republican** [2] - 42:13, 58:2
**request** [4] - 44:11, 55:13, 58:2, 60:23
**requested** [2] - 25:5, 57:20
**require** [2] - 14:23, 14:24
**required** [5] - 18:2, 32:10, 33:16, 90:5
**requirement** [4] - 7:25,

11:15, 18:6, 21:1

**requirements** [2] - 26:6, 26:7

**reseal** [1] - 11:21

**reserve** [2] - 61:7, 61:10

**resident** [1] - 15:4

**residents** [3] - 34:20, 44:20, 44:21

**resolve** [1] - 35:6

**resolved** [1] - 52:5

**respect** [21] - 7:20, 8:15, 26:4, 33:15, 33:21, 38:3, 43:24, 47:11, 48:23, 48:25, 54:20, 62:23, 73:3, 73:16, 73:24, 74:17, 75:24, 82:17, 83:4, 83:13, 90:19

**respond** [5] - 35:18, 48:13, 49:12, 52:25, 87:21

**responded** [1] - 53:2

**respondents** [2] - 8:5, 8:19

**responding** [1] - 54:23

**response** [5] - 5:16, 46:20, 58:8, 92:11, 92:15

**RESPONSE** [2] - 4:3, 93:2

**responsibilities** [1] - 56:10

**rest** [1] - 49:15

**Restaurant** [1] - 45:11

**restraining** [1] - 4:8

**restricting** [1] - 5:23

**resubmit** [1] - 11:21

**result** [3] - 8:8, 31:1, 88:22

**return** [2] - 65:24, 77:14

**returned** [4] - 57:8, 63:17, 77:13, 78:11

**review** [14] - 24:4, 24:6, 25:23, 65:1, 65:9, 65:20, 72:22, 73:13, 73:24, 74:4, 74:7, 74:11, 78:2, 80:3

**reviewed** [5] - 25:14, 51:17, 57:3, 64:9, 64:19

**reviewing** [2] - 67:5, 76:4

**ripped** [1] - 14:4

**risk** [1] - 35:22

**RMR** [1] - 93:11

**role** [1] - 56:18

**room** [6] - 51:15, 52:9, 53:16, 53:21, 62:11, 64:14

**rough** [2] - 66:19, 66:20

**Rule** [1] - 18:24

**rule** [11] - 35:20, 35:21, 37:7, 45:1, 45:2, 45:6, 45:8, 45:15, 50:8, 92:1

**ruled** [2] - 33:24, 53:19

**rules** [9] - 26:19, 26:20, 26:22, 26:25, 35:21, 35:23, 35:24, 37:7, 50:3

**run** [2] - 42:21, 79:6

**running** [1] - 9:2

**rushing** [1] - 75:11

**satisfied** [4] - 47:17, 87:12, 87:14, 87:16

**Saturday** [1] - 64:5

**saw** [4] - 51:19, 53:3, 53:4, 84:24

**scan** [2] - 73:11, 73:22

**scanned** [15] - 21:5, 21:6, 38:14, 73:5, 73:13, 73:14, 75:24, 76:8, 76:9, 76:11, 80:15, 86:3, 86:5, 86:8, 86:9

**scanners** [3] - 86:10, 86:13, 86:21

**scanning** [5] - 73:9, 73:19, 74:13, 76:5, 76:21

**school** [1] - 45:18

**School** [3] - 45:21, 45:22, 45:23

**scope** [3] - 81:15, 82:9, 83:12

**sealed** [1] - 11:19

**seated** [2] - 4:4, 55:18

**second** [4] - 4:25, 32:13, 34:16, 50:21

**secrecy** [4] - 36:20, 59:4, 74:6, 74:7, 75:3, 79:18, 79:19, 86:1

**Secretary** [7] - 6:22, 8:15, 8:20, 13:23, 21:4, 42:9

**secretary** [3] - 8:5, 18:1, 76:10

**Section** [1] - 50:1

**sections** [1] - 25:24

**secured** [1] - 76:2

**see** [7] - 5:21, 6:8, 19:25, 20:15, 40:4, 70:22, 77:1

**seeing** [2] - 61:6, 61:9

**seem** [1] - 76:7

**segregate** [1] - 72:21

**segregated** [1] - 59:2

**sender** [1] - 77:14

**sending** [1] - 67:6

**sense** [2] - 11:3, 19:8

**sent** [1] - 78:1

**separate** [3] - 42:14, 74:11, 74:14

**September** [3] - 6:18, 13:24, 44:7

**sequester** [4] - 13:14, 27:23, 61:15, 62:1

**sequestered** [5] - 13:15, 28:1, 28:11, 62:5, 71:24

**serious** [1] - 37:17

**services** [7] - 57:2, 57:4, 65:10, 77:14, 82:3, 84:21, 85:6

**set** [6] - 57:21, 57:24, 62:10, 63:12, 64:12, 68:22

**shaking** [1] - 77:7

**short** [2] - 46:18, 85:11

**shorten** [1] - 75:9

**show** [5] - 4:7, 23:9, 24:24, 60:24, 86:14

**shucks** [1] - 24:23

**side** [2] - 53:20, 55:8

**sign** [1] - 27:21

**significance** [3] - 29:3, 29:4, 54:20

**significant** [2] - 51:11, 52:24

**similar** [3] - 9:12, 44:16, 89:23

**similarity** [1] - 16:20

**simple** [2] - 33:9, 52:8

**simplest** [1] - 49:23

**simply** [3] - 32:23, 33:20, 68:22

**sit** [2] - 66:12, 68:14

**sitting** [1] - 7:6

**situation** [3] - 13:6, 28:7, 31:4

**social** [3] - 52:10, 52:11, 52:19

**sole** [1] - 79:2

**solely** [3] - 54:13, 66:9, 76:9

**solicitor** [1] - 85:6

**solid** [1] - 15:25

**Soltysiak** [10] - 55:21, 55:24, 56:7, 61:14, 62:20, 72:4, 72:11, 82:15, 82:17, 85:15

**SOLTYSIAK** [2] - 3:5, 55:22

**someone** [1] - 21:25

**something's** [1] - 14:12

**sometimes** [1] - 26:24

**somewhat** [2] - 52:20, 76:13

**sophisticated** [1] - 51:23

**sorry** [26] - 4:25, 5:3, 7:4, 23:16, 29:14, 30:18, 34:11, 38:18, 41:23, 42:5, 63:7, 65:14, 65:18, 67:12, 69:24, 70:20, 71:4, 72:9, 74:20, 77:7, 77:23, 79:19, 80:25, 84:10, 84:14, 89:16

**sort** [2] - 19:20, 74:9

**sorted** [3] - 62:4, 72:15, 80:5

**sorting** [4] - 64:13, 74:9, 75:21

**source** [1] - 79:2

**sources** [1] - 79:2

**space** [1] - 53:21

**specific** [2] - 31:4, 76:19

**specifically** [6] - 36:3, 36:17, 60:4, 60:6, 74:13, 91:14

**specified** [1] - 18:20

**spelled** [1] - 39:5

**spelling** [1] - 34:24

**spells** [1] - 21:3

**spirit** [1] - 19:11

**spoil** [1] - 14:24

**spoiled** [1] - 14:4

**spot** [1] - 14:18

**spreadsheet** [1] - 71:6

**squarely** [1] - 19:21

**staff** [4] - 57:4, 62:1, 64:9, 65:10

**stand** [1] - 45:14

**standard** [1] - 9:20

**standards** [3] - 88:15, 88:20, 90:20

**standing** [16] - 16:1, 16:2, 16:3, 16:11, 16:22, 16:24, 17:1, 17:15, 19:19, 30:8, 30:9, 34:18, 35:3, 35:15, 46:20, 92:9

**standpoint** [1] - 72:13

**stands** [1] - 45:15

**start** [3] - 17:1, 17:2, 73:7

**started** [2] - 5:15, 68:10

**starting** [3] - 49:22, 63:11, 68:21

**starts** [2] - 8:21, 45:3

**state** [12] - 18:13, 20:1, 20:2, 20:9, 20:10, 32:25, 33:22, 33:23, 42:2, 49:21, 54:4, 73:9

**State** [6] - 8:20, 13:23, 21:15, 21:21, 22:4, 42:9

**state's** [1] - 21:7

**state-wide** [1] - 18:13

**statement** [1] - 6:21

**states** [1] - 32:1

**States** [4] - 9:3, 9:5, 33:1, 33:2

**statewide** [5] - 46:11, 46:13, 65:14, 73:5, 73:19

**status** [2] - 81:4, 81:7

**Statute** [1] - 50:1

**statute** [8] - 8:11, 9:1, 15:15, 32:1, 45:17, 45:25, 53:15, 75:25

**statutory** [3] - 45:16, 45:25, 50:7

**step** [1] - 87:6

**still** [4] - 28:7, 28:10, 40:10, 69:13

**stop** [1] - 37:19

**stopped** [1] - 80:12

**strong** [1] - 30:2

**subject** [2] - 59:7, 82:21

**submit** [16] - 23:12, 24:11, 24:14, 24:15, 25:6, 38:20, 39:16, 39:17, 40:8, 40:23, 42:21, 48:13, 60:19, 60:24, 61:2, 92:24

**submits** [3] - 23:11, 59:18, 59:19

**submitted** [13] - 11:2, 11:4, 11:6, 12:2, 12:12, 27:17, 28:3, 32:5, 38:13, 38:21, 39:7, 43:16, 61:9

**subsequent** [1] - 34:4

**subsequently** [1] - 33:24

**sue** [1] - 89:3

**sued** [5] - 37:18, 89:3, 89:4, 89:22, 90:1
**suffered** [2] - 30:12, 30:15
**sufficient** [2] - 31:17, 52:7
**suit** [7] - 28:21, 29:1, 29:6, 29:23, 30:10, 40:3, 42:24
**summarily** [1] - 49:18
**Sunday** [8] - 64:2, 66:12, 66:18, 66:24, 67:16, 70:17, 70:25
**Sunshine** [1] - 82:21
**supplemental** [1] - 87:21
**supplied** [1] - 58:9
**supports** [1] - 33:20
**supposed** [3] - 76:12, 76:18, 76:22
**Supreme** [30] - 6:15, 6:18, 6:22, 7:1, 8:14, 9:11, 9:18, 10:18, 11:9, 11:13, 13:5, 13:23, 16:17, 16:21, 18:14, 24:17, 25:19, 25:22, 31:25, 32:8, 33:2, 33:24, 36:10, 36:15, 37:4, 44:7, 45:3, 46:8, 46:10
**SURE** [10] - 21:7, 65:14, 67:6, 73:5, 76:11, 79:5, 79:6, 80:18, 86:4, 86:5
**surprised** [1] - 92:14
**surrender** [2] - 38:6, 38:7
**surveillance** [1] - 62:11
**switch** [1] - 71:16
**sworn** [1] - 55:22
**system** [16] - 18:10, 21:7, 27:6, 46:12, 65:14, 67:6, 73:5, 73:9, 73:19, 76:11, 79:5, 79:6, 80:18, 86:4, 86:5
**table** [1] - 51:24
**tabulated** [1] - 51:17
**tabulation** [1] - 82:1
**technical** [4] - 36:19, 37:22, 37:23, 42:11
**telephone** [1] - 5:18
**temporary** [1] - 4:7
**Terence** [1] - 4:17
**term** [5] - 69:9, 70:4, 70:5, 70:11, 71:21
**terminology** [5] - 12:14, 64:16, 64:17, 68:2, 82:4
**Test** [1] - 35:23
**testified** [3] - 66:8, 82:17, 83:13
**testify** [4] - 47:6, 47:17, 48:3, 49:6
**testifying** [1] - 62:23
**testimony** [15] - 11:8, 11:17, 48:17, 64:2, 67:4, 69:17, 70:12, 72:2, 72:4, 72:6, 74:18, 77:11, 85:18, 87:13, 87:15
**text** [1] - 21:9

**thankfully** [2] - 34:23, 35:5
**The court** [296] - 4:2, 4:4, 4:11, 4:15, 4:19, 4:21, 4:24, 5:5, 5:7, 5:11, 5:14, 5:17, 6:8, 7:3, 7:5, 7:8, 7:13, 7:19, 7:21, 7:24, 8:10, 8:18, 8:22, 8:25, 9:5, 9:9, 9:10, 9:22, 9:25, 10:2, 10:5, 10:8, 10:12, 11:1, 12:1, 12:4, 12:18, 12:22, 13:11, 13:13, 13:16, 13:19, 14:9, 14:17, 14:21, 15:1, 15:6, 15:14, 15:20, 16:1, 16:6, 16:8, 16:15, 16:18, 16:25, 17:2, 17:16, 17:21, 17:24, 18:2, 18:15, 18:20, 18:23, 19:1, 19:25, 20:5, 20:11, 20:18, 20:25, 21:11, 21:13, 21:17, 21:20, 21:23, 22:2, 22:5, 22:9, 22:12, 22:17, 22:19, 22:22, 22:25, 23:3, 23:8, 23:14, 23:17, 23:21, 23:25, 24:3, 24:6, 24:8, 24:10, 24:12, 24:19, 24:22, 25:1, 25:3, 25:8, 25:11, 25:16, 25:21, 25:25, 26:3, 26:12, 26:16, 27:2, 27:4, 27:8, 27:11, 27:22, 28:14, 28:16, 29:3, 29:12, 30:17, 30:19, 31:7, 31:9, 31:15, 31:19, 33:7, 34:1, 34:9, 35:7, 35:9, 36:2, 37:1, 37:13, 37:19, 38:1, 38:4, 38:9, 38:11, 38:15, 38:24, 39:4, 39:8, 39:11, 39:14, 39:20, 39:22, 39:25, 40:2, 40:7, 40:9, 40:13, 40:15, 40:17, 40:22, 41:3, 41:8, 41:10, 41:13, 41:16, 41:18, 41:22, 41:24, 42:2, 42:4, 42:6, 42:18, 43:12, 44:13, 44:17, 46:3, 46:5, 46:23, 46:25, 47:3, 47:7, 47:19, 47:24, 48:1, 48:8, 48:14, 48:15, 48:22, 49:2, 49:9, 49:11, 49:14, 50:10, 50:15, 50:18, 50:21, 50:23, 51:3, 51:7, 51:19, 51:21, 52:1, 52:11, 52:14, 52:16, 52:19, 52:22, 52:25, 53:2, 53:6, 53:11, 54:6, 54:11, 54:13, 54:17, 54:22, 55:1, 55:3, 55:6, 55:10, 55:12, 55:15, 55:18, 55:25, 56:2, 56:4, 56:15, 61:1, 61:5, 61:12, 62:13, 62:16, 63:20, 64:20, 64:22, 65:4, 66:14, 68:5, 69:2, 69:16, 69:21, 69:25, 70:7, 70:23, 71:19, 72:5, 72:18, 73:1, 75:4, 75:11, 75:18, 75:21, 75:25, 76:6, 76:13, 76:17, 77:1,

77:8, 80:23, 81:1, 81:8, 81:15, 82:6, 82:9, 82:24, 83:2, 83:6, 83:15, 84:2, 84:9, 84:13, 84:24, 85:10, 87:3, 87:6, 87:9, 87:12, 87:18, 87:23, 87:25, 88:3, 88:5, 88:8, 88:10, 88:17, 88:24, 89:3, 89:8, 89:12, 89:15, 89:18, 89:25, 90:8, 90:13, 90:16, 90:18, 90:21, 90:23, 91:1, 91:4, 91:6, 91:11, 91:17, 92:14, 92:18, 92:24
**the witness** [15] - 49:14, 56:1, 56:3, 63:21, 65:5, 69:6, 69:22, 69:25, 72:9, 72:25, 80:25, 81:3, 84:12, 84:14, 84:25
**themselves** [1] - 30:4
**theoretically** [1] - 41:5
**theory** [1] - 91:20
**they've** [6] - 12:9, 28:2, 37:11, 38:13, 48:19, 58:22
**thinks** [1] - 82:24
**Third** [1] - 35:7
**Thomas** [1] - 4:11
**thorough** [1] - 33:15
**thoroughly** [1] - 5:19
**thousand** [1] - 27:16
**threatened** [1] - 92:12
**three** [6] - 7:15, 34:22, 43:24, 47:16, 56:19, 84:16
**throw** [1] - 26:19
**thrown** [1] - 85:15
**thrust** [5] - 46:7, 46:8, 90:7, 91:9, 91:11
**tight** [1] - 30:22
**timing** [5] - 29:5, 29:9, 37:25, 43:24, 54:19
**today** [16] - 8:8, 11:9, 11:17, 20:21, 46:17, 46:24, 47:6, 47:17, 49:5, 49:6, 49:7, 51:2, 56:21, 62:24, 66:12, 83:23
**tomorrow** [2] - 47:3, 92:25
**took** [3] - 11:6, 69:5, 84:22
**topic** [2] - 42:1, 61:14
**tossed** [1] - 39:18
**total** [5] - 61:19, 63:9, 63:15, 63:18, 68:2
**totals** [1] - 62:23
**touch** [1] - 28:18
**touching** [1] - 76:3
**tour** [1] - 47:12
**track** [1] - 19:10
**traditionally** [1] - 18:4
**transcript** [1] - 93:7
**trap** [1] - 36:24
**treat** [3] - 41:6, 76:19
**treated** [8] - 27:8, 27:12, 27:13, 30:13, 44:21, 76:20, 76:21, 81:24

**treating** [7] - 13:8, 13:9, 30:23, 32:21, 47:15, 68:15, 68:17
**treatment** [7] - 12:15, 13:20, 15:11, 88:16, 90:17, 91:18, 91:20
**trick** [1] - 36:25
**trivial** [1] - 19:15
**TRO** [3] - 50:25, 51:6, 53:10
**trouble** [2] - 43:3, 43:6
**true** [2] - 35:23, 65:15
**try** [3] - 7:3, 35:24, 62:22
**trying** [12] - 30:3, 42:7, 43:14, 46:16, 70:2, 75:6, 75:12, 75:13, 77:11, 77:21, 83:3
**Tuesday** [2] - 67:18, 68:9
**turn** [3] - 14:5, 32:15, 46:17
**turning** [1] - 52:6
**twice** [5] - 15:17, 15:18, 15:20, 15:25, 17:11
**two** [15] - 5:21, 5:22, 7:14, 9:14, 15:3, 28:23, 30:20, 34:19, 42:14, 54:9, 60:11, 67:24, 69:22, 70:1, 90:19
**types** [1] - 16:10
**ultimately** [1] - 25:14
**unable** [1] - 77:15
**unbundle** [1] - 31:23
**undeliverable** [2] - 63:17, 77:14
**under** [16] - 9:1, 15:24, 16:4, 16:12, 20:13, 26:13, 45:16, 45:25, 51:1, 53:11, 62:11, 69:18, 82:20, 88:16, 90:5, 91:22
**understood** [1] - 51:8
**underweight** [2] - 74:10, 74:14
**unequal** [4] - 13:19, 90:16, 91:18, 91:19
**unfortunately** [2] - 61:22, 62:2
**uniform** [6] - 9:20, 12:16, 13:9, 27:6, 46:11, 88:15
**unilateral** [1] - 88:12
**United** [4] - 9:3, 9:5, 33:1
**unless** [6] - 8:25, 18:20, 36:2, 39:8, 40:12, 46:8
**unpack** [1] - 35:10
**unsure** [1] - 64:24
**up** [17] - 7:8, 9:15, 11:20, 14:4, 21:3, 23:9, 24:24, 26:20, 44:3, 45:19, 57:19, 67:17, 67:25, 71:11, 74:25, 75:9, 78:12
**update** [1] - 86:14
**US** [8] - 9:11, 9:18, 16:17, 16:21, 25:22, 45:3, 45:4, 45:10

**useful** [1] - 35:16
**USPS** [1] - 64:8
**utilized** [3] - 51:15, 79:3, 80:10
**vaguely** [1] - 52:2
**valid** [1] - 39:6
**validity** [1] - 28:13
**various** [2] - 45:5, 60:5
**vendor** [1] - 34:15
**verbally** [3] - 70:20, 85:2, 85:4
**Verdict** [1] - 35:23
**versus** [3] - 30:14, 69:5, 86:23
**video** [6] - 51:19, 51:24, 52:4, 52:6, 53:3, 53:22
**view** [2] - 17:19, 91:13
**violate** [1] - 35:21
**violated** [1] - 37:7
**violates** [1] - 35:21
**violating** [2] - 20:2, 46:15
**violation** [12] - 6:25, 7:1, 7:11, 13:5, 15:13, 20:8, 20:9, 20:10, 33:9, 33:18, 76:4, 76:7
**violations** [2] - 33:12, 33:13
**voice** [1] - 7:3
**vote** [60] - 10:3, 10:9, 10:14, 14:12, 14:25, 15:18, 18:17, 19:4, 19:6, 19:20, 22:1, 22:11, 22:14, 22:23, 23:5, 23:10, 23:14, 23:17, 23:18, 23:22, 23:25, 24:1, 24:8, 24:23, 25:1, 25:3, 25:7, 25:13, 25:17, 26:3, 26:8, 27:7, 27:9, 27:12, 29:16, 32:21, 37:24, 38:24, 39:1, 39:13, 39:22, 41:11, 41:13, 41:18, 41:19, 43:19, 51:21, 57:12, 58:18, 59:4, 60:22, 80:21, 92:3
**vote's** [1] - 27:4
**voted** [6] - 14:3, 17:6, 22:14, 22:20, 23:4, 23:9
**voter** [39] - 9:16, 9:20, 10:2, 18:15, 19:4, 26:7, 26:25, 27:6, 35:20, 38:21, 57:2, 57:4, 57:8, 57:9, 58:20, 58:22, 59:8, 59:9, 59:18, 63:3, 65:10, 73:21, 77:14, 77:16, 78:8, 78:10, 78:12, 78:21, 78:22, 79:5, 81:3, 81:6, 82:2, 84:21, 85:6, 85:21
**voter's** [3] - 59:8, 65:22, 78:16
**Voters** [1] - 49:18
**voters** [47] - 6:2, 8:12, 8:16, 10:20, 15:9, 17:5, 18:11, 19:7, 19:22, 20:19, 22:7,
29:8, 29:9, 29:10, 29:16, 29:17, 30:4, 32:5, 35:21, 35:24, 36:19, 36:25, 37:2, 37:5, 37:6, 37:21, 40:5, 42:10, 42:20, 42:23, 43:1, 43:15, 58:9, 58:15, 58:25, 59:24, 60:18, 61:17, 68:22, 78:7, 79:1, 80:9, 80:19, 85:19, 88:21, 90:3, 92:3
**votes** [7] - 5:22, 19:13, 19:23, 28:22, 30:13, 32:19, 36:25
**voting** [12] - 14:1, 14:9, 15:17, 15:20, 15:25, 17:10, 19:11, 26:6, 26:10, 54:24, 59:5, 91:23
**wait** [2] - 41:22, 80:23
**waited** [1] - 28:25
**walk** [1] - 28:4
**walk-in** [1] - 28:4
**wants** [1] - 72:5
**waste** [2] - 54:22, 54:25
**watcher** [1] - 53:13
**weaker** [1] - 54:9
**Wecht** [1] - 46:11
**weed** [1] - 72:24
**week** [4] - 37:14, 37:16, 40:3, 58:5
**weekend** [6] - 63:24, 63:25, 64:3, 66:17, 67:16, 77:6
**weeks** [3] - 28:24, 36:12, 37:12
**weight** [2] - 74:10, 75:22
**Western** [1] - 19:22, 33:5
**whichever** [1] - 48:14
**wide** [1] - 18:13
**win** [1] - 31:11
**window** [2] - 80:24, 81:1
**wish** [3] - 43:16, 43:18, 43:20
**withdraw** [2] - 54:9, 54:12
**withdrawing** [1] - 54:11
**Witness** [1] - 3:4
**witness** [9] - 48:7, 48:12, 48:14, 49:5, 49:6, 49:10, 55:9, 55:10, 55:19
**WITNESS** [1] - 55:22
**witness's** [1] - 83:3
**witnesses** [10] - 47:9, 47:10, 47:12, 48:3, 48:8, 48:9, 48:16, 48:18, 87:8, 87:9
**word** [5] - 22:19, 36:13, 64:20, 64:22, 85:15
**words** [2] - 6:12, 26:3
**workers** [1] - 21:25
**works** [1] - 18:10
**write** [1] - 53:3
**written** [1] - 83:18
**years** [8] - 37:12, 56:19, 56:23, 57:18, 57:20, 66:8, 66:9, 84:17
**yesterday** [6] - 5:19, 42:3, 50:25, 61:20, 67:14, 81:2